LORI LOWENTHAL MARCUS*
JEROME M. MARCUS*
THE DEBORAH PROJECT
P.O. Box 212
Merion Station, PA 19066
Telephone: (610) 664-7109
Email: lorilowenthalmarcus@marcuslaw.us

ROBERT PATRICK STICHT (SBN 138586)
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, D.C. 20024
Telephone: (202) 646-5172
Fax: (202) 646-5199
Email: rsticht@judicialwatch.org

*Application for admission pro hac vice forthcoming

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CONCERNED JEWISH PARENTS AND TEACHERS OF LOS ANGELES, JOHN DOE, AND JANE DOES 1-5, <br><br> Plaintiffs, <br><br> v. <br><br> LIBERATED ETHNIC STUDIES MODEL CURRICULUM CONSORTIUM; UNITED TEACHERS OF LOS ANGELES; CECILI MYART-CRUZ, THERESA MONTANO, AND GUADALUPE CARRASCO CARDONA, in their individual and official capacities as public employees; AND DOES 1-10, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     This case is brought to compel public disclosure of, and to enjoin, Defendants' efforts to insert into the Los Angeles public school curriculum, overtly racist as well as antisemitic teaching material which, as its authors intend, discriminates against a segment of California residents on the basis of their religious beliefs and their national origin—namely American and Middle Eastern-Americans Jews who embrace their religion's foundational belief in Zionism.

2.     While California law will, by 2030, require that all students graduating from high school have taken at least one class in ethnic studies, Los Angeles imposed the requirement effective August 25, 2020.  Los Angeles also "integrate[s] Ethnic Studies into the PreK-8 curricula."

https://achieve.lausd.net/site/default.aspx?PageType=3&DomainID=4&ModuleInstanceID=4466&ViewID=6446EE88-D30C-497E-9316-3F8874B3E108&RenderLoc=0&FlexDataID=96041&PageID=1

This decision provided the opening, of which Defendants have taken advantage, to use the materials at issue in this Complaint now in LAUSD.

3.     Defendants have denominated the materials they teach, and which they are disseminating to teachers throughout Los Angeles and beyond, as the Liberated Ethnic Studies Model Curriculum (the "LESMC") to distinguish them from the Ethnic Studies Curriculum ("ESC") which was approved by the State of California. Defendants vehemently disagree with the way in which the state government, based upon strong, widespread criticism, revised the curriculum content which had been submitted to it by a group of educators known as the Ethnic Studies Model Curriculum Advisory Committee. That revised version of the law was ultimately passed by the California Legislature and in October, 2021, signed into law by its Governor.  But Defendants believe the state-approved law—i.e. the law of California—does not tell what they believe to be and therefore insist is the truth about, among other things, Israel, Zionism and the Middle East.  They therefore seek

to carve into the California public school curriculum the information that they believe is the only true, authentic and permissible version of those issues and about the rest of ethnic studies.  This is so even though the material they seek to insert and its underlying false and antisemitic bases are the very components which were rejected by the people of California and its government.

4.     In materials posted on Defendant Consortium's website, when instructing educators about how to teach public school students about Palestine, the LESMC states: "Zionism is a nationalist, colonial ideology that, from the late 19th century on, has called for the creation and expansion of Israel as a Jewish state in historic Palestine by any means necessary."  Although this and much of the other material about Palestine was removed from the LESMC website in the past several months, nearly all of it was screen captured either before it was removed or was retrieved since. This quote can be found at "Preparing to Teach Palestine: A Toolkit" attached hereto as Exh. A at 3.

5.     Because of the public's rejection of their chosen version of history and political opinions, Defendants now act to conform the California public school teachings to their opinions both overtly and covertly, in whatever way Defendants believe the situation requires.

6.     Defendants believe that teaching any view other than their own about Israel or the Middle East, or providing equal attention and respect to all ethnicities and other minorities, rather than focusing solely on the four racialized groups which Defendants believe must be the only groups taught about in ethnic studies, is wrong. Defendants say, regarding California's broadening of the lens through which ethnic studies should be taught to extend to other minority, even overtly marginalized, groups : "Dilution is not the Solution."

7.     As we show below, Defendants reject the ESC because, as they insist it is legally required to do, it does not focus solely on the four ethnic groups recognized by Defendants, but instead seeks to incorporate the history and backgrounds of many

different ethnic and religious groups which comprise the vast tapestry of California's school population, and because it seeks to promote in the public schools an understanding, and therefore mutual respect, for the heritage of all of these many different cultures. Thus, during an April 13, 2021 United Teachers of Los Angeles ("UTLA") public Ethnic Studies Panel ("ULTA ESP"), the proponents of LESMC ridiculed the State Board of Education's Ethnic Studies Guideline example, which explains the purpose of ESC is to "Promote critical thinking and rigorous analysis of history, systems of oppression, and the status quo in an effort to generate discussions on futurity and imagine new possibilities." Defendants reject this idea. Instead, Defendants insist that the only valid principles on which ethnic studies classes must be based are those espoused by the LESMC proponents: "Critique empire, white supremacy, racism, patriarchy, cisheteropatriarchy, capitalism, ableism, anthropocentrism, and other forms of power and oppression at the intersections of society." In other words, Defendants don't see ethnic studies having as its goal a positive future for all. Defendants' goal for ethnic studies is to create a forum for some formerly excluded groups to call out and punish those they view as former "oppressors," and ignore—or worse—anyone else who doesn't fit Defendants' template.

8.     The understanding and therefore mutual respect by and for all of California's minority and ethnic groups which the State Board of Education's revised and then approved version of ethnic studies sought to attain, is oftentimes referred to under the general headings of multiculturalism or diversity. Those concepts, which Defendants say clearly when they are speaking amongst themselves, are wrong and bad.  Defendants believe that anything other than what they insist is the only "authentic" ethnic studies is illegitimate—even the recognition of historic mistreatment of any minorities and ethnicities other than the four categories who are the only people of interest to Defendants.  Defendants have taken and continue to take the actions at issue in this case because they believe that multiculturalism is

wrong and must not be taught in California's public schools. As Defendant Teresa Montaño said at the April 13, 2021 UTLA ESP, "[t]he District wants to use multicultural curriculum, that is not ethnic studies." See, e.g. LESMC Questions and Answers, attached hereto as Exh. G, at 4. Defendants' view is that the only acceptable form of ethnic studies is the "liberated" one which requires actual discrimination against and denigration of majority groups as well as other minorities, and the elevation of what Defendants claim is the "lived experiences" of exactly four specific "racialized" minorities: Black Americans, Chicano/Latinos, Native Americans, and Asian American/Pacific Islanders ("AA/PI").

9.     Curiously, Palestinian Arabs have been shoe-horned into the AA/PI category by Defendants and their supporters. But only non-Jews from the same geographic region as Middle Eastern Jews are permitted entry to this category, despite the fact that nearly the entire population of Middle Eastern Jews, a not insignificant percentage of whose descendants now live in California, suffered from religious persecution and actual ethnic cleansing by those (Arabs, Turks, and Iranians) amongst whom they lived.

10.     Defendants wish to inject their views into the LAUSD curriculum— views which are, by design, racist. And arising from those views, "liberatory" Ethnic Studies vilifies and discriminates against religious beliefs that Defendants claim to know are oppressive at the same time that Defendants claim to know that they are not "religious" beliefs; and against racial groups, nationalities and people of, or deemed to be of, a particular skin color that, according to Defendants, are not deserving of the same degree of respect as the four groups which are the focus of their form of ethnic studies.

11.     California law mandates that public school teaching materials be publicly disclosed, and that new materials be adopted only after publication and two public meetings at which parents and the general public can be heard on the materials. Such public disclosure does not suit Defendants, however. For that

reason, one of Defendants' tactics to advance their curriculum is to disclose publicly what they are doing, and what they intend to teach, only when such disclosure will advance their goals; when secrecy will be more effective, Defendants practice, and brazenly counsel educators, that public disclosure be avoided and prevented.

12.     Thus, Defendant Liberated Ethnic Studies Model Curriculum Consortium ("Consortium") advises teachers who seek to use its materials to "consider" whether

a.     "if you tell them about your plans," [is] the teacher's "administration likely to be supportive"; if not, teachers are advised that they may well be "better off trying to fly under the radar or grow[] strong enough as a group to pressure them."  LESMC Preparing to Teach Palestine: A Toolkit ("Teach Palestine"), Exh. A at 8.

b.     Similarly, if in a sympathetic teacher's community, Jewish organizations such as "the JCRC [Jewish Community Relations Counsel], the ADL [Anti-Defamation League], the Jewish Federation and/or other Zionist organizations [are] active and likely to create problems," then Defendant Liberated Ethnic Studies Model Curriculum Consortium ("Consortium") counsels that teachers wishing to use LESMC materials first "build support before you begin so you're in a strong position to withstand potential attack." (emphasis added) Ibid.

c.     It is noteworthy that Defendants characterize each of the above organizations—all of which were founded and headed by Jews and whose missions are primarily to assist Jews within their communities, and none of which advocate for any specific form of Jewish observance or any particular political platform relating to Israel other than its right to exist—as enemies of their curriculum.  They are simply organizations of Jews, and it is for this and only this reason that Defendants identify them as enemies. Here, therefore, Defendants identify these simply Jewish organizations with what they intend as a pejorative  "Zionist."

d.     In the same document in which the LESMC describes any Jewish

organization whether or not it is focused on Israel as "Zionist," it also states the
opposite. It states:

It's important to be clear:

-       Critical pedagogy about Israel's role in Palestine is not
antisemitic.

-       Antisemitism is discrimination against, violence towards, or
stereotypes of Jews for being Jewish. Criticism of Israel's policies of
apartheid and oppression of Palestinians is not antisemitism.

-       False accusations of antisemitism that rely on the conflation of the
State of Israel with Jewish identity are an explicit strategy of Zionists,
who portray Palestinians as motivated by antisemitism or irrational
hatred rather than resistance to oppression.

-       Zionists claim to speak for all Jews, but Zionism is distinct from
Judaism.

Teach Palestine, Exh. A at 5. (emphasis added)

e.       Overall, the LESMC advises teachers to teach Liberated Ethnic
Studies in secret if that is the course most likely to allow such teaching at all: "Be
Strategic!" Teach Palestine Exh. A at 7.  Perhaps, LESMC recommends, teachers
should take as role models other "educators" "who shut their doors and teach their
students liberatory [sic] curriculum."  Teach Palestine, Exh. A at 12.

