LORI LOWENTHAL MARCUS (Pro Hac Vice)
JEROME M. MARCUS (Pro Hac Vice)
THE DEBORAH PROJECT
P.O. Box 212
Merion Station, PA 19066
Telephone: (610) 664-1184
lorilowenthalmarcus@deborahproject.org
jmarcus@marcuslaw.us

ROBERT PATRICK STICHT (SBN 138586)
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, D.C. 20024
Telephone: (202) 646-5172
Fax: (202) 646-5199
Email: rsticht@judicialwatch.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CONCERNED JEWISH PARENTS AND TEACHERS OF LOS ANGELES, AMY LESERMAN, LINDSEY KOHN, DANNA ROSENTHAL, AND DANIEL ELI, <br><br> Plaintiffs, <br><br> v. <br><br> LIBERATED ETHNIC STUDIES MODEL CURRICULUM CONSORTIUM; UNITED TEACHERS OF LOS ANGELES; CECILY MYART-CRUZ, THERESA MONTANO, AND GUADALUPE CARRASCO CARDONA, in their individual and official capacities as public employees; AND DOES 1-10, <br><br> Defendants, <br><br> and <br><br> LOS ANGELES UNIFIED SCHOOL DISTRICT, <br><br> Nominal Defendant. | Case No. 2:22-cv-03243-FMO(PVCx) <br><br> **PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND SPECIAL MOTIONS TO STRIKE SECOND AMENDED COMPLAINT** <br><br> <u>Concurrently filed herewith:</u> <br><br> **Plaintiffs' Ex Parte Application for Order Permitting Opposition Brief That Exceeds 25 Pages** <br><br> Hearing:     December 14, 2023 <br> Time:        10:00 a.m. <br> Place:       Courtroom 6D <br>                   350 W. 1st Street <br>                   Los Angeles CA 90012 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ v

INTRODUCTION .................................................................... 1

ARGUMENT ......................................................................... 3

    I.     THE FACTS ................................................................ 3

          A.     What Plaintiffs Have Charged ........................................ 4

               1.     The SAC Properly Alleges That Defendants Are State Actors Participating Directly In The Government Function Of Determining The Content Of Public School Classes…............................................................ 4

               2.     The SAC Alleges That The Teaching Materials At Issue In This Case, and In Use Now In LAUSD, Are Explicitly, Formally, Racist .................................................. 7

               3.     The SAC Alleges That The Teaching Material At Issue Denounces Plaintiffs' Sincerely Held Religious Beliefs and Seeks to Suppress Advocacy Of Those Beliefs ................. 9

               4.     The SAC Pleads That Plaintiffs Are Being Harmed Now And That Further, Even Greater Harm Is Imminent .......... 9

          B.     What Is Not At Issue In This Case ............................... 12

    II.    NO PROTECTED FIRST AMENDMENT ACTIVITY BY DEFENDANTS IS AT ISSUE IN THIS CASE .................................... 15

          A.     Defendants Misapprehend What Activity Is At Issue In This Case ......................................................... 16

          B.     The Law Is Clear That When Public School Teachers Are At Work In Their Classrooms They Have No First Amendment Rights To Teach Whatever They Want…………….............. 16

    III.   PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS……17

          A.     The Law On Standing Is Uniquely Accommodating For First

Amendment Claims…………….…............................................ 17

B.   Plaintiffs Have Sufficiently Alleged That Defendants' Teaching Materials Substantially Burden The Free Exercise Of Their Religious Belief........................................................................... 18

1.   Defendants' Teaching Materials Target And Seek To Suppress Expressions Of Plaintiffs' Sincerely Held Religious Belief……………………………………….....18

2.   Plaintiffs Have Sufficiently Alleged That The Burden Imposed  On Their Religious Beliefs Is Substantial……………………………………………..…19

IV.    COURTS ROUTINELY ADDRESS THE ONLY FACTUAL QUESTION RELATING TO RELIGION PRESENTED BY THIS CASE, WHICH IS THE PLAINTIFFS' CLAIM THAT THEY MAINTAIN SINCERELY HELD RELIGIOUS BELIEFS.................. 22

V.    BY ALLEGING THAT DEFENDANTS HAVE SOUGHT AND ATTAINED "CONTROL" OF THE TEACHING OF ETHNIC STUDIES IN LAUSD, THE PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT DEFENDANTS ARE STATE ACTORS............... 24

VI.   PLAINTIFF PARENTS HAVE STANDING TO BRING THEIR CLAIMS UNDER TITLE VI................................................................. 29

VII.   INTENT HAS BEEN ADEQUATELY ALLEGED FOR BOTH EQUAL PROTECTION AND TITLE VI CLAIMS.............................. 30

VIII.  PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE FEDERAL AND STATE EQUAL PROTECTION CLAUSE, AS THEIR OWN AUTHORITIES CLEARLY HOLD........................ 31

IX.   THE STATE LAW CLAIMS ARE ALL VALID, AND INDEED DEFENDANT CARDONA ADVANCES NO REASON WHY SHE IS NOT LIABLE UNDER THESE PROVISIONS...................... 32

1

X.      THE COURT SHOULD DENY THE ANTI-SLAPP MOTIONS. ...... 32

CONCLUSION....................................................................................................... 34

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allen v. Woodford,*
2006 U.S.Dist. LEXIS 45254 (E.D. CA June 26, 2006)…………….................. 27,28

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963)..................................................................................... 26

*Bowen v. Roy,*
476 US. 693 (1986)................................................................................... 18

*Brandenburg v. Ohio,*
395 U.S. 444, 447 (1969)........................................................................... 33

*Brown v. Board of Education,*
347 U.S. 483 (1954)................................................................................... 20

*Burton v. Wilmington Parking Authority,*
365 U.S. 715 (1961)................................................................................... 25

*Church of Lukumi Babalu Aye v. Hialeah,*
508 U.S. 520 (1993)................................................................................... 18

*Church of Lukumi Babalu Aye v. Hialeah,*
723 F.Supp. 1467 (S.D. FL. 1989).............................................................. 18

*Collins v. Womancare,*
878 F.2d 1145 (9th Cir. 1989)..................................................................... 25

*Evans v. Newton,*
382 U.S. 296, 299 (1966)............................................................................25

*Evans-Marshall v. Board Of Education Of Tipp City Exempted Village School District,*
624 F.3d 322 (6th Cir. 2010)...................................................................... 17

*Fenters v. Chevron,*
761 F.Supp.2d 957 (E.D. CA 2010)............................................................ 28

*Italian Colors Rest. v. Becerra,*
878 F.3d 1165 (9th Cir. 2018)..................................................................... 17

*Gillete v. United States,*
401 U.S. 437 (1971)................................................................................... 18

*Harris v. Escamilla,*
736 Fed. Appx. 618 (9th Cir. 2018)............................................................ 19

*Johnson v. Poway Unified School Dist.,*
658 F.3d 954 (9th Cir 2011)........................................................... 16,20,32

*Jones v Williams,*
791 F.3d 1023 (9th Cir. 2015)..................................................................... 18

*LSO, Ltd. v. Stroh,*
205 F.3d 1146 (9th Cir. 2000).................................................................. 17

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
584 U.S. ___, 138 S.Ct. 1719 (2018).......................................................... 18

*NOW v. Sperry-Rand Corp.,*
457 F.Supp. 1338 (D. CT 1978).................................................................. 21

*Pollard v. The GEO Group, Inc.,*
629 F.3d 843 (9th Cir. 2010)...................................................................... 27

*Putzer v. Donnelly,*
2010 U.S. Dist. LEXIS 63708 (D.NV May 11, 2010).................................. 20

*Shakur v. Schriro,*
514 F.3d 878 (9th Cir. 2008)...................................................................... 19

*United States v. Allamby,*
2005 U.S. Dist. LEXIS 32385 (N.D. OH July 29, 2005)............................ 33

*United States v. Bell,*
414 F.3d 474 (3d Cir. 2005)....................................................................... 33

*United States v. Schiff,*
379 F.3d 621 (9th Cir. 2004)...................................................................... 33

*Walker v. New York City Dep't of Educ.,*
712 Fed.Appx. 43 (2d Cir. 2017)................................................................ 17

*Walz v. Tax Comm'n of New York City,*
397 U.S. 664 (1970).................................................................................... 18

*Watts v. Fla. Int'l Univ.,*
495 F.3d 1289 (11th Cir. 2007)................................................................... 22

*West v. Atkins,*
487 U.S. 42
(1988)......................................................................................................... 27

*World Outreach Conf. Ctr. v. City of Chicago,*
591 F.3d 531 (7th Cir. 2009)...................................................................... 19

**Other Authorities**

Signing Statement of Governor Newsom, A.B. 101

https://www.gov.ca.gov/wp-content/uploads/2021/10/AB-101-Signing-Message-

PDF.pdf.....................................................................................................6,7

**Miscellaneous**

*Garcetti's Impact on Teachers,* (June 3, 2019)

https://onlabor.org/garcettis-impact-on-teachers/......................................17