13.     This case is brought on behalf of an association of Los Angeles residents
who are Middle-Eastern and American Jewish Zionists who are and who will be
harmed by the explicitly racist and discriminatory teaching material that Defendants
are now carving into LAUSD's educational paradigm.  That curriculum — the
LESMC — is infected throughout by explicitly racist and antisemitic principles,
among which are:

a.       It defines as "white," as "westerners," and as "colonialists,"
millions of Jews who are, by Defendants' own crude racial and racist definitions,

indisputably "Brown" or "Black;" who themselves, and whose ancestors, either never or not until very recently ever, lived in the Western Hemisphere, and whose ancestors, for thousands of years, resided exclusively in North Africa, India, or the Middle East — and it imposes this definition on these people for one reason and one reason only:  because they are Jewish.

b.     It purports to control and claims the right to control the definition and boundaries of antisemitism, to the exclusion of the right of Jews or representatives of the Jewish community to define that concept or even to be heard on the definition of this millennia-old hatred, with which the Jewish people have contended since at least the days of Pharaoh.

c.     It purports to control and claims the right to control the definition of Judaism, going so far as to define which concepts are and which are not the true content of Jewish religious ideas. And it does so incorrectly.

d.     It denounces as morally reprehensible an idea, and a religious commitment, that is, and has for millennia been, central to Jewish belief, Jewish practice, and Jewish identity:  the commitment to Zion and to the return of the Jewish people to the land of Israel, their ancestral homeland, and the reconstitution and the defense of a sovereign Jewish state in that homeland.

e.     It denies indisputable facts of Jewish history solely because those facts support the legitimacy of Israel as the nation-state of the Jewish people.

f.     It falsely and libelously makes the accusation and seeks to teach California's public school teachers and children that the Jewish state commits unspeakable crimes including genocide, ethnic cleansing, land theft, and the imposition of apartheid, all of which accusations are false.

g.     It is focused on what its own practitioners falsely claim are the actions of the Jewish state solely because it is Jewish, as evidenced by the fact that the Defendants and the LESMC vilify and demonize no other foreign state in the world: not North Korea, not China, not South Sudan, not Eritrea, not even those

countries where human slavery is still legal.  Ignoring, and thereby tacitly condoning, the worst human rights abusing nations in the world, the LESMC instructs LA public schoolchildren only to revile and reject Israel.

          h.     It casts these aspersions on the Jewish state solely because it is Jewish.

14.    The Liberated Ethnic Studies Model Curriculum suffers from a great many other profound flaws and manifests hostility to many other groups and political ideas that enjoy wide support among Californians and the residents of Los Angeles. It denounces capitalism, the traditional family, and the territorial integrity of the lower 48 states of the United States.  In the guise of "inclusion" it seeks to exclude a large fraction of the population of the Los Angeles School District from any entitlement to equal value as human beings. It fails to respect historical fact at the expense of what the LESMC's proponents characterize as the "lived experience" of a limited, calcified number of ethnic groups, on behalf of which groups the LESMC's proponents claim the exclusive right to speak.  Rather than an effort to include voices previously silenced, however—a goal with which Plaintiffs wholeheartedly agree, and which this case does not oppose—the LESMC silences and devalues many groups disfavored by the LESMC's proponents.

15.    Middle Eastern and American Jews are two such groups, but far from the only groups victimized by the LESMC.  By seeking to remedy the discrimination against Middle Eastern and American Jews, Plaintiffs do not wish to be understood to ignore or minimize the many other forms of illegal discrimination rife throughout the LESMC, such as the decision to "center" the curriculum – by which Defendants mean "focus the curriculum exclusively' on the LESMC's four recognized groups, rather than on all ethnic and religious groups present in the LAUSD population.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this case by operation of 28 U.S.C. §§ 1331 and 1343, because it seeks to redress the deprivation, under color

of a State law, of a right, privilege or immunity secured by the Constitution of the United States and by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and because it presents claims under an Act of Congress providing for the protection of civil rights, all of which are also necessarily federal questions, and under 28 U.S.C. § 1367 because it presents questions of state law over which this Court has supplemental jurisdiction.

17.     Venue is proper in this district under 28 U.S.C. §1391(b), because most of the Defendants reside in or are domiciled in this district and a substantial part of the events and omissions giving rise to the claims herein occurred in this district.

18.     Declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

19.     Plaintiff Concerned Jewish Parents and Teachers of Los Angeles ("CJPTLA") is an unincorporated association comprised of Jewish, Zionist Los Angeles teachers who teach in the LAUSD and Jewish, Zionist parents of children who are students in the LAUSD.

20.     Jane Doe 1 is a member of CJPTLA whose child is a student in the Los Angeles Unified School District.

21.     Jane Doe 2 is a member of CJPTLA and a former teacher in the LAUSD and a lifetime member of UTLA due to her former role as an officer of UTLA. Plaintiff B chose to not realign herself with the current leadership of UTLA due to their escalating antisemitism.

22.     Jane Doe 3 is a member of CJPTLA and a teacher in the LAUSD, as well as a member of UTLA.

23.     Jane Doe 4 is a member of CJPTLA whose mother is Israeli and whose children are enrolled in the LAUSD.

24.     Jane Doe 5 is a member of CJPTLA who is a Jewish Persian American Zionist whose children are enrolled in the LAUSD.

25.     John Doe is a member of CJPTLA who is a Jewish Israeli Zionist whose children are enrolled in the LAUSD.

26.     Defendant UTLA is the recognized union representing teachers employed by LAUSD.  UTLA is an active proponent of the LESMC. The leadership of UTLA causes UTLA to expend teacher resources and union dues paid by its members—for which it is a fiduciary—to promote adoption of the LESMC.

27.     Among its demands during the 2019 collective bargaining negotiation with LAUSD, UTLA sought and obtained the District's commitment to the creation of an Ethnic Studies Committee.  The District acceded to this demand, and the LAUSD-UTLA Ethnic Studies Committee is enshrined in Article XXV, Section 5.1 of the Collective Bargaining Agreement.

https://www.utla.net/sites/default/files/2019-2022_utla-lausd_collective_bargaining_agreement.pdf

28.     That Agreement guarantees UTLA four seats on the LAUSD-UTLA Ethnic Studies Committee. The UTLA has used its power to populate these seats by appointing, among others, Defendant Montaño, Defendant Cardona, as well as Dr. Melina Abdullah and Roxana Duenas.

29.     The LAUSD-UTLA Ethnic Studies Committee is authorized to "Review and suggest professional development, curriculum and teaching materials purchased by and developed by LAUSD for Ethnic Studies, Multicultural Literature and Cultural Proficiency."

30.     Abdullah's view of Jews and her conflation of her hatred of Israel with hatred of American Jews who speak out against antisemitism is expressed in tweets by her such as one she posted on Dec. 3, 2018:

> By firing @marclamonthill, @CNN has chosen to stand with a Zionist Israel that Murders and terrorizes the Palestinian people. They have shown the [sic] only believe in free speech for some. And they have demonstrated their racism towards Black Men who they cannot completely control.

31.     In another tweet, Abdullah, chosen by UTLA to serve as a member of the UTLA-LAUSD Ethnic Studies Committee, proudly and publicly shared her hatred of American Jews, blaming them for everything bad, including—ironically—intolerance:

> we must dismantle patriarchy! specifically jewish patriarchy offending muslims &controlling our economy & campuses!" and "... more & more jews invading campuses, causing islamophobia, racism, & intolerance!

32.     On the night of May 30, 2019, a crowd ran amok through the heavily Jewish Los Angeles neighborhood of Fairfax, yelling "F**k the police and kill the Jews!" Five synagogues and three Jewish schools were defaced with antisemitic graffiti.  Asked to comment on these events, Abdullah refused to condemn them in any way and instead justified these actions as "an uprising, a rebellion, a revolt." https://www.jpost.com/american-politics/black-lives-matter-the-jews-and-palestinian-nationalism-634946

33.     The fourth UTLA member of the Ethnic Studies Committee is Roxana Dueñas.  Ms. Dueñas is currently teaching ethnic studies in the LAUSD, as a teacher at Roosevelt High School, in Boyle Heights.  Dueñas is, on information and belief, currently teaching using the Liberated Ethnic Studies Model Curriculum including its material on Israel.

34.     In addition, UTLA has itself made "fiscal commitments for ethnic studies development through UTLA, which provided grants for professional development. Through community engagement, the LAUSD ILC [Instructional Leadership Corps] team was able to hold multiple workshops, including at the Association of Raza Educators-ILC 2 Day Professional Learning Experience and team member [Defendant] Guadalupe Cardona's "Culturally Responsive Teaching" CTA IPD Webinar."  These workshops led teachers to bring the Liberated Ethnic Studies curriculum "to their own classrooms." https://ilcblog.stanford.edu/2021/04/12/lausd/

35.     As a matter of current policy, UTLA is hostile to the state of Israel and

to anyone who believes in the legitimacy of Israel's existence as a Jewish state and that it is entitled to its self-defense.

36.    Defendant Cecily Myart-Cruz, president of UTLA, is a staunch proponent of inserting the LESMC into the Los Angeles School District's curriculum "from early childhood education" through graduate studies.  She scorns the concept of mere multiculturalism as a flaccid and failed substitute for "authentic ethnic studies."  As of 2019, Defendant Cruz was and, on information and belief, she remains now an employee of LAUSD.  Defendant Cruz is sued in her individual and official capacity

37.    Defendant Liberated Ethnic Studies Model Curriculum Consortium ("Consortium") is a nonprofit corporation incorporated under the laws of California on February 5, 2021.  The Consortium maintains its principal place of business in this district.  The Consortium's business is disseminating the LESMC and ensuring its adoption by as many school districts and teachers as possible, for pay from the public fisc, if possible, but for free if funds are not forthcoming. On its website, the Consortium offers services such as "a Year-Long Ethnic Studies District Advisement and Implementation Track" which will assist "local districts and schools to establish develop [sic] a program and process for the implementation of ethnic studies" and possibly "to design an elementary model of for [sic] Ethnic Studies teaching and learning."  The Consortium also offers an "Anti-racist Culturally Responsive Institute," which will help participants to "design a process for challenging systemic structural racism and white supremacy culture in schools." There is also an "Ethnic Studies Professional Learning Institute,"  which touts the fact that the Consortium faculty will introduce district educators "to the Liberated Ethnic Studies Model Curriculum framework," and help in the process of lesson development and "be available for consultation and advisement on curriculum and professional development."

38.    Defendant Theresa Montaño, Ed.D., is the secretary of the Consortium

and is the vice president of the California Teachers Union. Montaño explained at the April 13, 2021 UTLA ESP that, other than the four recognized "racialized" groups on which LESMC centers, the discipline of Ethnic Studies is not about any other ethnic groups. Montaño said: "Ethnic Studies is not about ethnic people, it is not where every group gets to say I want Ethnic Studies [for my group] too."  Montaño made very clear that LESMC is not interested in "those who argue for a balanced perspective" because "they have been doing that for 500 years. In [Liberated] Ethnic Studies it's our turn to tell our story. So where is the inclusivity and diversity in [Liberated] Ethnic Studies? No!"  Upon information and belief, Montaño is a resident of Los Angeles County. Defendant Montaño is a member of the LAUSD-UTLA Ethnic Studies Committee.  Defendant Montaño is sued in her individual and official capacity.