Bill Honig, *California Schools Should Opt for Inclusive Ethnic Studies,*

https://edsource.org/2022/california-schools-should-opt-for-inclusive-ethnic-

studies/674538............................................................................................. 8

Matthew Impelli, *Martin Luther King Adviser Writes to Gov. Gavin Newsom,*

*Criticizes Ethnic Studies Curriculum,*

https://www.newsweek.com/martin-luther-king-adviser-writes-gov-gavin-newsom-

criticizes-ethnic-studies-curriculum-1565410............................................ 8

Ted Lapkin, *Black Lives Matter, the Jews and Palestinian Nationalism,*

https://www.jpost.com/american-politics/black-lives-matter-the-jews-and-palestinian-

nationalism-634946.................................................................................... 7

*Disentangling the effects of perceived personal and group ethnic discrimination*

*among secondary school students: The protective role of teacher–student relationship*

*quality and school climate,*

https://onlinelibrary.wiley.com/doi/full/10.1002/cad.20415...................... 21

*Perceived Racial/Ethnic Discrimination and Mental Health: a Review and Future*

*Directions for Social Epidemiology,*

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5596659/....................... 21

Plaintiffs Concerned Jewish Parents and Teachers of Los Angeles, *et al*. respectfully submit this omnibus opposition to the following motions: (1) motion to dismiss filed by Defendants United Teachers Los Angeles and Cecily Myart-Cruz ("UTLA Defendants") on November 13, 2023 (Dkt. No. 121); (2) special motion to strike filed by the UTLA Defendants on November 13, 2023 (Dkt. No. 122); (3) motion to dismiss filed by Defendant Los Angeles Unified School District ("LAUSD") on November 13, 2023 (Dkt. No. 123); (4) motion to dismiss filed by Defendants Montano, Cardona, and Liberated Ethnic Studies Model Curriculum Consortium ("LESMCC Defendants") on November 13, 2023 (Dkt. No. 124); and (5) special motion to strike filed by the LESMCC Defendants on November 13, 2023 (Dkt. No. 125).

## INTRODUCTION

This case charges that Defendants Liberated Ethnic Studies Model Curriculum Consortium, the United Teachers of Los Angeles, and their officers have taken effective control of the Ethnic Studies curriculum in Los Angeles public schools, and exercised that control (in part by hiding what they are doing). Thus acting under color of state law, Plaintiffs allege that Defendants have installed in public school classrooms an explicitly (indeed, proudly) racist curriculum which the State of California has expressly directed should not be used, and which seeks to suppress the free exercise of Plaintiffs' sincerely held religious beliefs.

This case relates, and asks for relief concerning, only one thing:  the publicly funded words that come out of the mouths of LAUSD public school teachers.  No other conduct in this case is said to be a violation of any law.  The Complaint does not allege that any other conduct – and any private conduct at all – is against the law, and it does not ask that this Court impose any remedy regarding any conduct, by any party, except for one thing:  the speech that comes out of the mouths of publicly funded teachers while they are engaged in publicly funded activities.

The first reason why Defendants' motions fail is that their sole topic is

something this case does *not* attack, or ask this Court to stop or interfere with in any way.  They tell this Court that the case is about something else entirely:  not the actual teaching that goes on in the classroom, but "UTLA Defendants' efforts to change the curricular model for public school teaching in Los Angeles and statements critical of the State's optional model curriculum for ethnic studies."  UTLA Slapp Br. at 7.  The Brief of Defendant Liberated Ethnic Studies Model Curriculum Consortium makes exactly the same false claim:  that the case seeks to stop defendants from "influenc[ing] statewide Ethnic Studies curriculum as well as the curriculum to be used by LAUSD."  LESMCC Br. at 6.

This is simply false – that's just not what this case is about at all.  The right to petition for redress of grievances, protected by the First Amendment and the *Noerr-Pennington* doctrine, is not at issue in this case because the Complaint does not ask this Court to address the legality, or to impose any remedy regarding, any such petitioning activity.  The right of teachers, or their union, to speak amongst themselves about what the content should be of the LAUSD curriculum, is also not at issue in this case and the Complaint does not ask this Court to impose any remedy regarding any such speech or interactions.  Defendants' devotion of their briefs to a defense of their Constitutional right to engage in such conduct is thus entirely irrelevant.  This is clear from the fact that the only remedy sought is a request that the racist material at issue in this case not to taught in LAUSD public school classrooms, or paid for with public money.

The second flaw in Defendants' attacks on Plaintiffs' claims is that they ignore the substantive law governing their conduct.  That law is clear:  the State of California has decreed *don't teach this,"* referring specifically to the antisemitic content at issue in this case. Defendants think the State of California did the wrong thing by so mandating.  SAC ¶190 and SAC Exhibit F at 4 (condemning "the actions taken by the California Department of Education when it rejected inclusion of Palestine in the California Ethnic Studies model curriculum"). So they direct the

1  exact opposite: ***DO teach this.***

2      Strikingly, Defendants do not contest this.  Nowhere in any of the Defendants'

3  briefs do they argue that the content they have inserted into the LAUSD curriculum is

4  in fact consistent with any of the state laws governing the Ethnic Studies curriculum.

5      As a result of Defendants' efforts, material that the State says should not be

6  taught is in fact being taught in the LA public schools. This case is brought to stop the

7  teaching of material that the State of California has expressly directed not be taught.

8      This relief sought thus seeks exactly and only one thing: a bar on the use in

9  publicly financed public school classrooms of material which is -   overtly – by its

10  own terms – racist, dividing people by race into oppressor and victim, and

11  denouncing as "white" (and so as "oppressors") the millions of Jews of color who

12  populate Israel and the diaspora; -   that – by its own terms – discriminates against

13  Israeli-Americans on the basis of their nationality and ethnicity; and that -   is overtly

14  antisemitic, because– by its own terms – it denounces and seeksto put an end to the

15  exercise of a fundamental Jewish belief.

16      The only other relief sought is public access to what is actually taught in the

17  publicly financed public schools of this city.What the Complaint in this case does ***not***

18  seek is a limit of any kind on any of the activities to which Defendants entirely devote

19  their briefs.

**ARGUMENT**

20  **I.    THE FACTS.**

21      A vast gap separates the allegations actually pled in Plaintiffs' Second

22  Amended Complaint,[2] which form the bases for Plaintiffs' legal claims, and the

23  made-up facts which form the basis for Defendants' Motions to Dismiss.  The

24  pleading at issue was denominated by Plaintiffs when filed as their First Amended

25  Complaint, the only prior amendment having been a corrected pleading filed by

26  stipulation among the parties.[1]

27  [1] The Court has denominated this as the Second Amended Complaint. All

28

Defendants thus ask this Court to dismiss Plaintiffs' request that this court prevent "students learning about the Israel-Palestine conflict," UTLA Br. at 4, and a claim that Plaintiffs have been harmed by "merely encountering materials that were posted online." *Ibid.* Similarly, they tell this Court that Plaintiffs' claims are based on the  "fact" that Defendants "advocate for a curriculum that includes mention of the equal human rights of Palestinians, criticizes Israel, and questions the basis for a religious ethno-state." LESMC Br. at 1. Nor are Plaintiffs before this Court because of a "possibility that "LAUSD – not UTLA –[might] later adopt[] the LESMC."  UTLA Br. at 6.

## A.    WHAT PLAINTIFFS HAVE CHARGED.

### 1.    The SAC Properly Alleges That Defendants Are State Actors Participating Directly In The Government Function Of Determining The Content Of Public School Classes

The SAC alleges clearly that Defendants are directly involved in *determining*— not suggesting, or advocating for, but determining -- the content of public school classes. SAC ¶51 alleges:

> The Consortium shares and exercises public power by participating directly in the writing of LESMC teaching materials with paid employees of the LAUSD for use in publicly-funded classrooms.

As the Consortium explains on its website, "Our ethnic studies experts work directly with the district's educators and curriculum development team who write the units, lessons, and develop the pedagogical practices."

https://www.liberatedethnicstudies.org/uploads/1/6/1/9/16198322/statement_on_how _the_lesmcc_supports_districts.pdf

The sufficiency of defendants' involvement in the challenged course of government conduct is itself a factual question not amenable to resolution on a motion to dismiss. The SAC pleads this as well. The SAC thus alleges that while the

_____

references to the pleading in this brief will be to this document (Dkt. No. 119), identified as SAC ¶__.

LAUSD has ordered Ethnic Studies to be taught, now, throughout the district, the LAUSD itself has not formally adopted an Ethnic Studies curriculum. Into this vacuum have stepped the LESMCC and UTLA Defendants, who have worked together to attain "control" – SAC ¶30 – over what is actually taught as Ethnic Studies in LAUSD. The SAC alleges that these Defendants have used this power to "insert" the LESMC "into the classrooms of the LAUSD." *Id*. ¶ 33.

They have accomplished this, the SAC alleges, in several ways. First, through secrecy –instructing those teaching their racist materials to maintain their ability to do so by "be[ing] strategic," SAC ¶¶15f and 116; "flying under the radar," SAC ¶¶15a and 117a, and "shut [their door]" when teaching this material. SAC ¶15fThese materials – which had been removed from the web, *see* SAC ¶7, 118 – also make clear the central role played by UTLA in advancing this scheme. Thus LESMC's website instructed teachers to "engage with activists outside of the union to support, co-sponsor, engage in mutually supportive projects and, also, to help one another negotiate the treacherous waters of white supremacy." SAC Ex. A at A13.