39.    Defendant Guadalupe Carrasco Cardona is the co-founder, chief executive officer and chief financial officer of the Consortium. She is a resident of this District and a teacher of Ethnic Studies employed by the Edward R. Royal Learning Center, an LAUSD public school. Defendant Cardona is a member of the LAUSD-UTLA Ethnic Studies task force. Upon information and belief, Defendant Cardona is and has been teaching using the materials from the LESMC at issue in this case in her LAUSD classroom.  Defendant Cardona is sued in her individual and official capacity.

40.    Defendant UTLA and its leadership invited Celine Qussiny to speak at the April 13, 2021 UTLA ESP, as its expert on "Palestine Studies."

41.    Celine Qussiny is an active consultant to UTLA and to the Consortium, and one of the Defendants' sources for "educational" materials and hate-filled rhetoric masquerading as information both about Israel in its dealings with Arab Palestinians, and the conflict between the two peoples. UTLA leadership invited Qussiny to present at its publicly advertised UTLA ESP so that she could explain to the educators and others in the audience of the necessity of including Palestine in the

Ethnic Studies Curriculum.

42.     During the UTLA ESP, UTLA's "Palestine Expert" Qussiny explained that "we have to always be confronting Zionism." She went on, at great length, quoting hateful propaganda with no basis in fact, indoctrinating the educators in anti-Israel hatred and antisemitism.

43.     Qussiny told those in attendance that when she's talking about Zionism, she's "talking about a political, settler-colonial ideology that justifies ethnic cleansing of the Palestinians from their ancestral homeland," and she described Israel as a "fascist dictatorship." Qussiny also falsely informed the UTLA ESP audience that the IHRA [International Holocaust Remembrance Alliance] definition of antisemitism "is really dangerous because it criminalizes any criticism of Israel," and that Israel is a "colonial state founded on ethnic cleansing, on mass displacement and ongoing land theft."

44.     Not content to vilify Israel, Qussiny went on to attack both the government of California and the United States: "the erasure of Palestine and the attack on [authentic] ethnic studies is reflective of colonialist strategies, [it is] the United States and Israel's alignment on a global scale."

45.     Qussiny identified herself as a member of the Palestinian Youth Movement ("PYM") which is affiliated with and supportive of the Popular Front for the Liberation of Palestine, a Marxist-Leninist terrorist faction of the Palestinian Liberation Organization. In her social media posts and videos, Qussiny glorifies and identifies with Palestinian Arab terrorists who have murdered Jewish and other Israeli citizens and who are amongst the most violent and unrepentant terrorists. The PFLP not only believes Israel has no right to exist, but vehemently, and sometimes violently, opposes any efforts at peace, including any dialogue at all between Israel and Palestinian Arabs. PYM has endorsed the widespread murder of Israelis and encourages kidnapping Israeli soldiers. Qussiny is employed by the U.S. Campaign for Palestinian Rights, a Virginia-based nonprofit organization that serves as the

American umbrella group of the Boycott, Divestment and Sanctions ("BDS")
movement and is one of the most prominent promoters of BDS in the United States.
The US Campaign, which is officially called Education for Just Peace in the Middle
East, coordinates the efforts of 329 different pro-BDS organizations.

46.      But as Tablet Magazine has confirmed, the group also helps facilitate
tax-exempt donations to a Palestinian coalition that includes Hamas, Palestinian
Islamic Jihad, the Popular Front for the Liberation of Palestine, and other groups the
U.S. State Department designates as terror organizations.

47.      The US Campaign, *Tablet* revealed, is the fiscal sponsor of a group
called the Palestinian BDS National Committee (BNC), the main West Bank and
Gaza-based cohort advocating for sanctions against Israel. The BNC was created in
2007 in Ramallah with the intention of serving as the Palestinian arm of the
international BDS campaign. According to the BNC's website, one of the group's
members is the Council of National and Islamic Forces in Palestine, commonly
known as PNIF. Among PNIF's members are five different groups designated by the
US as terrorist organizations, including Hamas, the Popular Front for the Liberation
of Palestine (PFLP), the Popular Front – General Command (PFLP-GC), the
Palestine Liberation Front, and Palestinian Islamic Jihad (PIJ). Since its founding, the
BNC has frequently and openly collaborated with known leaders of these terror
organizations.  See https://www.ngo-monitor.org/reports/pflp-ties-six-newly-
designated-terror-ngos/  and  https://www.tabletmag.com/sections/news/articles/bds-
umbrella-group-linked-to-palestinian-terrorist-organizations

48.      Nominal Defendant Los Angeles Unified School District ("LAUSD") is
the public school district for the city of Los Angeles, California.  It is the entity with
formal control over, and it is responsible for, the curriculum and teaching materials
used by all public schools in Los Angeles, California.  LAUSD has ultimate control
over and responsibility for the use and public disclosure of any teaching materials in
Los Angeles public schools other than those materials whose use is directed by the

California State Board of Education.  LAUSD is named in this case as a nominal Defendant to enable this Court to enjoin the use within LAUSD of teaching materials whose content violates federal and state law and to compel public disclosure of all Ethnic Studies teaching material used in the LAUSD schools.

**STATEMENT OF FACTS AND**

**THE BASES OF PLAINTIFFS' CLAIMS**

**Federal and State Law Bar Discrimination by California Public Schools on the Basis of Religion and National Origin, and Therefore Against Middle Eastern and American Jews**

49.     Federal and California law mandate that public schools, as educational institutions and as workplaces, be free of hostility to all races, religions and nationalities — including Middle Eastern and American Jews.

50.     Federal law bars discrimination against Middle Eastern and American Jews in any publicly funded setting.

**The Equal Protection Clause of the Fourteenth Amendment and The First Amendment**

51.     By operation of 42 U.S.C. §1983, the Equal Protection clause of the Fourteenth Amendment and the First Amendment bar any action by a state actor which discriminates on the basis of race or religion unless such discrimination is narrowly tailored to achieve a compelling government interest.  The rank discrimination embedded in the LESMC against Israelis and Middle Eastern and American Jews who hold a religious commitment to Zionism is in fact narrowly tailored to do the exact opposite:  one of Defendants' clearly expressed goals in seeking to insert the Palestine portion of the LESMC into California's public schools is precisely to expunge the idea of Zionism, and the legitimacy of the existence of the State of Israel, from the public square, on the ground that Defendants believe they have a right to teach, and to induce as many other people as possible to teach and to believe, "their truth": that Zionism and the Jewish State, Israel, are evil, that Israelis are oppressive and genocidal land thieves; that Israel has no right to exist as the

nation-state of the Jewish people; and that the Jewish people have no right to a nation-state of their own.  The First Amendment's Free Exercise Clause bars Defendants from using public funds to denounce the Plaintiff's sincerely held religious beliefs.

### Title VI of the Civil Rights Act of 1964

52.   Intentional discrimination actionable under Title VI of the Civil Rights Act of 1964 occurs when the recipient of federal funds acts, at least in part, because of the actual or perceived race, color, or national origin of the alleged victims of discriminatory treatment.

53.   Such intentional discrimination is present here because of the Defendants' actions at issue. Promulgation of the Palestine portion of the LESMC in the public schools of the LAUSD is motivated by Defendants' clearly expressed intent to discriminate against Israel, the Jewish State, and the Jewish belief in Zionism.

54.   Evidence of discriminatory intent can be direct or circumstantial, and ill-will is not required, although Defendants' ill-will against Jews and Israel is manifest. https://www.justice.gov/crt/fcs/T6Manual6#INT

55.    Evidence of Defendants' discriminatory intent is present here in many forms:

    a.    Statements by decision-makers responsible for preparation and dissemination of the LESMC;

    b.    the sequence of events leading to the Defendants' promulgation and promotion of the LESMC;

    c.    the fact that the content of the LESMC is, and was intended by Defendants to be, a clear departure from past policy and procedure within the LAUSD;

    d.    a past history of animus towards Zionism by Defendants and by the entities who are the actual source of the LESMC. The LESMC is a verbatim

reproduction of propaganda disseminated by organizations hostile to Israel and which are related to, and which support the Popular Front for the Liberation of Palestine ("PFLP"), an organization officially designated by the United States as a terrorist organization.  See https://www.ngo-monitor.org/reports/summary-pflps-ngo-network

e.     comparative evidence of more favorable treatment toward similarly situated individuals not sharing the protected characteristic of a belief in Zionism or a commitment to the continued existence of the State of Israel as the nation-state of the Jewish people.

f.     the reliance upon both a consultant and a curriculum steeped in false claims about and animosity towards Jews, the Jewish State and Zionism, a central value of Judaism.

56.     As a recipient of federal aid, Defendant LAUSD is legally required to ensure that it and all entities with which it contracts also comply with Title VI.

**California Law**

57.     In multiple statutory provisions, California law forthrightly requires that public school teaching materials teach respect for all races, religions and nationalities.

58.     Section 51500 of the California Education Code provides that "A teacher shall not give instruction and a school district shall not sponsor any activity that promotes a discriminatory bias on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."

59.     Section 51501 of the California Education Code provides that "The state board and any governing board shall not adopt any textbooks or other instructional materials for use in the public schools that contain any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."

60.     Section 220 of the California Education Code provides that "No person shall be subjected to discrimination on the basis of disability, gender, gender identity,

gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code , including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid."

61.     Section 60044 of the California Education Code bars the use of instructional material in California's public schools that contain:

"(a)  Any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, occupation, or because of a characteristic listed in Section 220.

(b)  Any sectarian or denominational doctrine or propaganda contrary to law."

62.     California law requires every school district to "promote the involvement of parents and other members of the community in the selection of instructional materials."  Educ. Code § 60002.  Indeed, the Education Code specifies that California law is intended to permit "the adoption of instructional materials only after public notice [and] comment by the public."  *Id*. § 60005.

63.     The legislation by which the completion of at least one Ethnic Studies course became a high school graduation requirement in California adopted this principle of public notice of curricular material and parental involvement in its formulation and adoption.  Implementing these principles, the provision adding the Ethnic Studies requirement allowed satisfaction of that requirement only by curricular materials that had received such public vetting.  Educ. Code § 51225.3(a)(1)(G)(ii).

64.     Section 51225.3(a)(1)(G)(ii)(IV) permits a local school district to adopt a "locally developed ethnic studies course" only if it

shall first be presented at a public meeting of the governing board of the school district or the governing body of the charter school, and shall not be approved until a subsequent public meeting of the governing board or

governing body at which the public has had the opportunity to express its views on the proposed course.

65.    As further detailed below, Defendants' conduct has been designed specifically with the intent to violate this provision and to prevent the general public from learning the actual content of material Defendants plan to teach in LAUSD classes in which they incorporate their "liberatory" Ethnic Studies material.

66.    Section 60202 of the California Education Code mandates that educational material be made public before it is used in California's public schools:

Before final adoption of any instructional materials not currently listed, the state board shall make any instructional materials proposed for adoption available for public inspection for not less than 30 days at display centers designated by the Superintendent of Public Instruction. There shall be an adequate distribution of display centers throughout the state.