"White supremacy," of course, means every effort to prevent Defendants from using their racist curriculum. SAC ¶ 104. The UTLA Brief at 2 tells this Court that *Plaintiffs* have used "inflammatory" language about "resistance," "white supremacy," "indigenous" peoples versus "colonialism" by Jews, while – according to Defendants' version of the facts (which is completely irrelevant here) the materials at issue "are nothing more than measured criticisms of the State of Israel." But the quoted inflammatory words are *defendants'* inflammatory words, which appear throughout the curricular materials at issue and indeed, as the Complaint explains, conveying these words, and their inflammatory content, is the whole point of the these materials. UTLA's felt need to ignore the pled facts, and argue on the basis of their own contradictory story, is at the root the reason why its motions must be denied.

What does it mean for a teacher to "shut the door" when teaching? Defendants

are clear that this tactic is to be deployed to prevent "administration" and Jewish or parent organizations from stopping the use of these materials. SAC Ex. A at A8 makes it plain: On hiding from administrators, Defendants advise: "Is the administration likely to be supportive if you tell them about your plans? Or are you better off flying under the radar?"

On parents and Jews, secrecy from perceived enemies is equally important:

> What about parents and other members of the community? If there's a PTA, does it support social justice teaching? Are parents or the local community organized in support of progressive causes that will make them likely to support your work? On the other hand, are the JCRC, the ADL, the Jewish Federation and/or other Zionist organizations active and likely to create problems? If so, how can you build support before you begin so you're in a strong position to withstand potential attack?

*Ibid.* This frank advice reveals clearly that the goal of Defendants' scheming and secrecy is clear: secrecy is to be used to cement control: to identify people who will help and to prevent anyone who might oppose the use of these materials from finding out about it, when discovery would increase the chance that teachers will be stopped from using the teaching materials at issue in this case in public school classrooms.

As we demonstrate below, what comes out of the mouths of public school teachers in public school classrooms is state action.[2]  A second instrument through which state action is the Ethnic Studies committee, SAC ¶¶33-44, which is empowered to review all material used to teach Ethnic Studies in LAUSD. This is an additional mechanism by which Defendants take advantage of the lack of any

---

[2] These materials also make clear that for Defendants, "Zionist" means "Jewish." In identifying the dangerous white supremacists, Defendants do not speak about right wing Israeli political parties, or some marginal Jewish group or pro-Israel advocacy organization. They identify as their enemies the central apparatus of Jewish communal organization in the United States: the Jewish Federations, the Jewish Community Relations Council, the Anti-Defamation League. SAC ¶117b. The SAC and its Exhibits provides a clear contradiction of Defendants' ipse dixit that their enemies are not "Jews" but somebody else.  See also note         below, discussing the overt hostility to Jews of Dr. Melina Abdullah, one of UTLA's appointees to the LAUSD Ethnic Studies Committee.

LAUSD instruction on how to satisfy the mandate to teach Ethnic Studies, enabling them to control the information teachers receive about how to fulfill that obligation. The SAC alleges that the UTLA has obtained, and Defendant Myart-Cruz has personally exercised, the power to appoint members to an official School District Ethnic Studies Committee with jurisdiction over the content of LAUSD Ethnic Studies teaching materials. This power has been wielded to appoint at least one full-throated Jew-hater to this official body: Dr. Melina Abdullah. SAC ¶¶40-43.[3] This appointment constitutes UTLA's embrace of this avowed antisemite's views and Defendants' placement of the holder of these views in a position of official power to review and judge the Ethnic Studies materials used in LAUSD.

      **2.**    **The SAC Alleges That The Teaching Materials At Issue In This Case, and In Use Now In LAUSD, Are Explicitly, Formally, Racist.**

The SAC alleges that the teaching materials at issue in this case explicitly classify students on the basis of nationality, ethnicity, and religious belief, sorting them into virtuous victims and evil oppressors. The SAC alleges as much, ¶¶10, 107, but there is no need to take Plaintiffs' word for it. As the SAC sets forth, when the Governor of California signed the California law mandating that Ethnic Studies be taught in the State's public schools, he specifically stated that the material here at issue is infected with "bias, bigotry, and discrimination." https://www.gov.ca.gov/wp-content/uploads/2021/10/AB-101-Signing-Message-PDF.pdf

Similarly, Bill Honig, former California State Superintendent of Instruction, and subsequently chair and vice chair of the California Instructional Quality

---

[3] This Court certainly need not answer any questions about the relationship between Zionism and Judaism to identify Dr. Abdullah's antisemitism: it is the good old-fashioned kind, manifest in her public denunciation of "more & more jews invading campuses," and in her explicit, publicly tweeted approval of calls to "f*ck the police and kill the Jews!" – not Zionists, just plain Jews.  The tweet referred to in the SAC is Dr.  Abdullah's public praise of physical attacks on synagogues and Jewish schools. See SAC ¶¶41-43; https://www.jpost.com/american-politics/black-lives-matter-the-jews-and-palestinian-nationalism-634946.

Commission explains that the curricular materials at issue in this case "[p]resent[] non-whites as victims and whites, individually and collectively through institutions, as oppressors." https://edsource.org/2022/california-schools-should-opt-for-inclusive-ethnic-studies/674538. They "focus on immutable differences" between students, "lump minority groups together in broad racial categories" and "discount the opinions of non-members of [minority] groups." http://www.buildingbetterschools.com/2022/06/14/the-ethnic-studies-controversy/. For this reason Dr. Clarence Jones, the Reverend Dr. Martin Luther King's speech writer, has warned that use of these teaching materials "will inflict great harm on millions of students in our state." https://www.newsweek.com/martin-luther-king-adviser-writes-gov-gavin-newsom-criticizes-ethnic-studies-curriculum-1565410.

As part of its explicitly racist content, the teaching materials here at issue define the creation of the State of Israel as an exercise in "white supremacy," *e.g.,* ¶¶176 and 178, denouncing Israel's founders and citizens as "white" – and therefore, as Superintendent Honig has explained – as oppressors – when in fact a majority of Israel's Jewish population are nonwhites who, and whose ancestors, have lived in the Middle East for centuries, and in some instances, millennia. The teaching materials at issue label everyone else in the world with the same demographic history as people of color. The Jews with this history are white, but they are white for only one reason: because they are Jewish. ¶195.

These clearly racist statements are the reason why, in addition to its many general proscriptions on the use of biased teaching material in public schools, California law specifically bars the use of the particular teaching material at issue in this case. And yet, among the most striking features of Defendants' briefs is that none of them, anywhere, actually argues that the teaching material here at issue *does* comply with California law, or that there is any way to square the use of this material with the explicit command of the government of California that exactly this material *not* be used. Defendants simply ignore the point. But this Court cannot ignore it.

3.     **The SAC Alleges That The Teaching Material At Issue Denounces Plaintiffs' Sincerely Held Religious Beliefs and Seeks to Suppress Advocacy Of Those Beliefs.**

The racist content is, the SAC alleges, driven by racist and antisemitic intent. Defendants' intention, the SAC states, is "to expunge the idea of Zionism, and thelegitimacy of the existence of the State of Israel, from the public square." *E.g.,* SAC ¶228; *see also id.* ¶¶12, 66, 71. The materials are designed to make LAUSD public school students into political activists advancing Defendants' political views, SAC ¶72. The materials teach children that just as the American idea of Manifest Destiny is morally wrong, so the Jewish idea that Israel is the land promised by God to the Jewish people is also morally wrong. SAC ¶191.

As UTLA's chosen instructor on the materials here at issue explains, the goal of the instruction to be provided in LAUSD classrooms is that "we have to always be confronting Zionism." SAC ¶56. Defendants say clearly that their goal is not education but political action: "Teaching the truth about Palestine is ... a political decision," and "part of a larger movement." SAC ¶72 and Exhibit E at E 3.

The cases make clear that whether something is a sincerely held religious belief is a question of fact. The Complaint therefore pleads this and substantiates it, alleging both that the belief is sincerely held, ¶¶26-29, and that it is a specifically *religious* belief, grounded in canonical Jewish texts, customs and holidays. ¶¶130-191.

4.     **The SAC Pleads That Plaintiffs Are Being Harmed Now And That Further, Even Greater Harm Is Imminent.**

The Ninth Circuit's decision in *Sabra v. Maricopa County Cmty Coll. Dist.,*  44 F.4th 867 (9th Cir. 2022) makes clear the nature of the harm that must be incurred in a case challenging academic content hostile to a particular religion. It holds that plaintiffs have standing to challenge the use of the curricular materials at issue here and to seek injunctive relief barring such use because the content has forced the plaintiff to expend resources.  In that case a Muslim association sued over the use in a

college class of material the association deemed hostile to Islam.  Reversing a trial court decision to the contrary, the Ninth Circuit found the association had standing because it had devoted resources to opposing the allegedly offensive material.  That expenditure of resources, the Court of Appeals held, was sufficient to confer standing.