67.    Section 60400 of the California Education Code provides that:

The governing board of each school district maintaining one or more high schools shall adopt instructional materials for use in the high schools under its control. *Only instruction materials of those publishers who comply with the requirements of Article 3 (commencing with Section 60040 ) and Article 4 (commencing with Section 60060 ) of Chapter 1 of this part and of Section 60226 may be adopted by the district board*. (emphasis added)

68.    AB 101, the legislation mandating as a graduation requirement the completion of at least one semester of ethnic studies in California public schools, contains a series of provisions that bar from the curriculum any teaching material that is biased, racist, or discriminatory teaching materials — specifically, antisemitic, anti-Israel and anti-Zionist materials.

69.    AB 101 mandates that all material used to teach ethnic studies "[b]e appropriate for use with pupils of all races, religions, nationalities, genders, sexual orientations, and diverse ethnic and cultural backgrounds, pupils with disabilities, and English learners" and that it "[n]ot reflect or promote, directly or indirectly, any bias, bigotry, or discrimination against any person or group of persons on the basis of any

category protected by Section 220."

70.     The signing statement for AB 101 issued by California Governor Gavin Newsom specifically referenced these provisions, noting that they bar exactly the antisemitic, anti-Israel and anti-Zionist materials that had been included in earlier drafts of the ESC but had been removed as a result of intense and widespread criticism by California citizens. Newsom's signing statement explained that "[t]he bill also expresses the Legislature's intent that courses should not include portions of the initial draft curriculum that had been rejected by the Instructional Quality Commission due to concerns related to bias, bigotry, and discrimination."

71.     AB 101 itself also states that "[t]o the extent that local educational agencies, including charter schools, choose to locally develop an ethnic studies program for approval by their governing board or governing body, it is the intent of the Legislature that local educational agencies not use the portions of the draft model curriculum that were not adopted by the Instructional Quality Commission due to concerns related to bias, bigotry, and discrimination."

72.     The California Superintendent of Schools Tony Thurmond explicitly stated on July 31, 2020, that:

> The CDE's recommendations and proposed edits were informed after reviewing tens of thousands of public comments, learning from ethnic studies subject matter experts and thought leaders, listening to educators, and engaging with students across the state. Based on stakeholder feedback, *the CDE has recommended removing all language that can be perceived as anti-Semitic* and has recommended a draft that provides resources educators can use to *acknowledge California's diversity and make connections to the experiences of all students*.

https://www.cde.ca.gov/nr/ne/yr20/yr20rel64.asp  (emphasis added)

73.     AB 101 does not mandate any particular teaching material for use in any public school in California, leaving it to each school district to choose its own material—so long, of course, as the material chosen does not violate any legal provision in force when the material is introduced, including the provisions of AB

101 when they become effective.  The Defendants have repeatedly, clearly and defiantly stated their belief that the same material and/or its equivalent which the State deleted as antisemitic must be part of the Ethnic Studies Curriculum in California. Defendants Montaño and Cardona have explicitly stated that they intend to put all of this material back in in every district they "advise" on implementation of the new Ethnic Studies mandate.

74.     As more fully alleged below, the LESMC contains this antisemitic and anti-Israel material.  The LESMC is intended to be, and is in fact, precisely what these California statutes bar:  The LESMC as well as its background material includes language which is an explicit denunciation of the legitimacy of one nation: the State of Israel. That biased curriculum includes statements that the existence of the State of Israel is based on ethnic cleansing and land theft, apartheid and genocide. It therefore discriminates against all persons of Israeli nationality.

75.     The LESMC also explicitly denounces the Jewish religious principle of Zionism, proclaiming falsely both that Zionism is morally wrong and that it is not actually a tenet of the Jewish religion.  Because it contains this material, the LESMC, which is what Defendants seeks to introduce into the LAUSD schools, therefore discriminates against all Jews who hold a sincere religious commitment to that central religious principle.

76.     As more fully detailed below, the LESMC discriminates against Middle Eastern Jews of color, by characterizing them as "white" and as "Western colonialists" solely because they are committed to the Jewish principle of Zionism.

77.     The LESMC asserts that antisemitism "comes from rising white supremacy and white nationalism."  Ethnic Studies Q&A, Exh. ES Q at 9.  Because it understands Zionism as an exercise in white supremacy, the LESMC thus blames antisemitism exclusively on Zionism—thereby exonerating the Liberated curriculum from any responsibility for antisemitism.

78.     Contrary to the dictates of California law, the LESMC makes no effort to

teach about the Middle East in a way that respects the claims and beliefs of all of the peoples who reside there.  It does not teach, or instruct California public school teachers to teach, in an equally respectful manner about the competing claims of Jews, Arabs, and others (such as the Druze and the Bedouins) to land or to sovereignty in that region.  Instead, lesson plans on which the LESMC is based simply present the claims of the group favored by Defendants as "true" and the claims of the Jews as false and rapacious.

79.    The LESMC completely ignores millennia of Jewish history, advancing instead, as if it were an indisputable fact, the claim that Jews are not indigenous to the land of Israel and that Jews have never had a sovereign state there.  It also adopts discredited claims by Arabs who maintain, contrary to the historical record as understood by all recognized authorities, that "Palestine" was a sovereign country in which Palestinian Arabs lived and governed themselves prior to 1948.  The LESMC lesson plans on "Palestine" present as if true the claim that Jews created the State of Israel by stealing land from Arabs who had allegedly owned and had been sovereign over that land before the Jews arrived immediately prior to the re-establishment of the State of Israel in 1948. It also ignores the historical fact that it was the Jews who were ethnically cleansed from Israel, their Homeland, and then, later, ethnically cleansed from the Arab-majority countries in which they had taken refuge from the previous ethnic cleansing.

**The History of the Adoption of California's Ethnic Studies Curriculum Shows that California's Policy Bars Content that Discriminates Against Jews, Zionism and Israel – and that Defendants Have Explicitly Stated Their Intention To Insert, In Any Way They Can, Precisely That Discriminatory Content Into The California Schools Through Adoption of the LESMC or Its Materials.**

80.    As Defendant Myart-Cruz stated at the April 13, 2021, UTLA ESP which was publicly advertised and hosted by Defendant UTLA, *see* Exh. B, Defendants believe that the inclusion of all cultures, ethnicities, nationalities and

religions in ethnic studies courses is wrong and that "authentic" ethnic studies is *"not cultural diversity"* and *"not multiculturalism."* Myart-Cruz said then that the curricular material adopted by the State of California is *"not actually ethnic studies."*

81.     At the same session, Defendant Montaño said that ethnic studies is *not* about empowering *all* students but only those from the four "racialized" groups recognized by the LESMC Consortium.

82.     Because Defendants believe this, they explicitly condemn as wrong – and proclaim the need and their intention to reverse or circumvent – the decision by the government of California to remove antisemitic and anti-Zionist material from the Ethnic Studies Curriculum.  Defendants complain that by doing this

> [t]he ESMC [Ethnic Studies Model Curriculum] that the state Board of Education approved in March 2021 bears so little relation to the original draft that every member of the ESMC demanded that their name be removed.

LESMC Story, attached hereto as Exh. C at 4.

83.     The LESMC explicitly teaches that the decision made by the California government to alter the ethnic studies curriculum that they drafted was caused by "[t]he state's submission to rightwing demagogues and lobbyists."  LESMC Story, Exh. C at 5.

84.     Defendants attack those who opposed them—including the California Jewish community—as "privileged voices" who were attempting to suppress "educators of color who spoke their truths."  LESMC Story, Exh. C at 3.  Defendants blame these "privileged voices" for the fact that some of the curricular material they sought to teach California's students was excluded from the ESC.

85.     Among the political positions that Defendants seek to promote in California's public school classes are that Israel's existence and Zionism are morally wrong and that, as the LESMC asserts, "Zionism is distinct from Judaism."  Teach Palestine, Exh. A at 5.

**Defendants Have Attempted To Hide The True Content of LESMC Because They Know It Violates Basic Principles of Federal and California Law and Deviates From The Mutual Respect Among All Peoples Which Is The Policy of California and of the United States.**

86. California law, in AB 101, requires that curricula used to satisfy the ethnic studies requirement be public. Educ. Code § 51225.3(a)(G)(ii).

87. Newly developed ethnic studies curricula may be used in local school districts only after public dissemination of the material, and the completion of two public hearings at which the general public is given an opportunity to be heard on the content of the curriculum. *Id*. § 51225.3(a)(G)(ii)(IV).

88. Defendants have taken active steps to hide the content of the LESMC, and their true political goals in promulgating the LESMC, from the general public and those who Defendants expect will oppose adoption of that curriculum by public school districts.

89. For example, the Consortium offers "Liberated Ethnic Studies Lesson Plan & Unit Development training" in a series of Zoom and/or in-person sessions, or institutes. But these training events are not open to the public or even to all teachers. Instead, those wishing access to such materials must apply and request it. Only those people who are granted acceptance are able to view or obtain the materials. The webpage advertising these Institutes states that admission is "by invitation only." See http://www.liberatedethnicstudies.org/institutes.html and Exh. D (captured November 19, 2021).

90. Defendant Consortium advises teachers who seek to use its materials to "consider" that "Teaching the truth about Palestine is [] a liberatory act, for teachers and for students. It's a political decision. But, as much as possible, you want to be strategic. The goal is for your anti-racist teaching to be sustainable, and to be part of a larger movement." Teach Palestine, Exh. A at 17. Thus, Defendants are instructing sympathetic teachers and administrators to make sure they are not discovered doing what Defendants are instructing these people to do in their public school classrooms

by anyone who disagrees, because such discovery will result in those teachers — and therefore the discriminatory LESMC material — being stopped.

91.     Thus the LESMC teaching materials advise sympathetic teachers to weigh the following factors in deciding whether, how, and when to reveal their plans to teach the LESMC curriculum material about Israel:

a.     It advises such teachers to ask themselves: "if you tell them about your plans," is the  teacher's "administration likely to be supportive?" if not, teachers are advised that they may well be "better off trying to fly under the radar." Teach Palestine, Exh. A at 8.

b.     Similarly, if Jewish organizations such as "the JCRC [Jewish Community Relations Counsel], the ADL [Anti-Defamation League], the Jewish Federation and/or other Zionist organizations [are] active and likely to create problems," then LESMCC counsels that teachers wishing to use LESMC materials first "build support before you begin" — that is, before you take any public action — "so you're in a strong position to withstand potential attack." Ibid.

92.     The most obvious example of Defendants' efforts to hide what they seek to insert into California educators' teaching plans is their removal of the entire "Teach Palestine" segment of the LESMC from the LESMC website. The "Teach Palestine" segment was originally on the website as part of its Chapter 4: "Asian American/ Pacific Islander Studies." As of the date of the filing of this Complaint, however, when that chapter of the curriculum is opened on the LESMC's website, there is no access to the lesson plan or description of the chapter studies, as there is, for example, for Chapter 2, "Black Studies," or Chapter 3, "Chicanx/Latinx Studies." Before the "Teach Palestine" content was removed it was captured in screenshots and is attached hereto as Exh. A, Preparing to Teach Palestine: A Toolkit.