The Complaint here demonstrates exactly this form of injury, among others.  It describes, for example, how Plaintiff Amy Leserman devoted time and money simply to trying to learn the precise content of Defendants' teaching materials --- and that she was prevented from doing so by Defendant Montano.  ¶¶122-127.

Every individual Plaintiff has alleged that he or she has experienced the antisemitic and anti-Zionist content at issue in this case and been injured by it, because that content has "been received by each Plaintiff in this case, and have made clear to each Plaintiff that they and similarly situated people such as Plaintiffs, who sincerely hold a religious belief in Zionism, or who are Israeli-Americans or who identify as ethnically Israeli, Jewish or Zionist, are not welcome in any LAUSD classroom where – as required by LAUSD policy – Ethnic Studies is being taught."  ¶30.

Similarly, the Complaint alleges that each parent plaintiff "is being forced, now, by Defendants' actions at issue in this case, to choose between protecting the sincerely held religious beliefs of their children and availing themselves of their legal right to send their children to a California public school. The practice imposed upon LAUSD teachers by Defendants, of concealing the publicly-funded teaching of the LESMC, makes it unreasonably difficult or impossible for Plaintiffs to detect whether their children's religious beliefs are, now, being denounced in the public school classrooms to which each Plaintiff sends his or her child each school day, or whether their children are being denounced as Israeli-Americans or ethnically Israeli, Jewish or Zionist."  ¶31.  And it alleges that "[e]ach Plaintiff who is a teacher is being forced, now, to work in an environment in which his or her religious or ethnic

identity is being officially denounced by publicly-funded propaganda in the public
school workplace on public school time." ¶32.[4]

Even if this were not the law, it would be clear that Plaintiffs have standing, as
the right to sue here now exists if the harm is being experienced now *or* is imminent.
The SAC alleges both. The cases hold clearly that whether there is substantial burden
on Plaintiffs' free exercise is also a question of fact.   The Complaint pleads these
facts as well: it alleges that Defendants' teaching *now* forces parents to choose
between sending their children to public school and risking that the teachers to whom
they commit their children will denounce their religious beliefs and national and
ethnic identities, or protecting their children from official attacks on their religious
beliefs by foregoing their right to public education, ¶31. It alleges that this danger is
compounded by Defendants' admitted tactic of hiding the fact that they are using
these racist materials in their classroom. *Ibid*.

The harm caused is not merely the risk of hurt feelings that Defendants conjure
and dismiss. Rather, as set forth above, the SAC alleges that Defendants' intended
goal is to drive public advocacy for Zionism out of the public square, ¶¶12, 66, 71,
72, 228, and to cause public school children in Los Angeles to be "social justice
warriors" who will espouse, and act on, the political opinions held by the individual
Defendants in this case and espoused by all Defendants.  SAC ¶12.

Defendants cannot be heard to dismiss these rising threats as unrelated to the
racist rhetoric they are deploying in LA public schools. It blinks reality to suggest
that there is no connection between teaching bias and hate, on the one hand, and
manifestations of it, on the other. We need not ignore as lawyers what we know as
human beings: children are in school to *learn* from their teachers. As the Ninth
Circuit explained in *Johnson v. Poway Unified School Dist.,* 658 F.3d 954  (9th Cir
2011).   The law governing what goes on in public school elementary and secondary

---

[4] These facts are also sufficient to demonstrate that the Plaintiffs have,
personally, experienced sufficient impact of the Defendants' actions to establish their
right to sue under Title VI.

schools must recognize "students' emulation of teachers as role models and the children's susceptibility to peer pressure."*Edwards v. Aguillard,* 482 U.S. 578, 584 (1987). The Ninth Circuit similarly cautioned in *Monteiro v. Tempe Union High Sch. Dist.,* 158 F.3d 1022, 1027 (9th Cir. 1998), "words can hurt, particularly in the case of children, and [] words of a racist nature can hurt especially severely."

It necessarily follows that if their teachers hate, and teach hate, it's reasonable for a Plaintiff to allege that that's what students will learn. The teaching materials here are far from a single suggestion, or a single book, or even two books, that provide one of many perspectives about Israel. Rather, the entire curriculum speaks with one homogeneous voice to tell children that an entire country, and a religious commitment to which the vast majority of Jews adhere, are – as a matter of fact – founded on genocide, ethnic cleansing and white supremacy. It is, to put it mildly, at least a question of fact whether such materials actually teach what they are intended to teach; whether students "learn" it; and whether the imminent result of that teaching and learning has the result that the SAC says the Defendants intend: to make LA's public schools a place where Zionist identity must be hidden and where Zionist commitment cannot safely be said out loud.

**B.     WHAT IS NOT AT ISSUE IN THIS CASE.**

What is ***not*** at issue here is any expression other than classroom expression by public school teachers, on the clock and paid for with public money. No claim in the Second Amended Complaint is based on anything happening outside of a public school classroom, during class time, while the teacher is being paid with public money out of the public fisc. No relief is sought relating to any other speech or to any private or personal speech. No claim is based here on any effort by any Defendant to "petition" the LAUSD or any public body about what curricular materials should be used, and no relief is sought relating to any such activity. Thus contrary to the claim of the UTLA Defendants, UTLA Slapp Br. 10, Plaintiffs do not claim that UTLA is acting wrongfully by petitioning the government to include the challenged materials

in the classroom, or to discuss with others what the curriculum should be or whether the law should be changed to allow Defendants to teach what they want. There is no claim that it is illegal for UTLA to speak to teachers about Ethnic Studies and there is no request that this Court order UTLA to stop doing so. The claim is that, when it comes to choosing Ethnic Studies materials in LAUSD, the decision by the District to require the course but not say how to teach it has left a vacuum into which the Defendants have inserted themselves, and that at present, UTLA and the Consortium effectively *are* the government, because these Defendants are effectively the ones deciding what materials are being used to teach Ethnic Studies in LAUSD.

Thus no claim is made here that the law is violated by Defendants' conduct of seminars showing teachers how to teach the LESMC, and no relief is sought from the Court asking anyone to stop conducting such seminars. The SAC makes this completely clear, in a section of the pleading entitled "Plaintiffs Do Not Seek To Restrict Rights of Petition or Free Speech Under the United States Constitution or California Constitution of Any Defendant or Anyone Else." The SAC there states explicitly that the *only* activity here at issue is speech paid for with government money. The SAC alleges:

> 222.  This case does not seek any limitation on the Defendants' petition or speech rights outside of the publicly funded speech and activities in which Defendants engage as alleged herein. It seeks no relief of any kind relating to any speech or petition activities, by any person, which is not found by this Court to constitute state action, and, in particular, ***Plaintiffs disclaim any effort to seek relief of any kind in this action relating to any of Defendants' non-government funded speech***.

(emphasis added).

Having explained what Plaintiffs are ***not*** suing over – categorically disclaiming any effort to restrict anything other than speech paid for with government money – the SAC goes on to explain what Plaintiffs ***are*** seeking in this case: nothing other than a bar on the use, in the public school classroom, of racist and discriminatory

teaching material whose presence in public schools is barred by state and federal law:

> 223.   Rather, this Action seeks only enforcement, within publicly
> funded institutions, of California and federal law barring the use, within
> such institutions, of state-funded curricula, educational materials, and
> education activities that discriminate against students, parents and
> teachers on the basis of their religion or national origin, and that have
> not been publicly disclosed and subject to public discussion as mandated
> by California law.

The SAC explains that, because Defendants have worked hard to hide the true

content of the racist materials they are using and that is at issue in this case, the

Plaintiffs have quoted statements by Defendants other than the teaching materials

themselves. But this is only to provide the Court with the best currently available

evidence of the content of the teaching materials themselves:

> 225.   The Defendants' positions on what the content of Ethnic Studies
> teaching materials should be, and on the substantive issues that
> Defendants wish to teach and to see taught in public school Ethnic
> Studies classes, are set forth in this Complaint not because any relief is
> sought with respect to Defendants' own, nonpublicly funded,
> expressions of those positions. Rather, that material is set forth in this
> First Amended Complaint for good reasons:
>
> a.   First, Defendants have actively advised their allies and
> colleagues to conceal the true content of the Ethnic Studies material they
> teach. Defendants' effort at concealment has not been completely
> successful, and this First Amended Complaint therefore contains much
> of the discriminatory teaching material designed by Defendants and
> caused by them to be used in Los Angeles public schools. But
> Defendants' efforts at concealment have been successful to some degree,
> and Plaintiffs have therefore been forced to identify the principles
> Defendants are causing to be taught – and that the Defendant teacher,
> Ms. Carrasco Cardona -- is teaching herself as the factual basis for the
> claims at issue here. Once discovery forces Defendants to release the
> actual materials, those materials themselves will be sufficient to
> establish the violations of plaintiffs' civil rights at issue in this case.
>
> b.   Second, this First Amended Complaint contains extensive
> material demonstrating the clear hostility to Judaism, Israel, and Zionism
> embraced by Defendants and those whom Defendants have chosen to
> place in positions of public trust because these clear manifestations of

bias directly support Plaintiffs' claims of hostility to them, their
ethnicity, nationality and religious belief – in the same way that a private
employer, if sued for racial discrimination, can be shown to have
violated Title VII if it appointed someone as head of human relations
whose private Facebook page made clear that he was hostile to Black
people and their culture, religious beliefs, and ethnic identity.