93.     The content on the LESMC website under the category of curriculum relating to Palestine contained a history of the controversy surrounding the evolution of the California Ethnic Studies law and the ensuing controversy. That material

blamed "right wing critics" and Zionists for the removal of the Ethnic Studies Model Curriculum Advisory Committee and their materials from the ultimate Ethnic Studies law and justified teaching Palestine under the rubric of oppressed and marginalized ethnic groups. The LESMC "Teach Palestine" curriculum was, word for word, taken from a downloadable pdf document that had been available on the Teach Palestine website, but which was also recently deleted. However, a copy of that material was captured and is attached as Exh. E.

94.     The remaining materials, however, at teachpalestine.org  reveal content on which the LESMC educators are likely to rely—given the word-for-word adoption of the Teach Palestine Toolkit—for teaching California public schoolchildren about Israel and Palestine.  The TeachPalestine.org website is a project of the Middle Eastern Children's Alliance (MECA), https://www.mecaforpeace.org/meca-projects/teach-palestine-project/  which partners with an affiliate of the Popular Front for the Liberation of Palestine (PFLP), a Foreign Terrorist Organization recognized by the United States, inter alia, which is described more fully, *supra*, at ¶¶ 45, 47. That affiliate, the Union of Palestinian Women's Committees, is identified by Mahmoud Abbas's Fatah as an official "affiliate," and by USAID as the "women's organization" of the PFLP. https://www.ngo-monitor.org/ngos/middle_east_children_s_alliance_meca_/

95.     Defendants have attempted to hide the substantive content they intend to teach, and the content and any link has been deleted, although they have not in any way changed their intentions; they have simply — to use their words — attempted to "be strategic" about how and what they go about inserting into California's public school curricula.

96.     Defendants seek to hide from their perceived enemies the precise content of and materials from the LESMC which are used within LAUSD. Thus they have taken down web pages revealing content of the LESMC; admitted people to discussions and teachings of the LESMC on an invitation-only basis; and permitted

teachers to learn about the LESMC only after being accepted through an admission-review process.  *See* Exh. D

97.     This content, however, is revealed in, among other places, the following documents, some of which are now, and some of which were but are no longer, available on the internet:

a.     The website of Defendant LESMC, liberatedethnicstudies.org, The Facebook page of Defendant UTLA's Human  Rights Committee, which advertises the October 2, 2021 "Teach Palestine" event , and which urges readers "Be sure to attend Educators Forum - Defending Ethnic Studies: Academic Freedom & Teaching Palestine #ethnicstudies #arabstudies #VivaPalestina

b.     The content of the April 13, 2021 UTLA ESP led by Defendants Myart-Cruz, Montaña, and Cardona and by Ms. Qussiny, and advertised by Defendant UTLA on its Twitter feed, the official Facebook page of the UTLA Human Rights Committee, and in publicly posted flyers. See Exh. B

c.     In a lesson plan from Teach Palestine, there is a vocabulary section which contains four words. These are the words and their definitions:

> Apartheid:  a system of **institutionalized segregation based on race** in South Africa. The term is often used to describe Israel's similar system of of racialized discrimination and separation.

> Zionism:  a **political ideology** that calls for the creation and expansion of Israel as a Jewish state in historic Palestine.

> Settler:  An Israeli citizen who lives on Palestinian land or takes over Palestinian home. (Similar to European settlers stealing Native American lands.

> Checkpoint:  A military barrier used by the Israeli military to control [Palestinians] movement from various aread.

*See* Teach Palestine Lesson Plan, attached hereto as Exh. F, at 3 (emphasis original).

**Zionism is a Religious Belief Sincerely Held by Each Plaintiff, Which the LESMC is Devoted to Condemning and Eradicating.**

98.     The LESMC's proponents claim that the LESMC is not antisemitic

1   because "Zionism is distinct from Judaism." Teach Palestine, Exh. A at 5.

2       99.   This claim is false.  In fact, Zionism is a central religious tenet of

3   Judaism.

4       100.   The concept of Zionism embodies the idea that to achieve the spiritual

5   relationship between God and the Jewish people which is a central goal of Jewish

6   teaching and the Jewish religion, it is essential for the Jewish people to have a

7   physical home in the land of Israel, subject to Jewish sovereignty, so that the Jewish

8   people can worship God together in that place.

9       101.   There is a wide variety of views among the world's Jews today, and

10   among the Jewish people throughout history, about how, when, and at whose instance

11   Zionist ideas are to be implemented.  And there is no single expression of Zionism

12   upon which all Jews agree.

13       102.   Indeed, there is virtually no proposition of Jewish belief upon which all

14   Jews agree, and the Jewish canon has never had an officially adopted creed setting

15   forth the essence of Jewish belief or any mechanism for the creation of such a creed.

16   But that does not diminish the religious commitment of Jews to the religious

17   principles to which they do adhere; and a great many Jews, including all of the

18   Plaintiffs in this action, sincerely hold a religious belief in Zionism.

19       103.   The religious principle of Zionism is expressed throughout the books

20   composing the Jewish canon, which canon has been in place for well over a thousand

21   years; throughout the calendar of Jewish holidays; and throughout a multitude of

22   Jewish practices.  It is through these sources that the principle of Zionism became,

23   and remains, a religious belief, held by the Plaintiffs and millions of other Jews in the

24   world today.

25       104.   The canonical Jewish texts express and teach the concept of the return of

26   the Jewish people to the land of Israel and their establishment of a state subject to

27   Jewish sovereignty.

28       105.   The principle of Zionism is expressed in, among a great many other

places, the following places in the canonical Jewish texts.

106.   The Torah — the books of Genesis, Exodus, Leviticus, Numbers and Deuteronomy, the Five Books of Moses which comprise the first part of the Jewish bible — is the account of the coming into existence of the Jewish people; of God's promise to them of the land of Israel as an eternal inheritance; and of God's fulfillment of that promise.

107.   For that reason, the Torah in multiple places states and restates God's promise, first to Abraham and then to his descendants Isaac and Jacob, that their descendants—the Children of Israel—will inherit the land of Israel.  The Torah in multiple places defines with precision, using landmarks and locations identifiable today, the boundaries of that land.  And the Torah ends, in Chapter 34 of Deuteronomy, with the Jewish people having left Egypt and poised at the border of the land of Israel, about to enter it and take possession of it.

108.   The books of the Prophets, which comprise the second of the three sections of the Jewish bible, and which appear in the Jewish bible after the Torah, describe the establishment by the Jewish people, with God's assistance, of their sovereignty over the land of Israel; of the establishment of a monarchy of the line of King David under the direct command of God; and the construction of a Temple in Jerusalem which is to be the center of Jewish religious worship.

109.   These books also describe the first of two instances when the Jewish people lost sovereignty over the land of Israel, and the immediate and religious quality of this political and military loss – namely, the destruction of the Temple in Jerusalem which was the center of Jewish worship.  This destruction is an indisputable fact of history, and occurred in the year 586 before the Common Era (BCE), at the hands of the Babylonian Empire.

110.   This loss of Jewish sovereignty was both a political and a religious event:  in addition to ending Jewish political control over the territory of Israel, it also constituted the destruction and loss of the centralized place of the Jewish worship of

God and so the Jews' loss of the ability to relate in that most direct way to God.  It is a central flexion point in Judaism, referred to and mourned from that day to this.

111.   These events are the subject of the book of Lamentations (in Hebrew the book of Eicha) which appears in the third section of the Jewish bible, denominated as Writings.

112.   It is an indisputable fact of history that the Jews regained limited sovereignty over the land of Israel approximately 70 years after they first lost it. These events are described in the biblical accounts in the books of Ezra and Nehemia, and in parts of the books of Chronicles, all of which also appear in the Writings. This historical fact is confirmed in secular and anthropological texts.

113.   Of the 150 poems which comprise the book of Psalms, which also appears in the Writings, dozens focus on the city of Jerusalem, the enormity of its loss and the importance of its rebuilding so that the Jewish nation can be reconstituted.

114.   The Mishna and the Talmud, which comprise the Oral Law of the Jewish canon, are filled with references to the return of the Jewish people to Zion.  That body of law was committed to writing to ensure that it would not be lost, so that the Jewish people could continue to be governed by Jewish law while they endured the loss of Jewish sovereignty over the land of Israel and so that they could recreate their Jewish institutions in the future when they regained sovereignty over the land of Israel.

115.   That body of law regulates all of Jewish life, and includes not only the details of the conduct of Jewish ritual in the Temple, but the law governing the establishment and operation of Jewish courts, Jewish civil and criminal law, the law governing the business of agriculture in the land of Israel (which is different from the Jewish law governing agriculture outside of the land of Israel) and even the procedure for expanding the amount of land in Jerusalem committed to holy ritual purposes (B. Shevuous 14a).

116.   Many, although not all, of the Jewish people exiled to Babylonia in 586

BCE returned to the land of Israel when such return was permitted to them 70 years later by Cyrus the Great, following his defeat of the Babylonians.  Those Jews who did return then rebuilt their Temple in the same place in Jerusalem where the first one had been, which is the same place where the ruins of the Temple are located today.

117.    The Jews who remained in Babylon retained their identity as Jews; while a Jewish Temple stood in Jerusalem, these Jews participated in Jewish worship at that Temple, complying with their duty under Jewish law to travel to Jerusalem from wherever they were in order to ascend to the Temple for specified religious observances each year and to pay certain taxes mandated by Jewish law.

118.    These Babylonian Jews are the ancestors of the Jewish communities which remained in Iran and Iraq until Israel's re-establishment in 1948— people whose history is directly relevant to the claims at issue in this case and which is the subject of ¶¶ 156-171, *infra*.

119.    Though it was challenged, the Jews strove to retain sovereignty over the land of Israel from the time of their permitted return from Babylon until some years after the Roman Empire defeated the Jews in war in the year 70 of the Common Era.

120.    At the time of the Roman conquest, many, though by no means all, of the surviving Jewish residents of the land of Israel were exiled to Rome.  Their exile and enslavement is also an indisputable fact of history and is depicted on the Arch of Titus in Rome. Titus built that monument when he was accorded a triumph upon his victorious return to Rome from the land of Israel, which, along with what is now Southern Syria, the Romans had denominated as Palestine, a geographic notation unconnected to any distinct set of people then in existence.  On that Arch, which still stands in Rome today, there appear the images of Rome's pride in destroying and sacking the Jewish Temple, eliminating both Jewish sovereignty over the land of Israel and the central place of the Jewish worship of God.

121.    A large community of Jews resided in Rome continuously from these events until most were murdered in the Holocaust between 1941 and 1945.

122.    Thus it may not be a religious belief that Pharoah's final solution—the murder of all Jewish male newborns, as described in the first chapter of the Book of Exodus—would be followed by Rome's, followed by forced conversion at the edge of a scimitar and then Crusades, Inquisitions, pogroms and then a conference at Evian followed by another at Wansee; but it is the psalmist's prayer, in  Psalm 147, which asks of God:  "rebuild Jerusalem, oh Lord, that the oppressed of Israel may enter." That prayer is recited every single day of the year by observant Jews.