Defendants do not merely ignore the clear distinction Plaintiffs have drawn between
Constitutionally protected speech – which Plaintiffs do not seek to limit – and
government speech, which has no First Amendment protection. Worse, they
affirmatively misrepresent the Plaintiffs' pleading. Thus the brief for Defendants
Montano, Cardona, and the Liberated Ethnic Studies Model Curriculum Consortium
represents to this Court that Plaintiffs are suing the Defendants simply because they
speak to teachers about what to teach.  LESMCC Slapp Br. at 6.

But Plaintiffs have done no such thing. Instead, Plaintiffs have asked the Court
to bar only Nominal Defendant LAUSD – which has no First Amendment rights –
from using these materials in its official work. *See* SAC Prayer for Relie ¶¶2-5; and
for an order barring the use of these materials in classrooms wher Defendants work or
in seminars paid for with public funds. *Id.* ¶

## II.   NO PROTECTED FIRST AMENDMENT ACTIVITY BY DEFENDANTS IS AT ISSUE IN THIS CASE.

The only activity at issue in this case is the speech and conduct of publicly pai
teachers in their public school classrooms during class time. Defendants' invocation
of the First Amendment as protection for the activity here at issue therefore fails.

This is true for two reasons. First, as explained in the Fact Section of this brief,
Defendants' argument misapprehends what activity is at issue here. Their briefs
incorrectly start, and devote effectively all of their space to arguing, that Defendants
are being sued for – and pretending that this case asks this Court to stop – activity
that is simply not at issue here.

The second reason why Defendants' First Amendment arguments fail is that
the law is absolutely clear in holding that public school teachers have no First

Amendment rights regarding what they say and do in their classrooms during class time. The Ninth Circuit has said so clearly, in *Johnson v. Poway Unified School Dist.,* 958 F.3d 954 (9th Cir. 2011) – in a holding that Defendants acknowledge exactly nowhere in any of their five briefs.  For this reason, UTLA's claim that the relief sought here amounts to a prior restraint is incorrect.  UTLA 12(b)(6) Br. at 7. Because there is no First Amendment protection for teachers inside an elementary or secondary school classroom, no First Amendment issue is presented by a restriction on such speech.  And at any rate, the restriction sought here is only the one imposed by state law – and a state law whose constitutionality no Defendant has attacked.

Two conclusions necessarily follow from this. First, it dooms all moving Defendants' effort to escape from this case by arguing that the case attacks activity protected by the First Amendment. That argument completely misstates the law, as we show below, and it therefore fails.   The second consequence of this clear law is that it compels denial of the Defendants' SLAPP motion. As all Defendants recognize, the first requirement for a successful SLAPP motion is that the activity at issue be protected by the First Amendment. Because none of the activity actually at issue is so protected, the motion must be denied.

## A.   Defendants Misapprehend What Activity Is At Issue In This Case.

As previously shown, Defendants briefs resolutely refuse to acknowledge that the activity here at issue is, and is only, what is said and done in public school classrooms during class time. Instead, they pretend that they have been sued "advocacy" regarding the Liberated curriculum. Because they have not, their First Amendment defense of their right to engage in such advocacy is irrelevant.

## B.   The Law Is Clear That When Public School Teachers Are At Work In Their Classrooms They Have No First Amendment Rights To Teach Whatever They Want.

The Ninth Circuit has answered this question. *See Poway v. Johnson Unified School Dist., supra*. In so holding, the Ninth Circuit joined other circuits that have

reached the same conclusion. *See, e.g.*, *Evans-Marshall v. Board Of Education Of Tipp City Exempted Village School District*, 624 F.3d 322 (6th Cir. 2010); *Walker v. New York City Dep't of Educ.,* 712 Fed.Appx. 43 (2d Cir. 2017). For this reason, even a legal analyst sympathetic to teachers, and who clearly wished the law were otherwise, described claims about teachers' First Amendment rights in the classroom as "easy cases."   The teachers, he explained, lose these cases. *See Garcetti's Impact on Teachers,* (June 3, 2019) https://onlabor.org/garcettis-impact-on-teachers/   As the Ninth Circuit explained in *Poway,* a teacher's speech in the classroom is speech that "the school board hire[d]."   The teacher does not own the right to decide what gets said in a classroom. In California, in a series of laws invoked by the SAC, the state has mandated a complete ban on teaching that is biased on the basis of religion, nationality, and ethnic origin, among other factors. Teachers have absolutely no First Amendment right to violate that ban because they have opinions critical of a particular nationality, ethnicity or religion.  *Poway* is binding law in this Court. It resolves this question. Defendants' failure to cite, acknowledge or even try to explain away this holding leaves the issue a straightforward one for this Court.7

## III.   PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS.

### A.   The Law On Standing Is Uniquely Accommodating For First Amendment Claims.

The Ninth Circuit's decision in *Sabra v. Maricopa Cty. Comm. Coll. Dist.*, *supra,* makes clear that Plaintiffs – all of whom have lost resources, and/or incurred expenditures because of the current use of the curricular materials here at issue – have standing to sue now to bar the use of those materials.  See *supra* at __.

Beyond this, the Ninth Circuit has held that "when the threatened [government action] implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1155 (9th Cir. 2000). As the Ninth Circuit explained in *Italian Colors Rest. v. Becerra,* 878 F.3d 1165 (9th Cir. 2018): First Amendment challenges  "present unique standing

considerations." As the Supreme Court itself recently explained, In *Church of Lukumi Babalu Aye [v. Hialeah,]* the Court made clear that the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* 584 U.S. ___, 138 S.Ct. 1719, 1731 (2018).

As the above Supreme Court pronouncements are sufficient on their own to make clear, Defendants are flatly wrong in suggesting that a free exercise claim can succeed only if physical conduct is prevented or punished. That position has been explicitly rejected by the Ninth Circuit. In *Jones v Williams,* 791 F.3d 1023, 1031-32 (9th Cir. 2015) (internal quotations and citations omitted) (emphasis added), that court held: "It was well established in 2007, and remains so today, that government action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs *or* to engage in conduct that violates those beliefs."

**B.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT DEFENDANTS' TEACHING MATERIALS SUBSTANTIALLY BURDEN THE FREE EXERCISE OF THEIR RELIGIOUS BELIEF.**

**1.    Defendants' Teaching Materials Target And Seek To Suppress Expressions Of Plaintiffs' Sincerely Held Religious Belief.**

Government action "targeting religious beliefs as such is never permissible. *Church of Lukumi Babalu Aye v. Hialeah,* 508 U.S. 520, 533 (1993). "The Cour must survey meticulously the circumstances of governmental categories to eliminate,  as it were, religious gerrymanders." *Walz v. Tax Comm'n of New York City,* 397 U.S.  664, 696 (1970)(Harlan, J. concurring). The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality, *"Gillete v. United States,* 401 U.S. 437, 452 (1971)  and "covert suppression of particular religious beliefs," *Bowen v. Roy,*476 US. 693,  703 (1986)

(opinion of Burger, C.J.).

The SAC alleges clearly that Defendants have transgressed this rule, an indeed
Defendants proclaim it themselves: the materials here at issue are designed to ensure
that LAUSD teachers are "always [] confronting Zionism." What can that profession
of duty mean other than an obligation on the part of all teachers to  "suppress [this]
particular religious belief"?

Plaintiffs allege that the Liberated curriculum denounces, and seeks to teach all
LAUSD children to oppose the Torah's promise of the Land of Israel to the Jews in
just the same way as they are taught to oppose the idea of Manifest Destiny. SAC
¶191. This directly and specifically "targets [Plaintiffs'] belief," exactly what was
forbidden by *Lukumi*.

### 2. Plaintiffs Have Sufficiently Alleged That The Burden Imposed  On Their Religious Beliefs Is Substantial.

"[D]etermining whether a burden is substantial (and if so whether it is
nevertheless justifiable) is ordinarily an issue of fact … and … substantiality is a
relative term-whether a given burden is substantial depends on its magnitude in
relation to the needs and resources of the religious organization in question." *World
Outreach Conf. Ctr. v. City of Chicago,* 591 F.3d 531, 539 (7th Cir. 2009); cf. *Shakur
v. Schriro,* 514 F.3d 878, 891, (9th Cir. 2008).

The issue is whether the plaintiff "has presented sufficient evidence that [the
defendant] engaged in actions that would 'tend[] to coerce [the plaintiff] to forgo
h[is] sincerely held religious beliefs' by treating plaintiff's religious article
disrespectfully."  *Harris v. Escamilla,* 736 Fed. Appx. 618 (9th Cir. 2018).