### Jews' Yearning for the Return to Zion is Expressed Throughout the Jewish Prayer Book

123.    The contents of the Jewish bible were fixed in the first two centuries of the Common Era, as set forth in, among other places, the Tractate Bava Basra of the Babylonian Talmud at 14b-15a, which was itself written after the Roman exile had begun.  After the Jewish bible was closed, new expressions of Jewish ideas, including the Jewish commitment to the return to Zion, continued to be formulated, in the books and practices that were developed by the Jews as they lived in exile – that is, largely (though never entirely) outside of the land of Israel which was barred to them for so long, yet remained a central focus and shared and ardent longing for millennia.

124.    Thus, for example, the post-biblical Jewish canon's teachings about the land of Israel and the return of the Jews to Zion following the Roman exile are an essential component of the Jewish prayer book and of Jewish prayer.

125.    Ritual Jewish prayer is recited facing Jerusalem.

126.    The return to Zion of the Jewish people, and of God's presence on earth in Jerusalem, is referenced multiple times in daily Jewish prayer, which is recited three times each day by observant Jews; in the prayers Jews recite when they atone for sins; in their grace after every meal; and in the words Jews use to comfort a Jewish mourner, who is, according to centuries-old custom, to be told "May the Omnipresent comfort you among the mourners for Zion and Jerusalem."

127.    A plea for the Jewish return to the land of Israel is the last phrase recited

at the traditional Jewish Passover Seder—the single most widely observed Jewish ritual among Jews today throughout the world—which ends with the proclamation that the Seder should be observed "next year in Jerusalem!"

### Jewish Yearning for the Return to Zion Permeates the Jewish Calendar

128.   The importance of Jewish sovereignty in the land of Israel is an essential teaching of the Jewish calendar, which prescribes holidays and fast days.

129.   The holiday of Hannukah is a celebration of the restoration of Jewish sovereignty over the land of Israel and over Jerusalem, and the opportunity that sovereignty allowed for the Jews to again worship God as they were required to do by Jewish law, in their Temple in Jerusalem.

130.   The holiday of Tu b'Shvat celebrates the date upon which crops in Israel begin their growing cycle.

131.   The holiday of Purim is about the precariousness of Jewish existence and of the ability of Jews to worship freely, without sovereignty. The book describing this holiday, the Scroll of Esther, begins by noting that the Jews were living outside the land of Israel, and were subjects of a non-Jewish king, because they had been exiled from the land of Israel by the Babylonians.  Although Purim is a joyful holiday, the words of that book describing this exile are chanted in the mournful tune that is otherwise used only on the Ninth of Av, the day (*see infra* ¶ 134) on which the Jews mourn the destruction of Jerusalem and the loss of Jewish sovereignty over the land of Israel.

132.   The holiday of Passover is a celebration of the beginning of Jewish nationhood and of the Jews' march out of Egyptian slavery and toward the land of Israel.

133.   The holiday of Shavuout is, among other things, a holiday marking the connection between Jewish sovereignty over the land of Israel and the Jews' duty to support the priests who presided over religious worship at the Jewish Temple in Jerusalem.

134.   The Ninth day of the month of Av (Tisha B'av) is the date on the Jewish calendar that marks the destruction of both the First and the Second Temples, the exile of the Jewish people from their home, and the loss of Jewish independence and freedom of worship which were the product of Jewish sovereignty over the land of Israel and the city of Jerusalem. It is a day of mourning in which a full 25 hour fast is observed. The biblical book of Lamentations is read in synagogue while listeners sit as mourners on the floor.

135.   The liturgy of the most solemn day of the Jewish calendar, Yom Kippur, is defined by the order of service followed by the High Priest at the Temple in Jerusalem when the Jewish Temple was in existence.  All Jews who pray on this day recall that ancient service; the more traditional among them ask God to reinstate it, in exactly the same place.

136.   The prayer space at the Western Wall in Jerusalem is located today where it is because that point was, historically, the closest freely accessible point (freely accessible to Jews, that is) to the place at the Jewish Temple where the High Priest performed that service.

137.   Every time Jews read from the Torah in Synagogue, and when they annually celebrate their completion of the reading of the Torah and the commencement of another cycle of that reading, the siddur teaches them to sing: "for out of Zion will come Torah, and the word of God from Jerusalem."

138.   The Jewish calendar sets six annual fast days, four of which are explicitly focused on mourning the destruction of the Temple in Zion, and the loss of Jewish sovereignty in the land of Israel, which make it impossible for Jews to worship God as they had been commanded.  Every Jewish wedding ceremony ends with the breaking of a glass, as a reminder that even in such a moment of great happiness, all Jews must remember Jerusalem and mourn its destruction.

**The LESMC Discriminates Against Plaintiffs' Sincerely Held Jewish Religious Beliefs in Zionism.**

139.   At the April 13, 2021 UTLA ESP, Defendants' consultant Ms. Qussiny was a featured speaker.  She began her presentation by stating that, in work on the curriculum for California's public school ethnic studies classes, "We have to always be confronting Zionism."  She explained that "when I'm talking about Zionism, I'm talking about political, settler-colonialist ideology that justifies ethnic cleansing of the Palestinians from their ancestral homeland."  She asserted that the ethnic studies curriculum must incorporate the idea that Israel is a colonialist state, founded on ethnic cleansing, on mass displacement and ongoing land theft.

140.   At that same session Defendant Montaño took the position that removal of antisemitic language and of the denunciation of Israel constituted the erasure of Palestinian voices that were deliberately put in the curriculum—in other words, that the only way Arab-Americans could be "heard" or included in a public school curriculum is by completely denying the right of the Jewish people to national liberation, and by denouncing the Jewish state with blood libels such as the commission of genocide and apartheid.

141.   Ignoring—and denying—all of the Jewish history, Jewish liturgy and Jewish belief expressed throughout all of the sources set out above, the LESMC asserts that "Zionism is distinct from Judaism."  Teach Palestine, Exh. A at 5. Defendants assert this dichotomy in an effort to justify their attack on the Jewish state of Israel while exculpating themselves from accusations of antisemitism.

142.   Also, in a flat denial of the history and liturgy set forth above, the LESMC proponents seek to ensure that California's public schoolchildren are taught falsehoods such as the claim Zionism is an invention of the late 19th century and of Jews who resided exclusively in the Western hemisphere. They seek to inculcate these schoolchildren with lessons that accuse the Jewish people—not Israelis, or some fraction of them, but "Jews"—of using this invention to justify their taking

control over a land with which they have no true connection and to which they have no true right, according to the LESMC.

143.   The LESMC teaches that "Israel [is a] white settler state" characterized by "apartheid."

144.   In their Teach Palestine Toolkit, Defendants falsely claim that:

"Zionism is a nationalist, colonial ideology that, from the late 19th century on, has called for the creation and expansion of Israel as a Jewish state in historic Palestine by any means necessary." (emphasis added)

145.   The same document falsely describes the Anti-Defamation League ("ADL"), the Jewish Community Resource Council, ("JCRC") and the Simon Wiesenthal's Museum of Tolerance as "some of the most active Zionist organizations fighting against Palestine curriculum K-12." That document denounces these mainstream Jewish institutions by claiming that "their primary goal is to stunt the development of authentic anti-racist curriculum" and to "prevent teachers and students from making connections between the US and Israel as white settler states." *Ibid.*

146.   According to Defendants, the mere act of challenging Defendants' accusations against Israel and Zionism is proof of racism: The Palestine Toolkit instructs that opposition to adoption of the Defendants' curriculum, and the assertion that their accusations against Israel endanger Israeli or Jewish children or "make[] classrooms 'unsafe' for Jewish or Israeli American students are [themselves] racist."

147.   Similarly, according to Defendants, efforts by members of the Middle Eastern and American Zionist Jewish communities to defend themselves and Israel from Defendants' accusations are themselves the cause of antisemitism. The Teach Palestine Toolkit states that opponents of the Defendants' views are "rightwing," "conservative," Zionists and Jews, and that antisemitism "is fostered and exploited by [such] rightwing movements in the US and around the world [to] gain power by keeping us divided." Teach Palestine, Exh. A at 6.

148.   Defendants' hostility to Jews is also manifest in their effort to exclude Jewish Americans from California's ESC, as evidenced by the letter signed by all drafters of the original version of California's Ethnic Studies Model Curriculum after it was rejected.  In a single breath that letter protested against inclusion of Jews and in favor of including material on Arab Americans which attacks Zionism. This letter leveled false and ugly accusations against Israel, at the same time claiming that the Jewish People have no historical connection to the same geographic area they claim mandates the inclusion of Palestinians:

> There is a proposed revision statement in the curriculum that includes Jewish American Studies under the AAPI [Asian American/Pacific Islander] umbrella. This is grossly inaccurate, and has no institutional history. We are concerned that this addition is *based on pressure from pro-apartheid Israel interest groups* given the attempts to erase Palestine and Arab American Studies from the ESMC.

Letter of March 12, 2021, to the California State Board of Education, https://savearabamericanstudies.org/wp-content/uploads/2021/03/ESMC-Writers-and-Advisory-Committee-Response-Letter.pdf  (emphasis added).

149.   While Defendants' above attack on the state-approved ESC suggests that they merely wish to have the curriculum "include[]" information about Arab Americans, this is false.

150.   The LESMC describes the founding of the State of Israel purely from the standpoint of Arabs who fought it, explaining that "[t]he largest single group [of Arab immigrants to the United States in the late 1940's]  was Palestinian, as hundreds of thousands of Palestinians had been displaced in the Nakba (Arabic for "Catastrophe")" the term used to describe the dispossession and dispersal of many Palestinian Arabs from the new state of Israel in 1948 Palestine."  While the number of Palestinian Arabs who were displaced during the war against Israel's independence in 1948 may have numbered in the hundreds of thousands, far fewer, not hundreds of thousands as they claim and seek to teach—came to the United States until the late 1960's. According to the Arab American Institute, fewer than 90,000 Arab Americans–a

group that is necessarily larger than the number of Palestinian Americans—lived in Los Angeles in 2017.  https://yallacountmein.org/states/california

151.   While it focuses on the displacement of numerous populations, including Palestinians, Native Americans, and others, the LESMC makes no reference to the hundreds of thousands of Jews who were stripped of their assets and violently driven out of Arab countries, and into Israel, immediately upon the founding of the modern state of Israel.

152.   Defendants' Early version of California's ethnic studies curriculum proposed lessons on topics that ignore mortal threats to Jews and the Jewish State. For example, the first draft curriculum proposed a class equating "border studies" for "Palestine and Mexico," ignoring the facts that (a) the United States and also the United Nations, currently recognizes no country called Palestine, and that no defined borders for any such country exists now or have ever existed; and (b) Israel's neighbor in Gaza has declared a state of war against Israel with the explicit intent, set forth in the charter of the government in Gaza, the Hamas Charter Articles VI and VII, to kill Jews and eliminate the entire State, while Mexico is not at war with its neighbors and presents absolutely no military threat to the United States.