The measurement of that burden in this case is not only a function of the
impact of the teaching on Jewish children who hold this belief: it is also on other
children who are being taught to hate that belief and to oppose it actively. Can a
publicly paid teacher ever have the right to teach some children to hate and oppose
another student's religious belief? And precisely how much hatred will have to be

taught for it to be enough to confer standing? Do we need another pogrom in Los Angeles, of the kind explicitly approved of by UTLA's appointee to the official LAUSD Ethnic Studies Committee? Do we need deaths, or will mere bodily injuries be enough?

The rule is clear that the impact of challenged government action on a Plaintiff's free exercise requires a full record, and must be assessed with careful attention paid to the impact of the challenged government action on the plaintiff Thus, for example, the extent to which particular prison policy pressures an inmate to betray his religious beliefs would be a factual issue to be resolved at trial. *Putzer v. Donnelly,* 2010 U.S. Dist. LEXIS 63708 (D.NV May 11, 2010).

Nowhere can this rule be more relevant than in elementary and secondary schools, because the target of Defendants' actions are children. We are, after all, not dealing here with adult criminals serving time in federal prison; but with children as young as five years old. Since *Brown v. Board of Education,* 347 U.S. 483, 494 n. 11 (1954), it has been clear that explicit segregation by race harms at least the entire population of the race victimized by such discrimination.

That is true whether the segregation determines who enters which school house or how different races are treated in the same school house. In the course of holding that public school teachers have no First Amendment rights when they are on the job, the Ninth Circuit has itself noted "the position of trust and authority they hold and the impressionable young minds with which they interact." *Johnson v. Poway Unified School Dist.,* 658 F.3d 954, 968 (9th Cir 2011). Indeed, as the Ninth Circuit held in that case, teachers address themselves to the impressionable and "captive minds" when they teach and they must not "take advantage" of that fact "to press [their] particular views." *Ibid.* Pressing their particular views – "their truths," as Defendants say it, SAC ¶110 – is exactly what Defendants freely admit they are doing in this case.

Over two decades of research have shown that subjective or perceived

exposure to racial or ethnic discrimination has deleterious effects on both physical

and mental health for African Americans, and recent studies report similar findings

for Asian Americans, Latinos, and other ethnic groups. Whether racial discrimination,

racism, ethnic discrimination, or cultural racism, often used interchangeably, the

shared meaning of these terms is the unfair treatment that members of marginalized

racial and ethnic groups experience because of their phenotypical or linguistic

characteristics and cultural practices.  Perceived exposure to discrimination (broadly

stated here to imply unfair treatment due to one's race or ethnicity) has been

conceptualized as a unique chronic stressor. Consistent with other stressors, perceived

discrimination can elicit variable emotional and behavioral responses that have been

hypothesized to adversely affect mental health.

 *Disentangling the effects of perceived personal and group ethnic*

*discrimination among secondary school students: The protective role of teacher–*

*student relationship quality and school*

*climate,*https://onlinelibrary.wiley.com/doi/full/10.1002/cad.20415 ; *See also*

*Perceived Racial/Ethnic Discrimination and Mental Health: a Review and Futur*

*Directions for Social Epidemiology,*

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5596659/  The measurement of the

burden on Plaintiffs is not only a function of the impact of the teaching directly on

Jewish children who hold this belief: it is also on other kids who are being taught to

hate that belief and to oppose it actively. That means that even non-Jewish children

have the right to challenge an antisemitic curriculum. *NOW v. Sperry-Rand Corp.,*

457 F.Supp. 1338 (D. CT 1978) (because every citizen has the right to a

discrimination-free environment, even a member of the majority, non-victimized

population has standing to challenge discrimination against a minority because such a

plaintiff has his or her own right to a non-discriminator

environment).

**IV.** **COURTS ROUTINELY ADDRESS THE ONLY FACTUAL QUESTION RELATING TO RELIGION PRESENTED BY THIS CASE, WHICH IS THE PLAINTIFFS' CLAIM THAT THEY MAINTAIN SINCERELY HELD RELIGIOUS BELIEFS.**

Completely ignoring the entire body of law governing the assessment of Plaintiff's sincerely held religious belief, the UTLA Defendants invoke totally irrelevant cases to suggest that this Court's adjudication of Plaintiffs' claims would require it to resolve disputes over Jewish religious doctrine.. The argument is completely meritless.  As they must, given their Article III duty to resolve cases and controversies, courts routinely decide whether a plaintiff's religious beliefs are sincerely held, and whether they are, indeed "religious." See *Watts v. Fla. Int'l Univ.* 495 F.3d 1289 (11th Cir. 2007):

> Federal case law is replete with examples of courts articulating the threshold free exercise requirements as a two-part analysis. *See, e.g.*, Lukumi, 508 U.S. at 531, 113 S. Ct. at 2226-27  [**31] (noting that the Court "must consider" the plaintiffs' free exercise claim because no question existed as to the plaintiffs' sincerity and the practice of animal sacrifice was a religious belief); United States v. Seeger, 380 U.S. 163, 185, 85 S. Ct. 850, 863, 13 L. Ed. 2d 733 (1965) (describing a court's responsibility as deciding whether a plaintiff's beliefs are "sincerely held" and religious) (*citing* United States v. Ballard, 322 U.S. 78, 86, 64 S. Ct. 882, 886, 88 L. Ed. 1148 (1944)); Benning v. Georgia, 391 F.3d 1299, 1313 (11th Cir. 2004) ("[T]he First Amendment . . . requires [a court] to determine whether the asserted belief . . . is religious and sincerely held.") * * * Callahan v. Woods, 658 F.2d 679, 683 (9th Cir. 1981) (noting "two basic criteria" for free exercise protection: (1) that the proffered belief be "sincerely held" and (2) that the claim be rooted in religious belief and not secular concerns).

Thus the only issue is whether, as a factual matter, *Plaintiffs* sincerely believe what they claim to believe, and whether that belief is an article of *their* faith. Quite obviously, none of this requires this Court to decide any issue of international law or to decide who's right in the Middle East, any more than it requires this Court to "resolve or take a side in, thorny and hotly debates religious doctrinal questions." UTLA 12(b)(6) Br. at 8, or to define Jewish doctrine in any way. On the contrary: the Complaint specifically precludes this argument by Defendants, alleging in ¶133 that

Plaintiffs are not asking this Court to adjudicate the truth or validity of these beliefs. Plaintiffs are seeking only recognition and enforcement of the black letter principle that their own sincerely held religious beliefs are entitle to First Amendment protection as well as to the protection afforded religious commitments under the various other Constitutional and statutory provisions invoked in this case.   Indeed, the SAC ¶134 makes clear not only that the Court is not being asked to define Jewish doctrine but that there is no one official statement of Jewish creed, with respect to Zion or anything else:

> There is virtually no proposition of Jewish belief upon which all Jews agree, and the Jewish canon has never had an officially adopted creed setting forth the essence of Jewish belief or any mechanism for the creation of such a creed. But that does not diminish the sincerity of the religious commitment of Jews to the religious principles to which they do adhere; and a great many Jews, including Plaintiffs, sincerely hold a religious belief in Zionism.

To enable the factfinder to decide these questions, the SAC does what every plaintiff must do who asks a court to adjudicate a claim regarding his or her sincerely held religious belief: Plaintiffs have put before the Court allegations that will enable them to put into evidence exactly the same kinds of facts that all other courts examine when deciding such claims. Thus, for example, the trial court in *Lukumi*, 723 F.Supp. 1467,1469-70 (S.D. FL 1989) received, examined and ruled on extensive evidence regarding the source and content of the religious belief at issue. This evidence was briefly summarized by the Supreme Court in its opinion in that case. *Lukumi,* 508 U.S. at 524-526. Because this is appropriate, and indeed, required, in cases of this kind, the SAC includes allegations on this topic. See SAC ¶¶130-171. [5]

Because they are wrong about Plaintiffs' beliefs – and the belief of a great many Jews – regarding the centrality of Zionism to Jewish identity, Defendants are also wrong about the antisemitic quality of what they are peddling to LAUSD'schildren.[6]

**V.   BY ALLEGING THAT DEFENDANTS HAVE SOUGHT AND ATTAINED "CONTROL" OF THE TEACHING OF ETHNIC STUDIES IN LAUSD, THE PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT DEFENDANTS ARE STATE ACTORS.**

The SAC alleges clearly that Defendants perform the government function of writing the curriculum of public school classes. SAC ¶51 says this in black and white, quoting the Consortium's own website:  "Our ethnic studies experts work directly with the district's educators and curriculum development team who write the units, lessons, and develop the pedagogical practices."

 For these reasons, also, the LESMCC Defendants' argument that the SAC seeks an unconstitutional restraint on Defendants' speech and on the right of students to receive information fails. Ignoring the clear command of California and federal law, these Defendants suggest that students' right to "information" is denied by the relief Plaintiffs seek here. Under law that affords no room for ambiguity, no student has a "right" to hear from a public school teacher that any ethnic group or nationality is, categorically, genocidal or an oppressor. Such "instruction" would be biased on the basis of ethnicity and nationality and it would be impermissible. And no student has the right to the "information" that Zionism is morally wrong, any more than they have the right to the information that any other religious principle is true or false, morally right or evil.