153.   The LESMC proponents' hostility to the Jewish State of Israel, and its commitment to establishment of a California public school curriculum that would teach all California public school students that the existence of such a state is morally wrong, did not cease or even change after public pressure forced the removal of the anti-Israel BDS language from the LESMC.  This is evidenced by, among many other things, the Consortium's public declaration denouncing the Jewish State of Israel's defense of its citizens from thousands of bombs launched either at random or at exclusively civilian targets throughout the country during the conflict there in May, 2021.

154.   The Consortium issued a press release condemning and falsifying the facts about the defensive military response by Israel; about the ongoing conflict; and

about specific incidents; as well as about aid to Israel from the United States. The Consortium also demanded that such condemnation be incorporated into the California public school curriculum.  This release, titled "Palestinian Lives Matter, A Call for Peace and Self-Determination" and published with the name and contact information of Defendant Montaño on behalf of Defendant Consortium (since deleted from the LESMC Consortium's website, but attached hereto as Exh. F) states:

> Today, we express our deep sorrow and indignation at the indiscriminate killing of Palestinians in Gaza, and the violent attacks on Palestinians in Sheikh Jarrah and surrounding cities.
>
> ***
>
> The Liberated Ethnic Studies Model Curriculum Consortium (LESMCC) believes that engaging in the critical examination of systems of oppression like white supremacy and settler colonialism is a foundational and fundamental principle of Ethnic Studies. *** *When California's Department of Education began its campaign to erase and silence Palestinian voices from California's Ethnic Studies Model Curriculum,* **LESMC argued that Ethnic Studies is not authentic without the inclusion of Arab American Studies, specifically without the representation of Palestinian History, culture and voice. Ethnic Studies is about resistance to colonial conquest, slavery, and the exploitation of racialized peoples**.
>
> LESMC maintains that you don't have to be Palestinian or Muslim to *condemn the continued marginalization and displacement of Palestinians. Racism, colonial expansion and forcible displacement cannot be tolerated by justice loving people. LESMC stands in solidarity with Palestinians threatened with expulsion from their homes in Jerusalem by Israeli forces*.
>
> ***
>
> Furthermore, *we must demand that the 4 billion dollars Israel receives unconditionally from the U.S. require that* **a radical change in how Israel treats the Palestinian people. No more encroachment on Palestinian homes. No more murder of Palestinian people. No more erasure or silencing of Palestine from the   media, the curriculum, or government. Palestinian lives matter**.
>
> Finally, *as educators, it is our responsibility to do what others will not, to teach truth. The refusal to acknowledge Palestinian history and*

*human rights by those in government and by the media mirror the actions taken by the California Department of Education when it rejected inclusion of Palestine in the California Ethnic Studies model curriculum. This week's events make clear why our students need to learn about Palestine. In this light, we refer you to our colleagues at teachpalestine.org for support in curriculum and resources on Palestine and how to bring Palestinian voices into your classrooms*.

Exh. F at 2-4 (emphasis added).

155.   Although it is now deleted from the LESMC website, the Consortium urges teachers to "integrate Palestine into your curriculum" by comparing various allegedly heinous practices and policies of the Israeli government with similar evil-doing by the U.S. government.  But it also includes not just a swipe at Israeli practices, but at Judaism itself, albeit misunderstanding the concept entirely.  The LESMC tells educators to teach children about the: "impact of ideology comparing Manifest Destiny to the Promised Land."  Teach Palestine, Ex. A, at 11.

**The LESMC Discriminates Against Hundreds of Thousands of Israeli Jews and Other Middle Eastern Jews by Falsely Calling them "White," and Thereby Designating Them Oppressors, Solely Because They Are Jews.**

156.   The LESMC denies the true identity of half of the population of Israel for one reason and one reason only:  because they are Jews.

157.   The LESMC characterizes Israel as a "white settler state."

158.   In fact, approximately half of Israel's Jewish population now consists, and has since the founding of the modern state of Israel in 1948 consisted, of Jews who themselves or whose parents or grandparents, resided in Iran, Iraq, Yemen, Egypt, Lebanon, Syria, Morocco, Turkey, India or Ethiopia, and whose ancestors had resided in those places for many hundreds of years.

159.   Defendants identify all other residents of this part of the world as members of their favored group of Asians, Africans and Pacific Islanders. Defendants exclude Jews, however, from this favored category – even though hundreds of thousands of Jews have ancestors who resided in these areas for

hundreds and many cases thousands of years. These Jews are excluded from this favored category for only reason: because they are Jewish.

160. These Jewish people are, to use Defendants' crude racial and racist terms and the standards Defendants apply to identify all other people on earth, "Brown" or "Black" or "People of Color."

161. Thus, though it is an outrage that the fact should even have to be invoked, it is a fact that Israel's community of Ethiopian Jews have skin just as black as the skin of all other African peoples.

162. Similarly, the B'nei Menashe, a community of Israeli Jews who immigrated to Israel from India, have skin color identical to the skin color of other peoples of India.

163. Similarly, the hundreds of thousands of Israeli Jews who are themselves, or who are descended from, Iraqi, Iranian, Yemeni, Egyptian, Syrian, Lebanese, Moroccan, or other Middle Eastern Jewish communities, or from Turkish or Indian communities, all have skin color and other features of other people who, like these Israelis and their ancestors, resided in those countries for hundreds and in many cases thousands of years.

164. In addition, the many Jews who fled to the United States from their homes in Arab or Muslim countries due to the ethnic cleansing or attempted genocide of Jews by the leadership of those countries, are considered "white" according to the LESMC, while the non-Jewish immigrants from those same countries are considered "people of color," despite both sharing the same skin color and physical characteristics.

165. Many of these Jews are descendants of Jewish communities that had resided in Iran and Iraq since the Babylonian exile in 586 BCE. They are, accordingly, more indigenous to these areas than the vast majority of all other inhabitants, and their roots there precede the advent of Islam by over a thousand years.

166.   Defendants nonetheless assert in the LESMC that the Jews in the State of Israel — half of whom are the peoples identified, *supra*, in ¶¶ 158-164, are "white" and that their presence there is solely a function of the "fact" that they are "colonialists."

167.   By so claiming, Defendants deny the truth — not "their truth" but the actual truth — about the identity of all of the people identified, *supra*, in ¶¶ 158-164.

168.   Defendants deny these peoples' true identity for one reason and one reason only:  Defendants call these people "white" not because they are actually white, or Caucasian, although they are neither. Defendants call these people "white" because in the eyes of the Defendants they are oppressors and they are oppressors only because they are Jews.

169.   The proof of this is that Defendants refer to all other persons who reside, or whose ancestors resided, in these places, and who have the same color skin and other features as these Jews, as either "Black" or "Brown" or "People of Color."

170.   What Defendants actually mean by referring to these people as "white" is simply that Defendants believe these people are oppressors of other people whose skin is the same color as the Jews but whose political agenda and religious beliefs are favored by Defendants over that of the Jews.

171.   In labelling these Israeli or other Middle Eastern Jews as oppressors, Defendants deny the actual history of these people, who were stripped of their assets and driven from the countries in which they and their families had lived for hundreds of years, and where they were treated this way for one reason and one reason only: because they were Jews.

//
//
//
//
//

**The LESMC Discriminates Against Jewish Zionists As Demonstrated By The Fact That Comparative Evidence Shows That Groups Other Than Israelis and Zionists, But Which Otherwise Share The Same Characteristics and Similar Histories of Persecution, Are Accorded More Favorable Treatment By Defendants.**

172.   Basic principles of federal law barring discrimination on the basis of race, ethnicity and religion, including Guidelines promulgated by the United States Department of Justice, establish that actionable discrimination can be shown by, inter alia, comparative evidence showing that the group claiming victimization shares the same characteristics as other groups but is accorded less favorable treatment by the Defendants.  *See* U.S. DOJ Title VI Legal Manual at 52.

173.   Such differences in treatment are manifest here.  Thus, for example, the territory of Gaza, which is controlled by Hamas—the terrorist organization which was voted into power in 2006—officially bars, on a non-idle threat of death, entry into its territory by any Jewish person.

174.   Israel, by contrast, does not refuse entry to any person on the basis of the person's religion.

175.   The steps Israel has taken to defend all of its citizens—Jewish, Christian and Muslim—from attack by Hamas and other Arab terrorists are denominated by the LESMC as "genocide."  This accusation is wildly false; no remotely plausible definition of the term "genocide" would embrace Israel's actions.

176.   Thus, for example, Article II of the Convention on the Prevention and Punishment of the Crime of Genocide defines that term as "*acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group[.]*" Doc.1_Convention on the Prevention and Punishment of the Crime of Genocide.pdf

177.   Israel, whose military is indisputably strong enough to destroy the population of Gaza or the territories committed to the control of the Palestinian Authority by the Oslo Treaty, has never stated the intention to carry out, and has in

fact never carried out, any acts which come remotely close to eliminating, in whole or in part, any national, ethnic, racial or religious group.  On the contrary, the Arab populations of Gaza as well as those within the territory controlled by the Palestinian Authority under the Oslo Agreements have grown exponentially since those agreements were entered into in 1992 (and indeed in every year since 1948, the year of Israel's founding). Since the 1967 war, those Arabs have come to enjoy one of the highest standards of living, quality of life, literacy levels, life expectancy and infant survival of any Arab people anywhere in the world.

178.   The Hamas Charter, by contrast, officially states that it is the policy of Hamas to kill all Jews—not just Israelis, but all Jews—anywhere they are found.

179.   Article 7 of that Charter states:

> The Day of Judgment will not come about until Moslims fight the Jews (killing the Jews) when the Jew will hide behind stones and trees.  The stones and trees will say: O Moslims . . . there is a Jew behind me, come and kill him.  Only the Gharkad tree would not do that because it is one of the trees of the Jews.

https://avalon.law.yale.edu/20th_century/hamas.asp

180.   Article 28 of the Hamas Charter states: "Israel, Judaism and Jews challenge Islam and the Muslim people: 'May the cowards never sleep.'" https://avalon.law.yale.edu/20th_century/hamas.asp  In its preface that Charter quotes Hassan al-Banna, founder of the Egyptian Muslim Brotherhood which gave rise to Hamas, as saying:  "Israel will exist and continue to exist until Islam will obliterate it, just as it obliterated others before it."  *Id.*

181.   Because it is, by its constituting documents, committed to destroying Israel and killing Jews, Hamas rejects any willingness or efforts to make peace with Israel.  Article 13 of the Hamas Charter states:

> *Initiatives, and so-called peaceful solutions and international conferences, are in contradiction to the principles of the Islamic Resistance Movement. Abusing any part of Palestine is abuse against part of religion. Nationalism of the Islamic Resistance Movement is part*

*of its religion. Its members have been fed on that.*

\*\*\*

*There is no solution to the Palestinian question except by Jihad. All initiatives, proposals, and International Conferences are a waste of time and vain endeavours*."

https://avalon.law.yale.edu/20th_century/hamas.asp   (emphasis added).