But reading Defendants' argument more sympathetically than it deserves, one could suggest that students have the right to learn that *some people believe* Israel has done bad things, or was founded wrongfully, while *other people believe* something else. That would be information. The difficulty for Defendants is that that's not what they're doing or teaching or causing others to teach. As the SAC makes clear, ¶66, the only "information" Defendants want taught is "their truth" – which is the antisemitic and anti-Zionist content that the State of California has forbidden from public school classrooms.

The Consortium's conduct sitting with public school educators and writing

public school curriculum means that that Consortium shares and exercises public power by participating directly in the writing of LESMC teaching materials with paid employees of the LAUSD for use in publicly-funded classrooms.   That's what it means for the Consortium to say that they engage jointly with public officials "to write the units, lessons, and develop the pedagogical practices." https://www.liberatedethnicstudies.org/uploads/1/6/1/9/16198322/statement_on_how_the_lesmcc_supports_districts.pdf. The SAC further describes in detail the steps Plaintiffs have been able to identify by which Defendants have successfully caused the materials here at issue to be taught, now, in LAUSD schools. These allegations are sufficient to survive a motion to dismiss.

Whether something constitutes state action is a question of fact. "The Supreme Court has repeatedly cautioned that while the principle of 'state action' is 'easily stated, the question of whether particular discriminatory conduct is private, on the one hand, or amounts to 'state action,' on the other, frequently admits of no easy answer. *Collins v. Womancare*, 878 F.2d 1145, 1148 (9th Cir. 1989), *citing Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972); *see also Evans v. Newton*, 382 U.S. 296, 299 (1966). According to the Supreme Court, "only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961).

In this case, as the SAC alleges, LAUSD has required that Ethnic Studies be taught but not told teachers how to do that. Defendants, working together and as part of the official Ethnic Studies Committee, have stepped into this vacuum and answered the question the District has left unanswered. The curricular materials Defendants have inserted into the curriculum benefit the School District, which is able to satisfy the obligation to have Ethnic Studies courses while not having the obligation to develop curricular material on its own. Their answer is the racist material now being taught and at issue in this case.

Defendant Cardona is, in addition to her role as an officer of Defendant Liberated Ethnic Studies Model Curriculum Consortium, also a teacher in an LAUSD public school. No party denies that when Defendant Cardona acts as a teacher in public school, she is engaging in state action. None of the claims dependent on a claim of state action can therefore be dismissed as to this Defendant.

Defendants' attempt to dismiss the significance of the Ethnic Studies Committee by pointing out that it has no official power to pass on teaching materials. Exactly the same argument was made, and rejected, in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963). There a state commission had been created "to educate the public" about potentially obscene books not appropriate for children. *Id.* at 59. The body did "not regulate or suppress obscenity, but simply exhorts booksellers and advises them of their legal rights." 66. It had no power to prosecute anyone or to issue any kind of mandate requiring, or barring, conduct of any kind. The Court found this irrelevant because "the record amply demonstrates that the Commission deliberately set about to achieve the suppression" of certain books, and because "informal censorship may sufficiently inhibit" protected First Amendment activity." *Id.* at 67.

Plaintiffs also satisfy the state action requirement by pleading, and alleging facts to support their claim, that the Defendants conspired with one another to get their chosen teaching materials into LAUSD classrooms. UTLA claims to be dissatisfied the degree of detail provided in the SAC about how the conspiracy operated. Yet the SAC provides the "who, what, when and where" in, *e.g.,* ¶235 regarding the operation of this conspiracy to the extent that Plaintiffs can know it. Given Defendants' tactic of hiding what they are doing even from "administrators" in the school who might put a stop to it, See SAC Ex. A at A8, how could Plaintiffs know more at this point? Indeed, the SAC explains that Defendants have carefully vetted who has access to their racist material in an effort to ensure that it reaches only people who are share their goals and views. See e.g., SAC ¶¶122-127, detailing the lengths Defendants have gone to to prevent Plaintiff Amy Leserman from discovering

1   the actual content of Defendants' teaching materials.

2        In *Sullivan*, the Court took the dramatic step of enjoining the Commission from

3   communicating with the pressured book sellers. Here Plaintiffs seek no limit of any

4   kind on the Defendants' conduct vis-à-vis teachers – thus no limitation on what they

5   say to teachers or public officials, including even the ones who – sitting jointly with

6   Consortium personnel – write the curriculum. Plaintiffs seek only a bar on the illegal

7   result – racist and antisemitic teaching in the classroom – that Defendants are

8   producing.   Where a state delegates certain governmental functions to outside

9   parties, the determination as to whether that person is a state actor is generally a

10   question of fact that cannot be determined at the pleading stage. *See, e.g.*, *West v.*

11   *Atkins,* 487 U.S. 42  (1988); *Pollard v. The GEO Group, Inc.,* 629 F.3d 843 (9th Cir.

12   2010). As the court held in *Allen v. Woodford,* 2006 U.S.Dist. LEXIS 45254 at *40

13   (E.D. CA June 26,  2006),

14        Actions taken by a private individual may be "under color of state law" where

15   there is a significant state involvement in the action." Franklin v. Fox, 312 F.3d 423,

16   444 (9th Cir.2002); Johnson v. Knowles, 113 F.3d 1114, 1118 (9th Cir.1997) As the

17   Ninth Circuit has held in *Poway*, the ultimate decision about what gets said in a

18   public school classroom is, necessarily, a government decision.

19        At the end of the day, by requiring that Ethnic Studies be taught but not

20   providing a curriculum, the LAUSD has effectively delegated to Defendants the

21   power to make that decision, and Defendants have filled that void and are exercising

22   that control. Because the decision itself is a government decision, the Defendants'

23   actions in making the decision constitute state action.  A variety of tests have been

24   formulated for defining state action, an Defendants' conduct here satisfies them:

25   Under the public function test, a private party is viewed as a state actor if the plaintiff

26   establishes that, in engaging in the challenged conduct, the private party performed a

27   public function that has been 'traditionally the exclusive prerogative of the state.' ...

28   Under the joint action test, state action is found where a private person is a 'willful

participant in joint activity with the State or its agents' that effects a constitutional deprivation ... Under the state compulsion test, a private party is fairly characterized as a state actor when the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State ... Lastly, under the governmental nexus test, the issue is whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself .... *Fenters v. Chevron,* 761 F.Supp.2d 957 (E.D. CA 2010).

There can be no dispute that the choice of what to teach in public school classrooms is a "public function," and indeed Defendants do not claim otherwise.

The SAC alleges that, in the absence of an official LAUSD choice, the Defendants  have stepped in to make that determination. The District's authorization of the Union and its president to appoint individuals to an official body that reviews all Ethnic Studies teaching material in the district satisfies the joint action test.

But as the court cautioned in *Allen v. Woodford,* 2006 U.S.Dist. LEXIS 45254 at *42 (internal quotations omitted), "[w]hile these factors are helpful in determining the significance of state involvement, 'there is no specific formula for defining state action.' *McDade v. West,* 223 F.3d 1135, 1139 (9th Cir. 2000). The extent of state involvement remains a factual inquiry. 'Only by sifting facts and weighing circumstances can the non-obvious involvement of the state in private conduct be attributed its true significance.'  *Howerton v. Gabica* 708 F.2d 380, 383 (9th Cir. 1983).  That is so here, particularly in light of Defendants' urging teachers to hide what they are doing at Defendants' direction. Only a detailed factual analysis of Defendants' conduct will enable a proper adjudication of Plaintiffs' claims. Only after discovery will it be truly known how, when LAUSD mandated the teaching of Ethnic Studies but provided no instruction, Defendants filled that vacuum and installed their view in Los Angeles public school classrooms.

Regarding the operation of this conspiracy to the extent that Plaintiffs can know it. Given Defendants' tactic of hiding what they are doing even from "administrators" in the school who might put a stop to it, See SAC Ex. A at A8, how could Plaintiffs know more at this point? Indeed, the SAC explains that Defendants have carefully vetted who has access to their racist material in an effort to ensure that it reaches only people who are share their goals and views. See e.g., SAC ¶¶122-127, detailing the lengths Defendants have gone to to prevent Plaintiff Amy Leserman from discovering the actual content of Defendants' teaching materials.

It has been argued on behalf of the individual Defendants that they are entitled to immunity because her conduct was not clearly illegal.[5]  But this entitlement to immunity applies only for claims for damages.  And at any rate, this argument clearly fails in light of Defendants' failure to even try to square the use of the teaching materials here at issue with California's express command ***not*** to use them, particularly in light of Defendants' explicit proclamation, cited in SAC ¶108 and discussed above at __, that the State of California was simply wrong in issuing this command. Not only were Defendants violating the law: they knew – indeed, they *announced* – that they were violating the law. Their actions were indeed clearly illegal. They knew it at the time and said so.