182.   Defendants have never once taken any cognizance of the fact that Hamas attacked civilians throughout Israel with thousands of rockets, just as they have always completely ignored the fact that, as the above sections of its Charter make absolutely clear, Hamas is publicly devoted to the destruction of Israel and to the—actual—genocide  of the Jews.

183.   It is not only Hamas, the Gaza Strip's terrorist government that is actually guilty of the many crimes of which Defendants accuse Israel. The Palestinian Authority, which is the de facto government for much of the area immediately to the west of the Jordan River, explicitly practices apartheid, ensuring that any Jew, Israeli or otherwise, who is found on the land it controls will face certain harm including, very plausibly, death. And Mahmoud Abbas, the president of the Palestinian Authority, now serving in the 18th year of his four-year term, has repeatedly and publicly announced that should "Palestine" ever be officially recognized as a country, not a single Jew will ever be permitted—on pain of death—to set foot into that country.   https://www.reuters.com/article/us-palestinians-israel-abbas/abbas-wants-not-a-single-israeli-in-future-palestinian-state-idUSBRE96T00920130730

**Plaintiffs Do Not Seek To Restrict First Amendment Rights of Any Defendant or Anyone Else.**

184.   This case does not seek any limitation on the Defendants' speech outside of the conduct described herein as violative of Plaintiffs' rights.  It seeks only enforcement, within publicly funded institutions, of California and federal law barring the use, within such institutions, of state-funded curricula, educational materials, and education activities that discriminate against students, parents and

teachers on the basis of their religion or national origin, and that have not been publicly disclosed and subject to public discussion as mandated by California law.

185.   The speech of public school employees while they are at work in public schools is government speech.  As public employees, Defendants have no First Amendment right to discriminate against American or Middle Eastern Jews.

## COUNT I

### Violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983

### (Against All Defendants)

186.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

187.   By operation of 42 U.S.C. §1983, the Equal Protection clause of the Fourteenth Amendment to the United States Constitution bars any action by a state actor which discriminates on the basis of race or religion unless such discrimination is narrowly tailored to achieve a compelling government interest.

188.   The rank discrimination against Middle Eastern and American Jews who hold a religious commitment to Zionism, which is manifest throughout the "Teach Palestine" portion of the LESMC – and which is, indeed, one of the Defendants' goals in implementing that curriculum — is in fact narrowly tailored to do the exact opposite:  one of Defendants clearly expressed goals in seeking to insert the entirety or at least significant portions of the LESMC into California's public schools is precisely to expunge the idea of Zionism, and the legitimacy of the State of Israel, from the public square, on the ground that  Defendants believe they have a right to teach California schoolchildren "their truth" not only about their own lived experiences, but also that Zionism and the State of Israel are evil and should be eradicated.

//

//

//

**COUNT II**

**Violation of the Free Exercise Clause of the First Amendment and**

**42 U.S.C. § 1983**

**(Against All Defendants)**

189.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

190.   By operation of 42 U.S.C. §1983, the Free Exercise clause of the First Amendment bars a state actor from intentionally placing a substantial burden on any person's religious belief or practice.  Such a burden is imposed if the challenged action creates substantial pressure on a religious adherent to modify his behavior or to violate his beliefs.

191.   Defendants' clearly expressed goal in developing and attempting to implement the LESMC is to suppress public expression of, and public support for, Zionist beliefs.

**COUNT III**

**Violation of Title VI of the Civil Rights Act of 1964**

**(Against All Defendants)**

192.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

193.   Intentional discrimination actionable under Title VI of the Civil Rights Act of 1964 occurs when the recipient of federal funds acts, at least in part, because of the actual or perceived race, color, or national origin of the alleged victims of discriminatory treatment.

194.   Such intentional discrimination is present here because the Defendants' actions at issue  — the promotion and promulgation of the LESMC in the public schools of the LAUSD  —  was motivated by Defendants' clearly expressed intent to discriminate against Israel and the Jewish belief in Zionism.

195.   Evidence of discriminatory intent can be direct or circumstantial, and ill-will is not required, although Defendants' ill-will against Jews and Israel is manifest.

196.   Evidence of Defendants' discriminatory intent is present here in many forms, including:

a.   Statements by decision-makers responsible for preparation, promotion and dissemination of the LESMC;

b.   the sequence of events leading to the Defendants' promulgation of the LESMC;

c.   the history of the development of the LESMC;

d.   the fact that the content of the LESMC is, and was intended by Defendants to be, a clear departure from past policy and procedure within the LAUSD;

e.   a past history of discrimination by Defendants and by the entities who are the actual source of the LESMC, which is in fact a verbatim reproduction of propaganda disseminated by a rabidly anti-Israel organization.

f.   comparative evidence of more favorable treatment toward similarly situated individuals not sharing the protected characteristic of a belief in Zionism or a commitment to the continued existence of the State of Israel.

197.   As a recipient of federal aid, Defendant LAUSD is legally required to ensure that all entities with which it contracts also comply with Title VI. This includes the consulting entity named herein as a Defendant.

## COUNT IV

### Violation of the California Education Code – Curricular Material Discriminates Against American and Middle Eastern Jews

### (Against All Defendants)

198.   Plaintiffs reallege all preceding paragraphs as if fully restated herein.

199.   Section 51500 of the California Education Code provides that "A teacher shall not give instruction and a school district shall not sponsor any activity that promotes a discriminatory bias on the basis of race or ethnicity, gender, religion,

disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."

200.    Section 51501 of the California Education Code provides that "The state board and any governing board shall not adopt any textbooks or other instructional materials for use in the public schools that contain any matter reflecting adversely upon persons on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."

201.    Section 220 of the California Education Code provides that "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid.

202.    A.B 101, the legislation mandating use of an ethnic studies Curriculum in California public schools contains a series of provisions to bar from the curriculum any teaching material that is biased, racist, or discriminatory — specifically, antisemitic and anti-Israel and anti-Zionist materials.

203.    A.B. 101 mandates that all material used to teach ethnic studies "[b]e appropriate for use with pupils of all races, religions, nationalities, genders, sexual orientations, and diverse ethnic and cultural backgrounds, pupils with disabilities, and English learners" and that all such material "[n]ot reflect or promote, directly or indirectly, any bias, bigotry, or discrimination against any person or group of persons on the basis of any category protected by Section 220."  As ¶__ above makes clear, this list of protected categories includes discrimination on the basis of nationality, religion and ethnicity.

204.    The signing statement issued by Governor Gavin Newsom with respect to A.B. 101 specifically referenced these provisions, noting that they bar exactly the

antisemitic, anti-Israel and anti-Zionist materials that had been included in the earlier draft of the ESC but had been removed as a result of a public outcry. Newsom's signing statement explained, "The bill also expresses the Legislature's intent that courses should not include portions of the initial draft curriculum that had been rejected by the Instructional Quality Commission due to concerns related to bias, bigotry, and discrimination."

205.   The LESMC is intended to be, and is in fact, precisely what these California statutes bar:

a.   The LESMC contains an explicit denunciation of a nation – the State of Israel – because it includes statements that the foundation of the State of Israel is illegitimate.  It therefore discriminates against all persons of Israeli nationality.

b.   The LESMC also denounces the Jewish religious principle of Zionism, proclaiming falsely both that it is morally wrong and that it is not actually a tenet of the Jewish religion, and the proponents of LESMC, the Defendants, therefore discriminate against all Jews who hold a sincere commitment to that religious principle.

## COUNT V

### Violation of the California Education Code – Breaching California law Requiring Public Disclosure of Curricular Materials

### (Against All Defendants)

206.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

207.   California law, including but not limited to Section 51225.3(a)(1)(G)(ii) of the Education Code, bars the use of ethnic studies curricular materials in California public schools without public disclosure of those materials and specified opportunities for public comment.

208.   Defendants, by recommending, and, in UTLA's case, allowing, teachers to "fly under the radar," or recommending that they "close their door" to teach, have

violated these public notice provisions.  Exh. A at 3.

209.   Defendant UTLA has taken steps to ensure the adoption, either overtly or by stealth means, of the LESMC in the LAUSD, including by advertising the availability of, and seeking compensation credit for, courses that encourage the use of and provide instructions to teachers on the use of the LESMC.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully request that the Court enter judgment in their favor and against all Defendants, as follows:

1.   For declaratory relief adjudging that use of the elements of the LESMC at issue in this case in Los Angeles public schools violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Free Exercise Clause of the First Amendment to the United States Constitution, Title VI of the Civil Rights Act of 1964, and the California Education Code;

2.   For declaratory and injunctive relief permanently enjoining and requiring Nominal Defendant LAUSD to publicly disclose all materials used by teachers to teach students Ethnic Studes in any public school in Los Angeles;

3.   For declaratory and injunctive relief permanently enjoining and requiring Nominal Defendant LAUSD to comply with California law requiring public hearings before adoption of Ethnic Studies teaching materials by the LAUSD;

4.   For declaratory and injunctive relief permanently enjoining and prohibiting Nominal Defendant LAUSD from:

a.   including any language, in any teaching materials, asserting that Zionism is not a Jewish belief; denouncing the Jewish belief in the land of Israel as the land promised by God to the Jewish people, or the Jewish belief in Zionism, or asserting that the State of Israel, as the Nation-State of the Jewish people, is illegitimate, or asserting as a fact that the Jewish State is guilty of committing such horrific crimes against others as ethnic cleansing, land theft, apartheid or genocide, or

that the Jewish people are not indigenous to the land of Israel or to the Middle East, or denying the State of Israel the right to self-defense; and/or denying the historical or religious connection between the Jewish people and the land of Israel; and

        b.    paying any person or entity to prepare, provide, or disseminate to LAUSD or LAUSD teachers any such materials, or to instruct LAUSD employees in any such falsehoods;

5.    For declaratory and injunctive relief permanently enjoining and prohibiting all Defendants from preparing, providing, and/or disseminating to LAUSD or LAUSD teachers, with or without compensation, any educational materials asserting that Zionism is not a Jewish belief; denouncing the Jewish belief in the land of Israel as the land promised by God to the Jewish people, or the Jewish belief in Zionism, or asserting that the State of Israel, as the Nation-State of the Jewish people, is illegitimate, or asserting as a fact that the Jewish State is guilty of committing such horrific crimes against others as ethnic cleansing, land theft, apartheid or genocide, or that the Jewish people are not indigenous to the land of Israel or to the Middle East, or denying the State of Israel the right to self-defense; and/or denying the historical or religious connection between the Jewish people and the land of Israel;

6.    For costs of suit, including attorney fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

7.     For any and all further relief to which Plaintiffs may be justly entitled.

May 12, 2022                          Respectfully submitted,

                                     THE DEBORAH PROJECT

                          By:     */s/ Lori Lowenthal Marcus*
                                     LORI LOWENTHAL MARCUS

                                     JUDICIAL WATCH, INC.

                          By:     */s/ Robert Patrick Sticht.*
                                     ROBERT PATRICK STICHT

                                     Attorneys for Plaintiffs