## VI.    PLAINTIFF PARENTS HAVE STANDING TO BRING THEIR CLAIMS UNDER TITLE VI.

Pretending away SAC allegations with which they otherwise deal directly Defendants suggest that the Title VI claim must fail because the Parent Plaintiffs are suing here merely to enforce their own rights and not those of their children. The argument is belied by the fact that throughout the rest of their briefs, Defendants acknowledge that what is at stake here is the injury to children from having their religious beliefs denounced, their national identity assaulted as criminal, and from Defendants' efforts

---

[5] The Defendants' briefs also invoke the *Sabra* case for the proposition that Defendant Carrasco Cardona, as a teacher, has qualified immunity from suit.  But that case related immunity to a claim for money damages.  There is no such claim here; Plaintiffs seek only injunctive relief.  *Sabra* is irrelevant on this issue.

to preclude these children from voicing their own religious beliefs in public school.
Defendants make no effort to explain how it could be that the students' rights and
injuries are at stake elsewhere in the SAC but somehow not for the Title VI
count.

## VII.  INTENT HAS BEEN ADEQUATELY ALLEGED FOR BOTH EQUAL PROTECTION AND TITLE VI CLAIMS

Defendants attack both Plaintiffs' Equal Protection and Title VI claims by
suggesting that Plaintiffs have not adequately alleged intent. The SAC says clearly in
¶74:

Evidence of Defendants' discriminatory intent is present here in many forms:

a.      Statements by decision-makers responsible for preparation and
dissemination of the LESMC;

b.      the sequence of events leading to the Defendants' promulgation
and promotion of the LESMC;

c.      the fact that the content of the LESMC is, and was intended by
Defendants to be, a clear departure from past policy and procedure within the
LAUSD;

d.      a past history of animus towards Judaism and Zionism by
Defendants and by the individuals and entities who are actual original sources of the
LESMC.

Given this clear allegation and the additional detail provided in the SAC, it's
difficult to understand what to make of this argument. The SAC pleads at length and
in detail that Defendants focus obsessively on Israel and Zionism, announcing their
belief that "we have to always be confronting" this Jewish belief; that they intend to
drive public speech in support of the Jewish commitment to Zion out of the public
square; that they denounce the existence of exactly one country in the world – the
Jewish state – while leaving uncriticized such nations as North Korea or even
countries where slavery is officially legal.

## VIII.  PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE FEDERAL AND STATE EQUAL PROTECTION CLAUSES, AS THEIR OWN AUTHORITIES CLEARLY HOLD.

The UTLA Defendants tell this Court that the Ninth Circuit has rejected attack on "curriculum content" as the "basis for alleging discriminatory conduct under the Equal Protection clause." UTLA Br. at 14, citing *Monteiro v. Tempe Union High School Dist.,*158 F.3d 1022 (9th Cir. 1998).

The case they invoke says the exact opposite. The Ninth Circuit explicitly distinguished the claim there – based on the presence of two books in a reading list – from a different claim, which would have yielded the opposite result. What is that different claim? The result would be different, the *Monteiro* court suggested, if the plaintiff were claiming that "the curriculum itself was racist." 158 F.3d at 1031.

Here, as Plaintiffs have demonstrated, not only does the SAC allege exactly that; but the State of California has officially determined exactly that.  Indeed, the State of California made that determination not once, not twice, but three times: when it rejected the content Defendants are actually teaching; when it enacted A.B. 101 and Governor Newsom explained that the law barred use of the material here at issue; and in September of this year, when the Executive Director of the Department of Education issued a letter announcing that the material here at issue should not be used.  SAC ¶99. And the evidence Plaintiffs have already put before this Court, drawn from the pronouncements Defendants have not successfully hidden from the public, make clear that we are not dealing here with a tiny fraction of a larger educational program:  we are dealing, as Plaintiffs allege, and as Governor Newsom has found, with a curriculum infected from top to bottom with racism and bias.  That is Plaintiffs' claim, and Plaintiffs have put forward a good deal of evidence with their pleading to demonstrate that it is so. Everything the courts have held, and which has been adduced earlier in this brief, makes clear that Plaintiffs must be accorded the opportunity to gather evidence to support that claim and to put that evidence before a finder of fact.

## IX. THE STATE LAW CLAIMS ARE ALL VALID, AND INDEED DEFENDANT CARDONA ADVANCES NO REASON WHY SHE IS NOT LIABLE UNDER THESE PROVISIONS.

Defendants attack the state law claims not by arguing that the racist material they are using conforms to state law. Instead, ignoring Plaintiffs' claims that Defendants are exercising a public function by choosing the teaching materials here at issue for use in public schools, the UTLA Defendants say these claims should be dismissed because the statutes do not bind private parties. Plaintiffs agree that the statutes do not bind private parties. As this brief has made clear, Plaintiffs claim that the Defendants are acting as *de facto **public*** parties. In any event, the only relief sought, as this brief has explained at length, is a restriction on a public function, namely the use of these materials in public schools.

Defendant Cardona, however, is a public school teacher. Even under UTLA's argument, a public school teacher is bound by all of the state laws invoked in the SAC. No party has advanced any argument why these claims should be dismissed as to Defendant Cardona. There is accordingly no basis for dismissal of these claims as to her, or indeed for dismissal of any claim where state action is at issue.

## X. THE COURT SHOULD DENY THE SLAPP MOTIONS

The Defendants' SLAPP motions ask this Court to punish Plaintiffs for bringing a claim they have not brought. They go to great length to establish these Defendants' right to engage in private speech about Ethnic Studies, and pays absolutely no attention to the only wrong for which Plaintiffs have sought redress – which is, as has been emphasized throughout this brief, what LAUSD public school teachers do and say in their classrooms during class time.

So complete is the Defendants' refusal to confront the claim Plaintiffs have actually brought that their SLAPP brief ignores directly controlling Ninth Circuit authority, holding categorically that teachers have no First Amendment rights in the classroom on class time. See *Johnson v. Poway Unified School Dist., supra.*   The UTLA

SLAPP Brief cites this case, at 11 but does not acknowledge this holding by the Court.

Rather than addressing the claim Plaintiffs have actually brought, the UTLA SLAPP Brief uses 19 of its 22 pages to demonstrate the right of the Union and its President to engage in speech which the Plaintiffs in this case do not seek to stop or to punish in any.[10] Indeed, unlike the cases the SLAPP statute was actually designed to deter, this case does not seek to punish anyone for anything. No damages are sought from any party; the only relief sought is an end to the use of racist teaching materials in Los Angeles public schools.

Because their motion is so thoroughly misdirected, the UTLA Defendant cannot satisfy the first of the SLAPP Act's two requirements, which is that the Plaintiff's claims arise from acts in furtherance of constitutional rights of petition and free speech. The only claims here arise from speech in the classroom. There is no Constitutional right to speech in the public elementary and secondary school classroom. That's the end of the matter.[11]

The UTLA Defendants do not formally argue that they are entitled to counsel teachers to hide what they are doing in class.  But in any event, the law is clear that the First Amendment does not bar a court from preventing a speaker from counseling the commission of imminent lawless action when such counseling is likely to incite or produce such action. *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969). That rule was deployed in, *e.g., United States v. Allamby,* 2005 U.S. Dist. LEXIS 32385 (N.D. OH July 29, 2005); in *United States v. Bell,* 414 F.3d 474 (3d Cir. 2005); and in *United States v. Schiff,* 379 F.3d 621 (9th Cir. 2004).

To the extent that Defendants wish to argue that the SLAPP Motion should be granted because they will prevail on grounds such as their claim they are not engaged in state action, those are factual issues as to which Plaintiffs are entitled to discovery before a ruling. *Planned Parenthood Fed'n of Am. V. Ctr. For Med.*

**CONCLUSION**

The case Defendants have attacked and asked this Court to dismiss and strike isnot the case Plaintiffs have brought. Plaintiffs' case is a carefully circumscribed claim that tramples on no-one's First Amendment rights, while enforcing federal and California law mandating a racism- and bias-free curriculum in publicly-funded schools.

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' Second Amended Complaint and the Defendants' special motions to strike should be denied. In the event that the Court finds factual allegations lacking that are required to state a claim, Plaintiffs respectfully request the opportunity to amend their Complaint to address any such failings.

*Progress*, 890 F.3d 828, 833-34 (9th Cir. 2018) ("Requiring a presentation of evidence without accompanying discovery would improperly transform the motion to strike under the anti-SLAPP law into a motion for summary judgment without providing any of the procedural safeguards that have been firmly established by the Federal Rules of Civil Procedure. That result would effectively allow the state anti-SLAPP rules to usurp the federal rules. We could not properly allow such a result." *See also Williams v. Kula*, 2020 U.S. Dist. LEXIS 154978, at *8-9 (S.D. Cal. Aug. 26, 2020) ("But in such a case, discovery must be allowed, with opportunities to

//

//

//

supplement evidence based on the factual challenges, before any decision is made by the court.").

Dated:  November 24, 2023                    Respectfully submitted,

                                             THE DEBORAH PROJECT

                                      By:    */s/ Lori Lowenthal Marcus*
                                             LORI LOWENTHAL MARCUS

                                      By:    */s/ Jerome M. Marcus*
                                             JEROME M. MARCUS

                                             JUDICIAL WATCH, INC.

                                      By:    */s/ Robert Patrick Sticht.*
                                             ROBERT PATRICK STICHT

                                             Attorneys for Plaintiffs