JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CONCERNED JEWISH PARENTS AND TEACHERS OF LOS ANGELES, <u>et al.</u>, | ) ) ) | Case No. CV 22-3243 FMO (Ex) |
| Plaintiffs, | ) ) | |
| v. | ) ) | **JUDGMENT** |
| LIBERATED ETHNIC STUDIES MODEL CURRICULUM CONSORTIUM, <u>et al.</u>, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | |

Pursuant to the Order Re: Motion to Dismiss, IT IS ADJUDGED that the above-captioned action is dismissed with prejudice.

Dated this 30th day of November, 2024.

_____
/s/
Fernando M. Olguin
United States District Judge

1
2
3
4
5
6
7

8    **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   CONCERNED JEWISH PARENTS AND    )    Case No. CV 22-3243 FMO (Ex)
     TEACHERS OF LOS ANGELES, et al.,    )

12                                       )
                    Plaintiffs,          )

13                                       )    **ORDER RE: PENDING MOTIONS**
             v.                          )

14                                       )
     LIBERATED ETHNIC STUDIES MODEL      )

15   CURRICULUM CONSORTIUM, et al.,      )
                                         )

16                  Defendants.          )
     _____ )

17

18          Having reviewed and considered all the briefing filed with respect to the United Teachers

19   of Los Angeles ("UTLA") and UTLA president Cecily Myart-Cruz's ("Myart-Cruz") Motion to Dismiss

20   (Dkt. 121, "UTLA MTD") and Special Motion to Strike (Dkt. 122, "UTLA MTS"); the Liberated Ethnic

21   Studies Model Curriculum Consortium ("Consortium"), Theresa Montaño ("Montaño"), and

22   Guadalupe Carrasco Cardona's ("Cardona") Motion to Dismiss (Dkt. 124, "Consortium MTD") and

23   Special Motion to Strike (Dkt. 125, "Consortium MTS"); and nominal defendant Los Angeles

24   Unified School District's ("LAUSD" or "nominal defendant") Motion to Dismiss (Dkt. 123, "LAUSD

25   MTD"), the court finds that oral argument is not necessary to resolve the Motions, see Fed. R. Civ.

26   P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and

27   concludes as follows.

28

### INTRODUCTION[1]

The Concerned Jewish Parents and Teachers of Los Angeles ("CJPTLA"), "an unincorporated association comprised of Jewish, Zionist Los Angeles teachers who teach in the LAUSD and Jewish, Zionist parents of children who are students in the LAUSD," initiated this action on May 12, 2022.  (Dkt. 1, Complaint at ¶ 19).  On October 16, 2023, CJPTLA and additional plaintiffs, Amy Leserman ("Leserman"), Lindsey Kohn ("Kohn"), Danna Rosenthal ("Rosenthal"), and Daniel Eli ("Eli") (collectively, "individual plaintiffs"), filed the operative Second Amended Complaint, (Dkt. 119, "SAC"), against the following defendants: (1) UTLA and UTLA president Myart-Cruz (collectively, the "UTLA defendants"), (see id. at ¶¶ 33 & 49); (2) the Consortium, a non-profit organization that helped develop the curriculum at issue, as well as Montaño,[2] the Consortium's secretary, (collectively, the "Consortium defendants")[3]; (3) Cardona, the Consortium's co-founder,[4] (see id. at ¶¶ 50, 52 & 53); and (4) LAUSD, as a nominal defendant. (Id. at ¶ 63).

Plaintiffs assert claims under 42 U.S.C. § 1983 ("§ 1983") for violations of: (1) the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV; and (2) the Free Exercise Clause of the First Amendment, U.S. Const. amend. I.  (See Dkt. 119, SAC at ¶¶ 226-36).  Plaintiffs also assert claims under:  (1) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq.; (2) the Equal Protection Clause of the California Constitution, Article I § 7; and (3) Cal. Educ. Code §§ 220, 51500, 51501 & 51225.3(a)(1)(G)(ii).  (See id. at ¶¶ 237-58).  Plaintiffs

---

[1]  Capitalization, quotation and alteration marks, and emphasis in record citations may be altered without notation.

[2]  Montaño is sued in her capacity as a member of the LAUSD-UTLA Ethnic Studies Committee.  (Dkt. 119, SAC at ¶ 52).

[3]  The UTLA and Consortium defendants are collectively referred to as the "non-District defendants."

[4]  Cardona is sued "in her individual and official capacity[]" as an LAUSD teacher.  (Dkt. 119, SAC at ¶ 53).  She is also identified as a member of the LAUSD-UTLA Ethnic Studies Committee, (see id.) which is alleged to have engaged in state action, (id. at ¶ 36), but it is unclear whether Cardona is also sued in her official capacity as a committee member.  (See id.).

seek declaratory and injunctive relief, as well as attorney's fees and costs.  (See id. at Prayer for Relief).

### PLAINTIFFS' ALLEGATIONS

As an initial matter, the court notes that plaintiffs' SAC is difficult to understand and contains a morass of largely irrelevant – and sometimes contradictory – allegations, few of which state with any degree of clarity precisely what plaintiffs believe defendants have done or, more importantly, how plaintiffs have been harmed.  (See, generally, Dkt. 119, SAC); see also Williams v. Weber, 2023 WL 6908642, *1 (C.D. Cal. 2023) ("[A] complaint violates Rule 8 if a defendant would have difficulty understanding and responding to the complaint.").  Indeed, so confusing are the allegations that plaintiffs spend approximately a third of their Omnibus Memorandum of Points and Authorities in Opposition to Defendants' Motions (Dkt. 129, "Opp."), endeavoring to explain exactly what they contend their SAC alleges – and, at times, attempting to walk back certain allegations or add new ones.  (See id. at 4-17).  The lack of clarity is particularly troubling given that this is plaintiffs' fourth iteration of their complaint.[5]  Indeed, the SAC was filed after plaintiffs had an opportunity to review and consider two rounds of briefing that were, in many respects, the same as the instant Motions.  (Compare Dkt. 57 (UTLA's First MTD), Dkt. 58 (UTLA's First MTS), and Dkt. 60 (Consortium's First MTD) with Dkt. 64 (UTLA's Second MTD), Dkt. 65 (UTLA's Second MTS), Dkt. 69 (Consortium's Second MTD), and Dkt. 71 (LAUSD's First MTD)).

In any event, plaintiffs' claims appear to revolve around the Liberated Ethnic Studies Model Curriculum ("LESMC" or "challenged curriculum"), a set of teaching materials developed by an independent non-profit organization that has not been adopted by LAUSD.[6]  (See Dkt. 119, SAC

---

[5]  Although plaintiffs label their complaint as the "Second Amended Complaint," and the court will refer to it as such, the SAC is, in fact, plaintiffs' third amended complaint.  (See Dkt. 1, Complaint); (Dkt. 39, First Amended Complaint); (Dkt. 62, [Second] First Amended Complaint); (Dkt. 119, SAC).

[6]  The SAC attaches several exhibits with screenshots from what appear to be Liberated Ethnic Studies or Teach Palestine websites, presumably as examples of the curricular offerings plaintiffs seek to exclude from LAUSD classrooms.  (See, generally, Dkts. 119-1-119-2, 119-4, 119-8-119-10, Exhs. A-B, D & H-J); see also United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (noting that a court may consider documents attached to the complaint "without converting the

¶¶ 2, 3, 14, 50, 84-85, 97, 101, 226-58 & Prayer for Relief at ¶ 4).  Plaintiffs allege that as of 2020, LAUSD has required high school students to take an ethnic studies class and "integrate ethnic studies into PreK-8 curricula."  (See id. at ¶ 2) (cleaned up).  Plaintiffs claim that the UTLA and Consortium defendants – the non-District defendants – have advocated for implementation of the challenged curriculum and "are inserting, or attempting to insert" these materials into LAUSD schools.  (Id. at ¶ 6); (see id. at ¶¶ 4, 33, 66 & 226-58).  Plaintiffs repeatedly describe, cite to, and quote from what appears to be the challenged curriculum.  (See, e.g., id. at ¶¶ 15, 111, 116-18, 119, 129, 130, 174, 177, 181 & 191).  For example, plaintiffs state that the SAC "contains much of the discriminatory teaching material designed by Defendants and caused by them to be used in Los Angeles public schools."  (Id. at ¶ 225(a)).

According to plaintiffs, the challenged curriculum "denounces capitalism, the nuclear family, and the territorial integrity of the lower 48 states of the United States[,]" (Dkt. 119, SAC at ¶ 20), and is designed "to expunge the idea of Zionism, and the legitimacy of the existence of the State of Israel, from the public square[.]"  (Id. at ¶ 66).  Plaintiffs allege there is "rank discrimination embedded in the LESMC," (see id. at ¶¶ 66 & 228), because the challenged curriculum, among other things, "includes statements that the existence of the State of Israel is based on ethnic cleansing and land theft, apartheid and genocide" and that "Zionism is distinct from Judaism."  (Id. at ¶¶ 101 & 111).  Because the challenged curriculum contains anti-Zionist material, plaintiffs allege that the curriculum is antisemitic.  (See id. at ¶¶ 1, 7, 15(d), 19, 19(d), 33, 99, 101, 108, 130-32 & 188).

Plaintiffs assert that they "sincerely hold a religious belief in Zionism" and that "Zionism is an essential part of Jewish belief as well as of Jewish culture and ethnic identity."  (See Dkt. 119, SAC at ¶¶ 15(d) & 30).  The individual plaintiffs allege that they are "aware of the content" of the challenged curriculum and are "imminently threatened" by it.  (See id. at ¶¶ 26-29).  They claim that the challenged curriculum "seeks to make it unsafe and ultimately impossible for any person

---

motion to dismiss into a motion for summary judgment").  Beyond these examples and references, (see, e.g., Dkt. 119, SAC at ¶¶ 66, 118 & 177), plaintiffs do not identify which portions of the challenged curriculum are at issue.  (See, generally, id.).

to express Zionist ideas or Zionist commitment in public in general and within LAUSD public schools in particular." (See id. at ¶¶ 26-29). According to plaintiffs, publication of the challenged curriculum has been "received by each Plaintiff" and "made clear to each Plaintiff that they and similarly situated people[,] . . . who sincerely hold a religious belief in Zionism, or who are Israeli-Americans or who identify as ethnically Israeli, Jewish or Zionist, are not welcome in any LAUSD classroom where . . . Ethnic Studies is being taught." (Id. at ¶ 30).

Kohn, Rosenthal, and Eli, parents of children enrolled in LAUSD schools, allege that they and their children are "imminently threatened" by the challenged curriculum, (Dkt. 119, SAC at ¶¶ 27-29), and that they are "being forced . . . to choose between protecting the sincerely held religious beliefs of their children and availing themselves of their legal right to send their children to a California public school." (Id. at ¶ 31). The parent-plaintiffs also allege that defendants are "concealing the publicly-funded teaching of the LESMC" which "makes it unreasonably difficult or impossible for Plaintiffs to detect whether their children's religious beliefs are . . . being denounced . . . or whether their children are being denounced as Israeli-Americans or ethnically Israeli, Jewish or Zionist." (Id.). Eli, "a Jewish Israeli Zionist[,]" also alleges that the challenged curriculum "seeks to make it unsafe and ultimately impossible for any person . . . to identify publicly as an Israeli." (Id. at ¶ 29). Additionally, Leserman and Kohn, "teacher[s] employed by LAUSD[,]" allege that they have "personally experienced the official hostility of Defendant UTLA to the state of Israel and to the concept of Zionism." (Id. at ¶¶ 26 & 27). They claim that they are being "forced" to work in an environment where their "religious or ethnic identity is being officially denounced by publicly-funded propaganda . . . on public school time." (Id. at ¶ 32).

In addition to taking issue with the content of the challenged curriculum, plaintiffs decry the non-District defendants' advocacy and support for the challenged curriculum. (See, e.g., Dkt. 119, SAC at ¶¶ 5, 6, 19, 33, 66, 72 & 105) (referencing defendants' attempts to "insert" the challenged curriculum in LAUSD schools). According to plaintiffs, "Defendants are injecting their views into the LAUSD curriculum[,]" (id. at ¶ 12), and "disseminating [the challenged curriculum] to teachers throughout Los Angeles, under the authority of nominal Defendant Los Angeles Unified School District ("LAUSD"), and at times through stealth[.]" (Id. at ¶ 3). Plaintiffs also allege that the non-

District defendants supported or participated in workshops that "led teachers to bring the LESMC to their own classrooms."  (Id. at ¶ 45) (internal quotation marks omitted).

Plaintiffs acknowledge that nominal defendant "LAUSD has the right to control the content of all Ethnic Studies classes taught in LAUSD schools" via "the LAUSD Division of Instruction." (Dkt. 119, SAC at ¶ 38); (see id. at ¶ 63) ("LAUSD has ultimate control over and responsibility for the use and public disclosure of any teaching materials in Los Angeles public schools other than those materials whose use is directed by the California State Board of Education.").  Plaintiffs allege that, as a result of the Collective Bargaining Agreement ("CBA")[7] between UTLA and LAUSD, the latter created an Ethnic Studies Committee ("ESC") to "provide input" on "implementation of the mandated course requirement of Ethnic Studies" and on "the development or selection of curriculum and teaching materials."  (See id. at ¶¶ 34-35).  According to the CBA, the ESC "operates under the direction of the [LAUSD] Division of Instruction[,]" and is comprised of "members of the Division of Instruction, UTLA members, school site District administrators and community members."  (2022-2025 Agreement: Los Angeles Unified School District and United Teachers Los Angeles Contract, Article XXV-A, Section 4.0, at 262-63, https://utla.net/app/uploads/2023/12/FINAL-CBA-2022-2025-UTLA-Contract-1.pdf.).  Plaintiffs claim that UTLA has used its "rights under its collective bargaining agreement with the [LAUSD] to appoint members to a government-funded and operated committee which exercises public power over the content of the Ethnic Studies curriculum . . . and have used that power to include in LAUSD classes the antisemitic and anti-Zionist teaching materials at issue."  (Dkt. 119, SAC at ¶ 33); (see also id. at ¶¶ 40-44).

Plaintiffs concede that the challenged curriculum has not been formally adopted by LAUSD, (see, e.g., Dkt. 119, SAC ¶¶ 2, 14, 84-85, 97, 101 & Prayer for Relief at ¶ 4), but nevertheless

---

[7]  The court takes judicial notice of the CBA.  See Fed. R. Evid. 201; see also United States v. 14.02 Acres of Land More or Less in Fresno Cnty., 547 F.3d 943, 955 (9th Cir. 2008) ("Although, as a general rule, a district court may not consider materials not originally included in the pleadings in deciding a Rule 12 motion, Fed.R.Civ.P. 12(d), it 'may take judicial notice of matters of public record' and consider them without converting a Rule 12 motion into one for summary judgment.").

claim that they "are being harmed" and "will be harmed" by the challenged curriculum "that Defendants are now inserting and attempting to insert into LAUSD's educational paradigm." (Id. at ¶ 19). Plaintiffs allege that the challenged curriculum is being taught in at least two LAUSD classrooms. (See id. at ¶¶ 44 & 53). LAUSD teacher Roxana Dueñas, who is not a defendant in this case, is "currently . . . using the LESMC including the discriminatory, hateful material on Israel at issue in this case." (Id. at ¶ 44). Additionally, Cardona, who is a defendant in this case, stated "that she is teaching from LESMC materials and would continue doing so in her LAUSD classroom." (Id. at ¶ 53).

Even as plaintiffs quote from what they claim to be the challenged curriculum, plaintiffs allege that the non-District defendants have concealed the content of the challenged curriculum from the public. (See Dkt. 119, SAC at ¶ 128); (see also id. at ¶¶ 31, 114, 118, 128-29, 225, 229, 235, 244 & 254) (alleging concealment). For example, Leserman alleges that she registered for a conference hosted by the Consortium, (see id. at ¶¶ 122-23), but when she arrived, she was told that attendance was "by invitation only[.]" (Id. at ¶ 127). She was later offered a refund of her travel expenses. (Id.).

The gist of plaintiffs' action appears to be that the non-District defendants: (1) are engaged in advocacy seeking to introduce the challenged curriculum into LAUSD schools, (see Dkt. 119, SAC at ¶¶ 85, 229, 235 & 239); (2) are simultaneously seeking to hide the content of the curriculum from the public, (see id. at ¶¶ 229, 235, 244 & 254); and (3) have succeeded in introducing the curriculum into LAUSD schools.[8] (See, e.g., id. at ¶¶ 45 & 53) (alleging use in two classrooms); (id. at ¶¶ 5, 6, 19 & 66) (using the phrase "inserting and attempting to insert," suggesting some successful action); (id. at ¶¶ 15, 44 & 74) (alluding to "use" of the challenged curriculum). According to plaintiffs, the non-District defendants' actions are sometimes public, and at other times covert and conspiratorial. (See, e.g., id. at ¶ 3).

---

[8] The court has endeavored to parse plaintiffs' wide-ranging, imprecise, and at times, baffling, 258-paragraph SAC into coherent theories.

As for their legal claims, plaintiffs allege that: (1) the challenged curriculum is discriminatory and that "introducing and attempting to introduce" it into LAUSD classrooms violates their rights under the Equal Protection Clauses of the U.S. Constitution and California Constitution, the Free Exercise Clause of the U.S. Constitution, Title VI of the Civil Rights Act, and Cal. Educ. Code §§ 220, 51500, and 51501, (see Dkt. 119, SAC at ¶¶ 75, 222, 226-228, 231-233, 237-25 & 246-255); and (2) the non-District defendants have urged teachers to use the materials covertly, in violation of Cal. Educ. Code § 51225.3(a)(1)(G)(ii)'s public notice and comment provision. (See id. at ¶¶ 256-258).

Based on these theories and claims, plaintiffs seek: (1) "declaratory relief adjudging that use of the elements of the LESMC at issue in this case in Los Angeles public schools violates Plaintiffs' rights"; (2) declaratory and injunctive relief enjoining LAUSD from failing to "publicly disclos[e] all materials used by teachers to teach students Ethnic Studies" in LAUSD classrooms; (3) declaratory and injunctive relief enjoining LAUSD from failing to hold public hearings "before adoption of Ethnic Studies teaching materials"; (4) declaratory and injunctive relief enjoining LAUSD from including language critical of Israel or Zionism in its teaching materials;[9] (5) declaratory and injunctive relief enjoining LAUSD from compensating teachers who use the challenged curriculum; and (6) declaratory and injunctive relief enjoining all defendants "from using the elements of the LESMC at issue in this case in their public school classrooms or in any training sessions funded by public funds, or for which salary points are awarded by LAUSD[.]" (See Dkt. 119, SAC, Prayer for Relief at ¶¶ 1-6).

With this background in mind, the court turns to the instant Motions.

---

[9]   In particular, plaintiffs request a prohibition on "any language, in any teaching materials, asserting that Zionism is not a Jewish belief; denouncing the Jewish belief in the land of Israel as the land promised by God to the Jewish people, or the Jewish belief in Zionism, or asserting that the State of Israel, as the Nation-State of the Jewish people, is illegitimate, or asserting as a fact that the Jewish State is guilty of committing such horrific crimes against others as ethnic cleansing, land theft, apartheid or genocide, or that the Jewish people are not indigenous to the land of Israel or to the Middle East, or denying the State of Israel the right to self-defense; and/or denying the historical or religious connection between the Jewish people and the land of Israel[.]" (Dkt. 119, SAC, Prayer for Relief at ¶ 4(a)).

**LEGAL STANDARDS**

I.      RULE 12(b)(1).

A defendant may seek to dismiss a complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[10] "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

II.     RULE 12(b)(6).

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965, "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted).

---

[10]  Unless otherwise indicated, all "Rule" references are to the Federal Rules of Civil Procedure.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, <u>Erickson</u>, 551 U.S. at 93-94, 127 S.Ct. at 2200, construe the complaint in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor.  <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); <u>Lazy Y Ranch Ltd. v. Behrens</u>, 546 F.3d 580, 588 (9th Cir. 2008).  However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." <u>Fayer v. Vaughn</u>, 649 F.3d 1061, 1064 (9th Cir. 2011).  Dismissal for failure to state a claim may be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. <u>See</u> <u>Mendiondo v. Centinela Hosp. Med. Ctr.</u>, 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint may also be dismissed if it discloses some fact or complete defense that will necessarily defeat the claim.  <u>Franklin v. Murphy</u>, 745 F.2d 1221, 1228-29 (9th Cir. 1984), <u>abrogated on other grounds by</u>, <u>Neitzke v. Williams</u>, 490 U.S. 319, 109 S.Ct. 1827 (1989).

## DISCUSSION

Defendants move to dismiss plaintiffs' SAC pursuant to Rules 12(b)(1) and 12(b)(6).  (<u>See</u> Dkt. 121, UTLA MTD at 3-7); (Dkt. 124, Consortium MTD at 9-10); (Dkt. 123, LAUSD MTD at 6-12).  The non-District defendants also move to strike the SAC under California's anti-SLAPP law. (<u>See</u> Dkt. 122, UTLA MTS); (Dkt. 125, Consortium MTS).  Specifically, defendants argue that plaintiffs lack standing, (<u>see</u> Dkt. 121, UTLA MTD at 3-7); (Dkt. 124, Consortium MTD at 9-10); (Dkt. 123, LAUSD MTD at 8-11), and nominal defendant LAUSD also argues that plaintiffs claims are not ripe and that LAUSD is immune from suit under the Eleventh Amendment.  (<u>See</u> Dkt. 123, LAUSD MTD at 6-8 & 11-12).  The court first addresses these threshold jusiticiability questions and concludes that plaintiffs' claims are unripe, that plaintiffs lack standing, and that LAUSD has sovereign immunity.  <u>See</u> <u>infra</u> § I.  Finally, even assuming plaintiffs' claims are justiciable, the court concludes that plaintiffs have failed to state a claim upon which relief may be granted, <u>see</u> <u>infra</u> § II., and that plaintiffs' state law claims must be stricken.  <u>See</u> <u>infra</u> § III.

/ / /

/ / /

I.    THRESHOLD ISSUES.

A.    Ripeness.

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300, 118 S.Ct. 1257, 1259 (1998). "[W]here further factual development would aid the court's consideration[,]" a case is unripe "until the pertinent facts have been well-developed[.]" In re Coleman, 560 F.3d 1000, 1009 (9th Cir. 2009). Until then, it is "too 'impermissibly speculative' to present a justiciable controversy." Id. at 1005.

In this case, plaintiffs concede that the challenged curriculum has not been adopted by LAUSD. (See, e.g., Dkt. 119, SAC ¶¶ 2, 14, 84-85, 97, 101 & Prayer for Relief at ¶ 4). And based on the SAC's allegations, it is far from clear that formal adoption of the challenged curriculum is imminent. Further, although plaintiffs allege that the challenged curriculum has been informally adopted in two classrooms, they do not allege that their children attend or will attend either of those classrooms. (See, generally, id. at ¶¶ 45 & 53). And even if plaintiffs, as teachers and parents, could assert injuries for use of the challenged curriculum, there are no allegations that they have been or are likely to be injured by any such occurrence. Thus, any claims concerning the potential adoption of the challenged curriculum by LAUSD are unripe. In short, plaintiffs' attempt to litigate the adoption of an ethnic studies curriculum in LAUSD – before any such adoption has occurred – is unavailing.

B.    Standing.

Even assuming plaintiffs' claims were ripe for judicial review, they suffer from another fundamental flaw – plaintiffs' lack of Article III standing. Article III of the United States Constitution limits federal court jurisdiction to "actual, ongoing cases or controversies." Wolfson v. Brammer, 616 F.3d 1045, 1053 (9th Cir. 2010) (internal quotation marks omitted). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341, 126 S.Ct. 1854, 1861-62 (2006). "A proper case or controversy exists only when at least one plaintiff establishes that she

has standing to sue." <u>Murthy v. Missouri</u>, 603 U.S. 43, 57, 144 S.Ct. 1972, 1985 (2024) (cleaned up).

To establish Article III standing to sue, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." <u>Food and Drug Administration v. All. for Hippocratic Medicine</u> ("<u>Hippocratic Medicine</u>"), 602 U.S. 367, 380, 144 S.Ct. 1540, 1555 (2024). "[S]tanding is not dispensed in gross[.]" <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 431, 141 S.Ct. 2190, 2208 (2021). "That is, plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief they seek." <u>Murthy</u>, 603 U.S. at 61, 144 S.Ct. at 1988 (internal quotation marks omitted).

Here, all plaintiffs – the parents, teachers, and organization – lack standing to assert any claims against any defendant.

1.      **Injury in Fact**.

An injury in fact must be concrete and particularized; "the injury must affect the plaintiff in a personal and individual way and not be a generalized grievance." <u>Hippocratic Medicine</u>, 602 U.S. at 381, 144 S.Ct. at 1556 (internal quotation marks omitted). "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples. Moreover, the injury must be actual or imminent, not speculative – meaning that the injury must have already occurred or be likely to occur soon. And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish sufficient likelihood of future injury." <u>Id.</u> (citations omitted).

The parent and teacher plaintiffs appear to allege a few related injuries arising out of the challenged curriculum. First, they allege that they are "imminently threatened" by the challenged curriculum, (see Dkt. 119, SAC at ¶¶ 26-29), and that the challenged curriculum has "been received by each Plaintiff in this case[.]" (Dkt. 119, SAC at ¶ 30); (see also Dkt. 129, Opp. at 10) ("Every individual Plaintiff has alleged that he or she has experienced the antisemitic and anti-Zionist content at issue in this case and been injured by it, because that content has 'been received by each Plaintiff in this case[.]'"). Second, they allege that each parent-plaintiff "is being

forced . . . to choose between protecting the sincerely held religious beliefs of their children and availing themselves of their legal right to send their children to a California public school."  (Dkt. 119, SAC at ¶ 31); (see also Dkt. 129, Opp. at 10).  Finally, the teacher-plaintiffs allege that they have "personally experienced the official hostility of Defendant UTLA to the state of Israel and to the concept of Zionism[,]" (Dkt. 119, SAC at ¶¶ 26-27), and that they are being "forced" to work in an environment where their "religious or ethnic identity is being officially denounced by publicly-funded propaganda . . . on public school time."  (Id. at ¶ 32).

Here, the individual plaintiffs' allegations fail to establish a concrete and particularized injury in fact.  There are no allegations that any of the children of the parent-plaintiffs have encountered the challenged curriculum.  (See, generally, Dkt. 119, SAC at ¶¶ 25-31).  Instead, the individual plaintiffs allege, in a conclusory fashion, that they are "imminently threatened" by the challenged curriculum.  (See id. at ¶¶ 26-29).  But they do not explain how or why the potential or actual teaching of the challenged curriculum harms or threatens them personally – that is, they never identify or define their actual alleged injury.  Similarly, other than supporting the notion that they are aware of the curriculum, plaintiffs' claim that they have "received" the challenged curriculum, (id. at ¶ 30), does not explain how this has caused them any harm.  Neither the parent-plaintiffs' allegations that they are "being forced . . . to choose" between sending their children to school and protecting their children's religious beliefs, (id. at ¶ 31), nor the teacher-plaintiffs' allegations that they are being "forced" to work in an environment where their "religious or ethnic identity is being officially denounced[,]" (id. at ¶ 32), explain how awareness of the challenged curriculum constitutes an injury.[11]

---

[11]  Although plaintiffs allege that Lesserman was denied entry to a conference, (see Dkt. 119, SAC at ¶¶ 122-27), plaintiffs' claims are not based on this incident.  Plaintiffs allege no tort or contractual claims against the Consortium in connection with this incident and the SAC does not seek any remedy for Leserman's exclusion.  (See, generally, Dkt. 119, SAC at ¶¶ 226-58 & Prayer for Relief).  Moreover, plaintiffs have not explained how this incident bears any relation to the future injuries plaintiffs allege.  Beyond plaintiffs' argument that the incident demonstrates defendants' intent to conceal the challenged curriculum, plaintiffs do not explain how these allegations establish that the teacher-plaintiffs have been injured by the challenged curriculum.  (See, generally, Dkt. 129, Opp. at 10-11).

The essence of plaintiffs' alleged injuries appears to be that they are aware of the challenged curriculum, disagree with it, and fear it will be adopted or used in LAUSD classrooms. (See Dkt. 119, SAC at ¶¶ 26-30). But it is far from clear that learning about Israel and Palestine or encountering teaching materials with which one disagrees constitutes an injury. See Caldwell v. Caldwell, 545 F.3d 1126, 1133 (9th Cir. 2008) (holding that a parent's "offense" to online instructional material was an "abstract objection" insufficient to support standing). As the Supreme Court has noted, "the psychological consequence presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 485-86, 102 S.Ct. 752, 765 (1982). Neither the parent-plaintiffs nor the teacher-plaintiffs have identified "any personal injury suffered by them as a consequence of the alleged constitutional error[.]" See Valley Forge, 454 U.S. at 485, 102 S.Ct. at 765 (emphasis omitted); (see, generally, Dkt. 119, SAC at ¶¶ 64-221). Plaintiffs may not "sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a [purported] government action."[12] Hippocratic Medicine, 602 U.S. at 381, 144 S.Ct. at 1556. In other words, the individual plaintiffs' potential exposure to ideas with which they disagree is insufficient to support standing.

But perhaps the issue most fatal to plaintiffs' claims is that their alleged injuries are neither actual nor imminent. None of plaintiffs' claims are based on allegations of past injuries. Because plaintiffs cannot trace any past injury to any defendant, it is "much harder" for them to make any showing of threatened future injury. Murthy, 603 U.S. at 59, 144 S.Ct. at 1987. As for their future injuries, the teacher-plaintiffs do not allege that they have or will encounter the challenged curriculum. (See Dkt. 119, SAC at ¶¶ 26, 27 & 32). Similarly, the parent-plaintiffs do not allege

---

[12] And to the extent plaintiffs allege that they are generally injured by defendants' purported non-compliance with the law in LAUSD classrooms, (see, e.g., Dkt. 119, SAC at ¶ 5 & Prayer for Relief) – despite not having encountered the challenged materials – this, too, is insufficient to confer standing. See Hippocratic Medicine, 602 U.S. at 381, 144 S.Ct. at 1556 ("A citizen may not sue based only on an asserted right to have the Government act in accordance with law.") (internal quotation marks omitted).

that any of their children attend classrooms where the challenged materials are allegedly being taught or will imminently be taught.  (See, generally, id. at ¶¶ 25-35).  Nor do they allege that they have withdrawn their children from LAUSD or that LAUSD has formally adopted the challenged material.  (See, generally, id. at ¶¶ 2, 14, 25-31, 84-85, 97 & 101).  At most, the parent-plaintiffs allege that it is "unreasonably difficult or impossible for Plaintiffs to detect whether their children's religious beliefs are . . . being denounced in the public school classrooms[,]" and that they are "being forced . . . to choose" between sending their children to school and protecting their children's religious beliefs.  (Id. at ¶ 31).  But these allegations merely raise the specter of possible future injury, which is insufficient to establish standing.  See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 133 S.Ct. 1138, 1147 (2013) (The Supreme Court has "repeatedly reiterated that . . . allegations of possible future injury are not sufficient.") (internal quotation and alteration marks omitted).  Thus, even if plaintiffs had cogently identified a stigmatic injury and properly asserted it, such an injury is neither ripe, nor actual or imminent.

Considering that the challenged curriculum has not been adopted and that the parent-plaintiffs allege a mere possibility that their children will encounter the challenged curriculum at some unspecified point in the future, plaintiffs' alleged injuries, (see Dkt. 119, SAC at ¶¶ 26-29), are "conjectural" and "hypothetical" rather than "actual or imminent," and plainly insufficient to raise a "substantial risk" that an injury will occur.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992); Murthy, 603 U.S. at 69, 144 S.Ct. at 1993 ("To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them."); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158, 134 S.Ct. 2334, 2341 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.").  That a student might be assigned to a teacher who might teach the allegedly objectionable material is too speculative to confer standing.  See T.K. v. Adobe Sys., 2018 U.S. Dist. LEXIS 142988, *13 (N.D. Cal. 2018) ("A possible requirement by a hypothetical future teacher cannot be said to be certainly impending.").  Without more, neither the mere possibility that LAUSD will adopt the challenged curriculum nor the mere chance that the teacher-

plaintiffs or the parent-plaintiffs' children will encounter the material suffices to confer standing. See City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670 (1983) ("Absent a sufficient likelihood that [the plaintiff] will again be wronged in a similar way,[the plaintiff] is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [state actors] are unconstitutional."). In short, the individual plaintiffs have not alleged "a sufficient likelihood of future injury." Hippocratic Medicine, 602 U.S. at 381, 144 S.Ct. at 1556.

Finally, as to CJPTLA, "organizations may have standing to sue on their own behalf for injuries they have sustained." Hippocratic Medicine, 602 U.S. at 393, 144 S.Ct. at 1563 (internal quotation marks omitted). "[H]owever, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." Id. at 393-94, 144 S.Ct. at 1563. The CJPTLA "must show far more than simply a setback to the organization's abstract social interests." Id. at 394, 144 S.Ct. at 1563 (internal quotation marks omitted). In other words, it is not sufficient for CJPTLA to show that the organization has diverted its resources in response to defendants' actions. Id. at 395, 144 S.Ct. at 1564. To establish standing, CJPTLA must show that defendants' actions "directly affected and interfered" with its "core business activities[.]"[13] Id. at 395, 144 S.Ct. at 1564. Here, other than stating that all plaintiffs, including CJPTLA, "have lost resources, and/or incurred expenditures because of the current use of the curricular materials here at issue[,]" (Dkt. 129, Opp. at 17), plaintiffs have not alleged any cognizable injury sustained by CJPTLA. (See, generally, Dkt. 119, SAC).

### 2. **Causation and Redressability**.

The court will address causation and redressability together because they "are often flip sides of the same coin." Hippocratic Medicine, 602 U.S. at 380, 144 S.Ct. at 1555 (internal quotation marks omitted). As to causation, plaintiffs "must . . . establish that [their] injury likely was

---

[13] Although plaintiffs cite to Sabra v. Maricopa Cnty. Cmty. Coll. Dist., 44 F.4th 867 (9th Cir. 2022), (see Dkt. 129, Opp. at 9-10), the Ninth Circuit recently stated that Sabra was "irreconcilable" with the Supreme Court's decision in Hippocratic Medicine, 602 U.S. 367, 144 S.Ct. 1540 (2024) and thus "overruled." See Arizona All. for Retired Americans v. Mayes, 117 F.4th 1165, 1178 (9th Cir. 2024).

1   caused or likely will be caused by the defendant[s'] conduct." Id. at 382, 144 S.Ct. at 1556. "The

2   line of causation between the illegal conduct and injury – the links in the chain of causation – must

3   not be too speculative or too attenuated. . . .  The causation requirement precludes speculative

4   links – that is, where it is not sufficiently predictable how third parties would react to government

5   action or cause downstream injury to plaintiffs." Id. at 383, 144 S.Ct. at 1557 (cleaned up).

6          First, plaintiffs do not clearly allege that any of their alleged injuries were caused by

7   defendants.  Plaintiffs' "claim is that, when it comes to choosing Ethnic Studies materials in

8   LAUSD, the decision by the District to require the course but not say how to teach it has left a

9   vacuum into which the [non-District] Defendants have inserted themselves[.]" (Dkt. 129, Opp. at

10  13).  Plaintiffs' SAC, however, contains only conclusory allegations regarding how the non-District

11  defendants' alleged conduct has "caused [the challenged curriculum] to be used in Los Angeles

12  public schools." (Dkt. 119, SAC at ¶ 225); see also Staub v. Zimmer, Inc., 2017 WL 2506166, *2

13  (W.D. Wash. 2017) ("[T]he complaint must contain sufficient non-conclusory factual allegations

14  to support at least one avenue of relief[.]").  Further, other than a vague statement by Cardona,

15  (see Dkt. 119, SAC at ¶ 53), plaintiffs do not identify any teachers who attended seminars or

16  conferences hosted by the non-District defendants, or who indicated that their teaching was

17  affected by the non-District defendants.  (See, generally, id. at ¶¶ 64-221).  Indeed, plaintiffs

18  acknowledge that "LAUSD has ultimate control over and responsibility for the use . . . of any

19  teaching materials in Los Angeles public schools," (id. at ¶ 63), making it clear that the non-District

20  defendants cannot be responsible for any harm.  Although plaintiffs allege that the challenged

21  materials were taught in at least one LAUSD classroom, (see id. at ¶¶ 45 & 53), they have not

22  established any alleged harm, let alone harm that is fairly traceable to any defendant.  (See,

23  generally, id.).  In other words, as to causation, plaintiffs have not met their "burden to establish

24  standing by setting forth specific facts."  Murthy, 603 U.S. at 67 n. 7, 144 S.Ct. at 1991 n. 7

25  (internal quotation marks omitted).  They have not plausibly alleged that the non-District

26  defendants caused the challenged curriculum to be taught in LAUSD schools, and there are no

27  allegations that LAUSD caused plaintiffs any injury.

28

Second, plaintiffs' claims are not redressable. "To determine whether an injury is redressable," courts "consider the relationship between the judicial relief requested and the injury suffered." California v. Texas, 593 U.S. 659, 671, 141 S.Ct. 2104, 2115 (2021) (internal quotation marks omitted). Courts also consider whether they have the power to order the requested relief. See M.S. v. Brown, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[E]ven where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief."); Republic of Marshall Islands v. United States, 865 F.3d 1187, 1199 (9th Cir. 2017) ("Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury.") (internal quotation marks omitted).

Plaintiffs sued LAUSD, UTLA, the Consortium, and the individual defendants in their individual and official capacities seeking a permanent injunction "prohibiting all Defendants from using the elements of the LESMC at issue . . . in their public school classrooms or in any training sessions funded by public funds, or for which salary points are awarded by LAUSD[.]" (Dkt. 119, SAC, Prayer for Relief at ¶ 6). Plaintiffs also seek an injunction prohibiting LAUSD from including language critical of Israel and Zionism in any future ethnic studies curriculum. (See id. at ¶ 4(a)). Finally, plaintiffs request that the court require LAUSD to comply with public disclosure requirements, (see id. at ¶¶ 2-3), none of which plaintiffs allege have been violated by LAUSD.

Plaintiffs' requested relief is sweeping in scope and impermissible in nature. In effect, plaintiffs ask the court to: (1) preemptively outlaw the challenged curriculum; (2) enjoin use of the challenged curriculum even before it has been approved by LAUSD; and (3) preemptively outlaw the broader use of language or statements – beyond any language at issue in the challenged curriculum – that are anti-Zionist or critical of Israel in any future teaching material utilized in LAUSD. (See Dkt. 119, SAC, Prayer for Relief at ¶¶ 1-6). Plaintiffs' requested relief raises significant First Amendment concerns,[14] as plaintiffs seek an injunction that amounts to an unconstitutional prior restraint on speech. See Vance. Universal Amusement Co., 445 U.S. 308, 315-17, 100 S.Ct. 1156, 1161-62 (1980) (noting onerous burden that an injunction prohibiting

---

[14] These concerns are explored further in § II.C.

future speech must overcome).  Because the non-District defendants are private parties, see infra § II.A.1., their speech and conduct is protected by the First Amendment.  The court cannot enjoin private parties from expressing their views on what an ethnic studies curriculum should or should not contain, let alone from using any "elements" of the challenged curriculum, because  doing so would violate the First Amendment.  Thus, to the extent plaintiffs seek to have the court impose a restraint on the speech of private parties, plaintiffs' injuries are not redressable.  See, e.g., M.S., 902 F.3d at 1086 (holding that injuries are not redressable when relief sought would violate the Constitution); Reeves v. Nago, 535 F.Supp.3d 943, 956 (D. Haw. 2021) (same).

Further, to the extent plaintiffs seek to limit publicly-funded participation in teacher-training sessions or the speech of LAUSD teachers in such training sessions, the request is vague and overbroad.  For example, in Van Dyke v. Regents of Univ. of California, 815 F.Supp. 1341 (C.D. Cal. 1993), the court considered a similar request for injunctive relief barring a professor from engaging in any activities "disrupting, destroying, impeding and interfering with the free exercise by plaintiffs of their religion."  Id. at 1346 (quoting the plaintiff's First Amended Complaint).  The court reasoned that it had "neither the power to grant such relief nor to enforce it if granted[,]" because the requested relief was "vague[,]" "overbroad[,]" and raised "insurmountable First Amendment concerns."[15]  Id.  As in Van Dyke, plaintiffs' alleged injuries are not redressable as the court could neither order nor enforce the requested relief.

In sum, plaintiffs have not shown that they have suffered or likely will suffer an injury in fact that is fairly traceable to defendants and redressable by a favorable decision.  "An Article III court is not a legislative assembly, a town square, or a faculty lounge," and plaintiffs' abstract disagreements with a potential curriculum are insufficient to confer standing.  See Hippocratic Medicine, 602 U.S. at 382, 144 S.Ct. at 1556.

---

[15]  The court acknowledges that different academic freedom and free speech considerations apply to universities and K-12 schools, but nevertheless finds this point instructive with respect to plaintiffs' request for a broad, vague speech restriction that would impinge on LAUSD's ability to develop a curriculum and teachers' discretion on how to implement it – and would likely chill protected speech.

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Valley Forge, 454 U.S. at 474, 102 S.Ct. at 760; see Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205 (1975) (Standing analysis "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."). Among other things, courts have "refrained from adjudicating abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." Valley Forge, 454 U.S. at 475, 102 S.Ct. at 760 (internal quotation marks omitted); see Alaska Right to Life Pol. Action Comm. v. Feldman, 504 F.3d 840, 848-49 (9th Cir. 2007) ("[P]rudential standing concerns require that [courts] consider, for example, whether the alleged injury is more than a mere generalized grievance, whether the plaintiff is asserting her own rights or the rights of third parties, and whether the claim falls within the zone of interests to be protected or regulated by the constitutional guarantee in question.") (internal quotation marks omitted). The Ninth Circuit has, accordingly, "dr[awn] a distinction between abstract grievances and personal injuries," Buono v. Norton, 371 F.3d 543, 547 (9th Cir. 2004), the upshot of which is that "[t]he court must refrain from becoming a judicial version of college debating forums." Caldwell, 545 F.3d at 1133 (internal quotation and alteration marks omitted).

At its core, plaintiffs' action seeks to have the court to weigh in on whether instruction that may be critical of Zionism or Israel is antisemitic. (See Dkt. 119, SAC at ¶¶ 64-214); (see, e.g., Dkt. 129, Opp. at 30) ("Defendants focus obsessively on Israel and Zionism, announcing their belief that 'we have to always be confronting' this Jewish belief; that they intend to drive public speech in support of the Jewish commitment to Zion out of the public square; that they denounce the existence of exactly one country in the world – the Jewish state – while leaving uncriticized such nations as North Korea or even countries where slavery is officially legal."). While courts do, as plaintiffs note, (see Dkt. 129, Opp. at 22-23), determine whether beliefs are religious in nature and whether they are sincerely held, without a justiciable case or controversy that presents a cognizable, redressable injury, the court would be entertaining a generalized grievance. Under such circumstances, prudential considerations also militate against standing.

1          C.      Sovereign Immunity.

2          In addition to bringing standing and ripeness challenges, nominal defendant LAUSD asserts

3    that plaintiffs' claims are barred by the Eleventh Amendment.  (See Dkt. 123, LAUSD MTD at

4    11-12).  Plaintiffs counter that the Eleventh Amendment does not apply because they seek only

5    prospective injunctive relief.  (See Dkt. 130, Plaintiffs' Memorandum of Points and Authorities in

6    Opposition to Nominal Defendant LAUSD's Motion to Dismiss Second Amended Complaint ("Pl.'s

7    Opp. to LAUSD MTD") at 2-3).

8          The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not

9    be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

10   United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S.

11   Const., Amend XI.  "It is well established that agencies of the state are immune under the Eleventh

12   Amendment from private damages or suits for injunctive relief brought in federal court."[16]  Savage

13   v. Glendale Union High Sch., 343 F.3d 1036, 1040 (9th Cir. 2003).  California school districts are

14   state agencies "protected by the Eleventh Amendment."  Belanger v. Madera Unified Sch. Dist.,

15   963 F.2d 248, 251 (9th Cir. 1992); Sato v. Orange Cnty. Dep't of Educ., 861 F.3d 923, 934 (9th

16   Cir. 2017) ("California school districts . . . remain arms of the state and continue to enjoy Eleventh

17   Amendment immunity.").

18         Plaintiffs are correct, (see Dkt. 130, Pl.'s Opp. to LAUSD MTD at 2-3), that under the

19   doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441 (1908), suits "for prospective declaratory

20   or injunctive relief against state officers in their official capacities for their alleged violations of

21   federal law" are permitted.  See Coal. to Defend Affirmative Action v. Brown, 674 F.3d 1128, 1134

22   (9th Cir. 2012).  The Ex parte Young doctrine applies only if:  (1) the plaintiff seeks prospective

23   injunctive relief; (2) the complaint alleges a violation of federal or constitutional law; and (3) the

24   individual state official sued has "some connection with the enforcement of the [allegedly

25

26         [16]   "Though styled as an 'immunity,' the Eleventh Amendment limits the subject-matter

27   jurisdiction of the federal courts."  U.S. Satellite Broad. Co., Inc. v. Lynch, 41 F.Supp.2d 1113,
     1117 (E.D. Cal. 1999) (citing Seminole Tribe of Florida v. Florida, 517 U.S. 44, 53, 116 S.Ct. 1114,
28   1122 (1996)).

unconstitutional] act."[17]  Id.; see Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645, 122 S.Ct. 1753, 1760 (2002) (describing doctrine); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 288, 117 S.Ct. 2028, 2043 (1997) (O'Connor, J., concurring) ("In Young, the Court held that a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment.").  The state official's connection to enforcement of the act "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."  Los Angeles Cnty. Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir. 1992).

In this case, plaintiffs sued LAUSD and one teacher, Cardona.  Because the Ex parte Young exception to sovereign immunity applies only to claims against state officials, it does not allow plaintiffs to sue LAUSD, notwithstanding plaintiffs' claims for injunctive relief.[18]  See Eu, 979 F.2d at 704; see, e.g., Mitchell v. Los Angeles Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1988), modified by Kohn v. State Bar of California, 87 F.4th 1021 (9th Cir. 2023) (finding that community college was "a state entity that possesses eleventh amendment immunity from the appellant's section 1981, 1983 and 1985 claims in damages and for injunctive relief.").  Cardona, then, is the only state official named.  Plaintiffs allege that she is teaching from the challenged materials, (see Dkt. 119, SAC at ¶ 53), but do not adequately allege that she has some connection to "the enforcement of the [allegedly unconstitutional] act."  See Coal. to Defend Affirmative Action, 674

---

[17]  The Ex Parte Young doctrine does not apply to claims for injunctive relief against state officials for violations of state law.  See Peralta v. California Franchise Tax Bd., 124 F.Supp.3d 993, 1000 (N.D. Cal. 2015), aff'd, 673 F.Appx. 975 (Fed. Cir. 2016); see also Dube v. State Univ. of New York, 900 F.2d 587, 595 (2d Cir. 1990) ("[A] federal court's grant of injunctive relief against a state official may not be based on violations of state law.") (emphasis omitted).

[18]  Plaintiffs do not allege a theory of municipal liability because, as they acknowledge, "the complaint does not allege wrongdoing by nominal Defendant LAUSD." (Dkt. 130, Pl.'s Opp. to LAUSD MTD at 3).  Additionally, if the state agency is entitled to invoke sovereign immunity even when its individual officials are named as nominal defendants, see Regents of the Univ. of California v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 903; Durning v. Citibank, N.A., 950 F.2d 1419, 1423 (9th Cir. 1991), then the agency must also be permitted to assert sovereign immunity when it is named as nominal defendant.

F.3d at 1134.  There are no allegations that Cardona possesses decision-making authority or otherwise has a sufficient connection to the enforcement of the alleged unconstitutional act, i.e., the development and implementation of the challenged curriculum.  (See, generally, Dkt. 119, SAC at ¶ 53); see Mecinas v. Hobbs, 30 F.4th 890, 903-04 (9th Cir. 2022) ("The connection required under Ex parte Young demands merely that the implicated state official have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.") (internal quotation marks omitted); see also R. W. v. Columbia Basin Coll., 77 F.4th 1214, 1227 (9th Cir. 2023) ("For a suit to proceed under Ex parte Young, a plaintiff must show that an injunction against a particular official would significantly increase the likelihood of relief, not that relief is a guarantee.") (cleaned up); see, e.g., Coal. to Defend Affirmative Action, 674 F.3d at 1134 (finding that head of University of California had connection to enforcement of non-discrimination law); Mecinas, 30 F.4th at 903-04 (finding that secretary of state had connection to enforcement of voting law); Eu, 979 F.2d at 704 (finding that governor and secretary of state had connection to enforcement of statute limiting the number of superior court judges).  In short, plaintiffs' federal claims against Cardona in her official capacity for declaratory and injunctive relief are barred by sovereign immunity.[19]

LAUSD, however, has validly asserted sovereign immunity, and beyond citing the Ex Parte Young doctrine, plaintiffs have not explained why the Eleventh Amendment does not shield LAUSD.  Instead, plaintiffs insist that LAUSD is necessary for the court to effectuate injunctive relief.  (See Dkt. 130, Pl.'s Opp. to LAUSD MTD at 4-5) ("LAUSD is, ultimately, legally in control of what happens in LAUSD classrooms and for that reason must remain as a nominal defendant in this case in order to enable this Court to enjoin the use of the racist and antisemitic material[.]").  But plaintiffs do not adequately explain why LAUSD is appropriately named as a nominal defendant, and the out-of-circuit cases they cite, (see id. at 3-5), offer no clues as to their theory.  Plaintiffs claim that LAUSD is a nominal defendant because "the complaint does not allege

---

[19]  However, even if plaintiffs' claims against Cardona were not barred, the claims would still be subject to dismissal because they: (1) are non-justiciable under ripeness and standing doctrines, see supra §§ I.A., I.B.; and (2) fail as a matter of law.  See infra § II.

wrongdoing" by LAUSD and its "intentions[,]" unlike those of the non-District defendants, are not "at issue." (See id. at 3-5). But plaintiffs assert most of their claims against LAUSD, allege that LAUSD controls the curriculum, and virtually all the injunctive relief they seek is against LAUSD. (See Dkt. 119, SAC at ¶ 63 & Prayer for Relief).

"A nominal defendant is a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." S.E.C. v. Colello, 139 F.3d 674, 676 (9th Cir. 1998) (internal quotation marks omitted).[20] The "paradigmatic nominal defendant is a trustee, agent, or depositary who is joined purely as a means of facilitating collection." Id. (cleaned up). Because "the nominal defendant has no legitimate claim to the disputed property, he is not a real party in interest" and "there is no claim against him[.]" Id. That a plaintiff has named a given party as a nominal defendant does not prevent the court from discerning the real party in interest. See, e.g., Prod. & Leasing, Ltd. v. Hotel Conquistador, Inc., 709 F.2d 21, 22 (9th Cir. 1983) (where state officials were named only in their individual capacities and not personally served, court concluded that these officials were nominal defendants and that the state was the real party in interest).

Here, LAUSD does not satisfy the definition of a nominal defendant. See Colello, 139 F.3d at 676. And even if the nominal defendant concept is more broadly applicable to situations where the defendant is not truly adverse to the plaintiff, that is not the case here. As the entity responsible for curricular decisions, LAUSD has a legitimate claim to, and interest in, any ethnic studies curriculum. Cf. id. ("[T]he nominal defendant has no legitimate claim to the disputed property[.]"). Additionally, plaintiffs assert many claims against LAUSD, (see Dkt. 119, SAC at ¶¶ 226-58) (identifying some claims as against "All Defendants Other than the Consortium" and others against "All Defendants Other Than LAUSD"), and the entire prayer for relief concerns LAUSD. (See id. at Prayer for Relief). Based on plaintiffs' SAC, it is clear that LAUSD is more

---

[20] As the Seventh Circuit explains, the nominal defendant is a "rather obscure common law concept" that "is not a real party in interest . . . because he has no interest in the subject matter litigated . . . [and] there is no claim against him." S.E.C. v. Cherif, 933 F.2d 403, 414 (7th Cir. 1991); see also Colello, 139 F.3d at 677 (noting that "the standard nominal defendant is a bank or trustee, which has only a custodial claim to the property").

than an actor facilitating injunctive relief, (see, e.g., id. at ¶¶ 71-73 & Prayer for Relief), and that plaintiffs have incorrectly identified LAUSD as a nominal defendant. See Colello, 139 F.3d at 676 (The "paradigmatic nominal defendant . . . is joined purely as a means of facilitating collection.") (internal quotation marks omitted). Nevertheless, plaintiffs' imprecise pleading is irrelevant because plaintiffs' claims against LAUSD fail for lack of standing, are barred by the Eleventh Amendment, and are insufficient under Rule 12(b)(6). See supra § I.; infra § II.

II.      FAILURE TO STATE A CLAIM.

As detailed above, plaintiffs' SAC merits dismissal under Rule 12(b)(1). See supra § I. Given the lack of clarity in plaintiffs' SAC, however, the court will also consider whether plaintiffs have stated a claim upon which relief may be granted. Accepting plaintiffs' allegations as true, and viewing them in the light most favorable to plaintiffs, see Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200, the court determines that all of plaintiffs' claims must be dismissed pursuant to Rule 12(b)(6).

A.      Section 1983 Claims.

As noted earlier, plaintiffs assert § 1983 claims for violations of: (1) the Equal Protection Clause of the Fourteenth Amendment; and (2) the Free Exercise Clause of the First Amendment. (See Dkt. 119, SAC at ¶¶ 64-66 & 226-36). "To state a claim under § 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person under color of state law." Naffe v. Frey, 789 F.3d 1030, 1035-36 (9th Cir. 2015) (internal quotation marks omitted). "Dismissal of a § 1983 claim following a Rule 12(b)(6) motion is proper if the complaint is devoid of factual allegations that give rise to a plausible inference of either element." Id. at 1036.

The court first considers whether plaintiffs have sufficiently alleged that the non-District defendants acted "under color of state law," 42 U.S.C. § 1983, and then turns to the constitutional violations alleged.

1.      **State Action**.

"[M]ost rights secured by the Constitution are protected only against infringement by governments," so "the conduct allegedly causing the deprivation of a federal right [must] be fairly

attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 936-37, 102 S.Ct. 2744, 2753 (1982) (internal quotation marks omitted). To determine whether the non-District defendants' conduct is "fairly attributable to the State," the court applies the two-step framework developed in Lugar. "Under this framework, we first ask whether the alleged constitutional violation was caused by the 'exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'  If the answer is yes, we then ask whether 'the party charged with the deprivation [is] a person who may fairly be said to be a state actor.'" O'Handley v. Weber, 62 F.4th 1145, 1156 (9th Cir. 2023) (quoting Lugar, 457 U.S. at 937, 102 S.Ct. at 2753).

Here, plaintiffs take issue with the conduct of the non-District defendants – the UTLA and Consortium defendants.  Specifically, plaintiffs allege that the Consortium "shares and exercises public power by participating directly in the writing of LESMC teaching materials with paid employees of the LAUSD for use in publicly-funded classrooms."  (Dkt. 119, SAC at ¶ 51). Plaintiffs also allege that "the exercise of the powers of the [Ethnic Studies] Committee, including [UTLA's] power to appoint members to the Committee . . . constitutes state action," (id. at ¶ 37), and that Montaño, secretary of the Consortium, "engages in state action" as a member of the ESC.  (Id. at ¶ 52).  As to Cardona, plaintiffs allege that her "actions in her classroom constitute state action[,]" (id. at ¶ 53), and that her "use of [the challenged curriculum] in public school classrooms constitutes state action."[21]  (Id. at ¶ 45).

Plaintiffs' allegations that the non-District defendants' involvement in the ESC constitutes state action are insufficient.  As an initial matter, by exercising its right under the CBA to appoint members to the ESC, UTLA is not exercising a state-created right.  There are no plausible allegations that the ESC or the non-District defendants have authority to determine the curriculum – the primary state function at issue here – for the more than 700,000 students that make up the

---

[21]  Cardona's alleged conduct may constitute state action to the extent she may have taught from the challenged materials in the scope of her employment as an LAUSD teacher.  But even assuming Cardona is a state actor, plaintiffs fail to adequately allege violations of the substantive law.  See infra §§ II.A.2., II.A.3. & II.B.

LAUSD.  (See, generally, Dkt. 119, SAC at ¶¶ 35-39).  Nor are there any allegations that the ESC has the authority to adopt a curriculum or that it is anything more than an advisory board.  (See, generally, id.).  In other words, the non-District defendants are not exercising a state-created right by serving and/or participating in the ESC.  Plaintiffs' claims thus fail at the first step, i.e., the alleged constitutional violation was not caused by the "exercise of some right or privilege created by the State."  See O'Handley, 62 F.4th at 1156 (internal quotation marks omitted).

While plaintiffs' failure to satisfy the first step is fatal to their attempt to allege state action, the court will address the second step for the sake of completeness.  Nevertheless, plaintiffs' failure to meet the first step "makes it much less likely that [plaintiffs] can satisfy the second because the two steps are united in a common inquiry into whether the [non-District] defendant[s] ha[ve] exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  O'Handley, 62 F.4th at 1157 (internal quotation marks omitted).

The Lugar Court outlined four tests to determine whether the conduct of private actors – such as the non-District defendants – amounts to state action: (1) public function; (2) state compulsion; (3) governmental nexus; and (4) joint action.  See 457 U.S. at 939, 102 S.Ct. at 2754-55. Although plaintiffs claim that the non-District defendants' conduct satisfies each test, (see Dkt. 129, Opp. at 27-28), the substance of plaintiffs' briefing is concerned with the "public function" and "joint action" tests.  (See id. at 24-29).  "These two tests largely subsume the state compulsion and governmental nexus tests, because they address the degree to which the state is intertwined with the private actor or action."  Ohno v. Yasuma, 723 F.3d 984, 995 n. 13 (9th Cir. 2013).

        a.    *The Public Function Test.*

Under the public function test, "a private entity may qualify as a state actor when it exercises powers traditionally exclusively reserved to the State."  Manhattan Community Access Corp. v. Halleck, 587 U.S. 802, 809, 139 S.Ct. 1921, 1928 (2019) (internal quotation marks omitted).  "[V]ery few functions fall in that category."  Id. at 809, 139 S.Ct. at 1929 (internal quotation marks omitted).

1     Plaintiffs allege that the non-District defendants are "introducing and attempting to introduce

2     the LESMC into the public schools of the LAUSD[.]"  (Dkt. 119, SAC at ¶ 239); (see id. at ¶ 233).

3     With respect to the UTLA defendants, plaintiffs contend that the public function test is satisfied

4     because "LAUSD has required that Ethnic Studies be taught but not told teachers how to do

5     that[,]" and UTLA has, through its power to appoint members to the ESC, influenced or essentially

6     dictated the curriculum.  (Dkt. 129, Opp. at 25).  But UTLA is not a state actor, and to the extent

7     allegations concerning Cardona and Cruz are based on their membership in the UTLA, there is

8     no basis for state action.  See Tom Beu Xiong v. Fischer, 787 F.3d 389, 397-98 (7th Cir. 2015)

9     ("As a general matter, unions are not state actors; they are private actors.") (internal quotation

10    marks omitted).  As to the Consortium defendants, plaintiffs' Opposition provides almost no

11    argument as to how or why they qualify as state actors.  (See, generally, Dkt. 129, Opp. at 24-29).

12    At most, plaintiffs put forth the conclusory allegation that the Consortium "shares and exercises

13    public power by participating directly in the writing of LESMC teaching materials with paid

14    employees of the LAUSD for use in publicly-funded classrooms."  (Dkt. 119, SAC at ¶ 51).

15    Taken together, the gist of plaintiffs' allegations appears to be that: (1) the Consortium

16    developed the challenged curriculum; (2) UTLA has supported the challenged curriculum; and (3)

17    members of UTLA and the Consortium serve or have served on the ESC, and as a result, the non-

18    District defendants are effectively determining the curriculum and thus engaged in state action.

19    But plaintiffs' allegations that LAUSD has effectively walked away from developing an ethnic

20    studies curriculum and left it to the non-District defendants are simply not plausible, especially

21    given the other allegations in plaintiffs' SAC.  As plaintiffs acknowledge, LAUSD established the

22    ESC as an advisory committee – under LAUSD'S control – to provide input on the development

23    and implementation of an ethnic studies curriculum.  (See, e.g., Dkt. 119, SAC at ¶¶ 34-38).  And

24    there are no specific and plausible allegations to establish, as plaintiffs contend, that the non-

25    District defendants "have stepped into th[e] vacuum" left by LAUSD merely because they have

26    advocated for the challenged curriculum.  (See Dkt. 129, Opp. at 5 & 25-26).  Such reasoning

27    would sweep up virtually every group that succeeds in advocating for changes to public programs.

28

Even assuming plaintiffs' allegations were sufficient to establish that the non-District defendants were exclusively responsible for developing and implementing an ethnic studies curriculum for LAUSD, that would not be sufficient to establish state action under the public function test because "the mere fact that a private entity performs a function that serves the public does not render its acts under color of state law for purposes of a § 1983 cause of action[.]" Dawkins v. Biondi Educ. Center, 164 F.Supp.3d 518, 529 (S.D.N.Y. 2016); see Rendell-Baker v. Kohn, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772 (1982) ("There can be no doubt that the education of . . . high school students is a public function, but that is only the beginning of the inquiry. . . . That a private entity performs a function which serves the public does not make its acts state action."). Private entities like the non-District defendants are state actors only if they perform a public function that is within the State's exclusive control. See Rendell-Baker, 457 U.S. at 842, 102 S.Ct. at 2772. And "[n]otwithstanding the importance of public education, courts have consistently held that education is not considered to be exclusively the prerogative of the State." Dawkins, 164 F.Supp.3d at 529 (collecting cases) (internal quotation marks omitted); see Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 816 (9th Cir. 2010) (holding that a private entity's "provision of educational services [was] not a function that is traditionally and exclusively the prerogative of the state"). Thus, plaintiffs' allegations regarding the non-District defendants' statements and conduct are insufficient to allege state action because "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct[.]" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S.Ct. 977, 985 (1999) (internal quotation marks omitted). In short, plaintiffs have not shown that defendants' alleged conduct satisfies the public function test.

b.    *The Joint Action Test.*

Under the joint action test, plaintiffs must allege "the existence of a conspiracy or . . . that the private party was a wilful participant in joint action with the State or its agents." Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1140 (9th Cir. 2012) (citation and internal quotation marks omitted); O'Handley, 62 F.3d at 1159 (same). Here, plaintiffs have not alleged facts satisfying the joint action test under either approach.

"The conspiracy approach . . . requires the plaintiff to show a meeting of the minds between the government and the private party to violate constitutional rights." O'Handley, 62 F.4th at 1159 (internal quotation marks omitted).  To allege a conspiracy, "[i]t is not enough merely to include conclusory allegations that certain actions were the result of a conspiracy; the plaintiff must allege facts that make the conclusion plausible."  Name.Space, Inc. v. Internet Corp. For Assigned Names & Numbers, 795 F.3d 1124, 1129 (9th Cir. 2015).  "This test is intentionally demanding and requires a high degree of cooperation between private parties and state officials to rise to the level of state action."  O'Handley, 62 F.4th at 1159-60.

Based on the allegations in the SAC, plaintiffs do not and cannot plausibly allege a conspiracy between the non-District defendants and LAUSD.  Plaintiffs contend that the non-District defendants "stepped into th[e] vacuum" left by LAUSD by advocating for a particular curriculum, (see Dkt. 129, Opp. at 25-26), and that the non-District defendants hid their conduct from LAUSD.  (See e.g., Dkt. 119, SAC at ¶ 3).  But plaintiffs also acknowledge that LAUSD has authority over, and is responsible for, the development and implementation of any ethnic studies curriculum.  (Id. at ¶ 38).  It is difficult to see how the non-District defendants and LAUSD could have a meeting of the minds to violate plaintiffs' constitutional rights when, according to plaintiffs, the non-District defendants were hiding information from LAUSD, i.e., the non-District defendants' would-be co-conspirator.  (See e.g., id. at ¶ 3).  In light of the allegations in the SAC, it is simply not plausible that LAUSD and the non-District defendants entered into a conspiracy, via the ESC or otherwise, to violate constitutional rights.  Further, even assuming plaintiffs could plausibly allege that the non-District defendants encouraged specific teachers – at a specific time and place – to teach the material plaintiffs complain about, that kind of encouragement is insufficient to establish a conspiracy between the non-District defendants and LAUSD.  See Radcliffe v. Rainbow Const. Co., 254 F.3d 772, 783-85 (9th Cir. 2001) (holding that insufficient allegations doomed conspiracy theory of state action under § 1983).

Finally, under the "willful participant" approach, "joint action exists when the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity."  Tsao, 698 F.3d at 1140 (citation and

internal quotation marks omitted).  In other words, the challenged actions must be "inextricably intertwined" with government action.  Mathis v. Pac. Gas & Elec., 75 F.3d 498, 503 (9th Cir. 1996).  This requires a "substantial degree of cooperative action."  Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989).  Here, there are no allegations that LAUSD "significantly involve[d] itself in the [non-District defendants'] actions and decisionmaking" in a "complex and deeply intertwined process" such that the non-District defendants can fairly be said to be state actors.  See Rawson v. Recovery Innovations, Inc., 975 F.3d 742, 753 (9th Cir. 2020).  Plaintiffs thus have not adequately alleged a conspiracy under the joint action test.

In sum, the non-District defendants' alleged conduct does not constitute state action because their conduct: (1) does not satisfy the first step of the Lugar framework; and (2) does not satisfy the public function or joint action test under the second step.  Finally, even if some or all of defendants were state actors, plaintiffs' claims would fail as a matter of law, for the reasons discussed below.

2.    **Equal Protection Claims**.[22]

Plaintiffs' equal protection claims under both the California and United States Constitutions are foreclosed by the Ninth Circuit's decision in Monteiro v. Tempe Union School District, 158 F.3d 1022 (9th Cir. 1998); see also Manduley v. Superior Ct., 27 Cal.4th 537, 571 (2002) ("[E]qual protection provisions in the California Constitution have been generally thought in California to be substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution.") (internal quotation marks and footnote omitted).  In Monteiro, a parent sued a school district, on behalf of her daughter and other Black students, over the high-school curriculum's inclusion of certain literary works, such as The Adventures of Huckleberry Finn and A Rose For Emily.  See 153 F.3d at 1024-25.  The plaintiff argued that because these works

---

[22]  The court will evaluate the state and federal Equal Protection claims together because "[t]he equal protection analysis under the California Constitution is 'substantially similar' to analysis under the federal Equal Protection Clause."  Olson v. California, 104 F.4th 66, 76 (9th Cir. 2024), cert. denied, 2024 WL 4486406 (Oct. 15, 2024); see also Automatic Sprinkler Corp. v. S. Cal. Edison Co., 216 Cal.App.3d 627, 633 (1989) (noting that although there is no explicit state action requirement in California's Equal Protection Clause, "federal state action decisions, though not binding, are to be considered carefully when applying the provision").

contain racially derogatory terms, their inclusion in the curriculum violated the Black students' rights under the Equal Protection Clause. See id. The Ninth Circuit held that "objections to curriculum assignments cannot form the basis of a viable Equal Protection claim, because curriculum decisions must remain the province of school authorities." California Parents for the Equalization of Educ. Materials v. Torlakson, 973 F.3d 1010, 1016 (9th Cir. 2020) (discussing Monteiro). "Absent an allegation of an underlying racist policy, plaintiffs cannot challenge the assignment of material deemed to have educational value by school authorities." Id. (internal quotation marks omitted).

Here, plaintiffs do not allege the existence of an underlying racist policy; instead, they challenge unspecified portions, see supra note 6, of a hypothetical curricular offering. (See, e.g., Dkt. 119, SAC at ¶ 30). Although plaintiffs assert that they have "allege[d] . . . a curriculum infected from top to bottom with racism and bias[,]" (Dkt. 129, Opp. at 31), plaintiffs do not direct the court to any allegations that support their assertion. (See, generally, id.). Plaintiffs cite to a single paragraph in the SAC that quotes from a letter from the California Board of Education that reiterates the non-controversial proposition that course materials may not be biased, bigoted, or discriminatory. (See id. at 31) (citing Dkt. 119, SAC ¶ 99). Far from reinforcing plaintiffs' argument, this allegation undercuts it – namely, it indicates that curricula in California public schools may not be based on an underlying racist policy. See Torlakson, 973 F.3d at 1016. There are also no allegations to support an inference of a discriminatory policy. Indeed, it is clear that the SAC is a direct "attack on curricula" – and "absent evidence of unlawful intentional discrimination, parents are not entitled to bring Equal Protection claims challenging curriculum content." Id. In short, plaintiffs' equal protection claims under both the California and United States constitutions must be dismissed. See Monteiro, 158 F.3d at 1031-32; Olson, 104 F.4th at 76 (noting similarities between the federal and California Equal Protection Clauses).

        **3.**    **Free Exercise Claim**.

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." Kennedy v. Bremerton Sch. Dist., 597 U.S.

507, 525, 142 S. Ct. 2407, 2421-22 (2022).  "Offensive content that does not penalize, interfere
with, or otherwise burden religious exercise does not violate Free Exercise rights." Torlakson, 973
F.3d at 1020.  This is so even where such content contains material that plaintiffs may find
"offensive to their religious beliefs." Id.

Plaintiffs contend that the substantial burden on the exercise of religion "in this case is not
only a function of the impact of the teaching on Jewish children who hold this belief: it is also on
other children who are being taught to hate that belief and to oppose it actively." (Dkt. 129, Opp.
at 19).  But plaintiffs do not cite to any portions of the SAC to support their contention that
instruction from the challenged curriculum burdens the exercise of their faith.[23] (See, generally,
id.).  Indeed, plaintiffs' SAC does not identify any burden at all – it does not allege that plaintiffs
have somehow been prevented from practicing their faith, or that the parent-plaintiffs have been
barred in any way from instructing their children at home. (See, generally, Dkt. 119, SAC at ¶¶ 25-
221 & 231-36).  In effect, the only hardship plaintiffs allege is that the existence of the challenged
curriculum – and its possible adoption – offends them.  But mere offense is insufficient to allege
a burden on religious exercise.  See, e.g. Torlakson, 973 F.3d at 1019-20 (holding that class
materials offensive to Hindu plaintiffs did not violate Free Exercise Clause); Sabra v. Maricopa
Cnty. Cmty. Coll. Dist., 479 F.Supp.3d 808, 818 (D. Ariz. 2020) (holding that class materials
offensive to Muslim plaintiffs did not violate the Free Exercise Clause); see also Grove v. Mead
Sch. Dist. No. 354, 753 F.2d 1528, 1543 (9th Cir. 1985) (Canby, J., concurring) ("[D]istinctions
must be drawn between those governmental actions that actually interfere with the exercise of
religion, and those that merely require or result in exposure to attitudes and outlooks at odds with
perspective prompted by religion.").  Plaintiffs have not alleged that the content "penalize[s],
interfere[s] with, or otherwise burden[s] religious exercise[.]" Torlakson, 973 F.3d at 1020.  Nor
have they "allege[d] any specific religious conduct that was affected by the Defendants' actions."

---

[23] Plaintiffs also allege that forcing parents to choose whether or not they should withdraw their
children in response to the challenged curriculum is a burden. (See Dkt. 119, SAC at ¶ 31).  But
plaintiffs have not explained precisely what burden on religious exercise is forcing their withdrawal
dilemma in the first place – that is, they have not explained what burden their children would suffer
by being exposed to the challenged material. (See, generally, Dkt. 129, Opp. at 9-12).

Id. at 1019.  In short, plaintiffs' claim that the challenged curriculum violates the Free Exercise Clause because it is intended "to suppress public expression of, and public support for, Zionist beliefs and to prevent Zionists from acting on their sincerely held religious belief[,]" (Dkt. 119, SAC at ¶ 233), must be dismissed, as plaintiffs have not adequately alleged a substantial burden on their religious exercise or practice.

       B.     Title VI and California Education Code Claims.

Plaintiffs also allege that defendants have violated Title VI as well as Cal. Educ. Code §§ 220, 51500, 51501 & 51225.3 because the challenged curriculum criticizes Israel and Zionism. (See Dkt. 119, SAC ¶¶ 237-258).  These allegations also fail to state a claim.

Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To state a Title VI claim, "a plaintiff must allege that (1) the entity involved is engaging in racial[, color, or national origin] discrimination; and (2) the entity involved is receiving federal financial assistance."  Fobbs v. Holy Cross Health Sys. Corp., 29 F.3d 1439, 1447 (9th Cir. 1994), overruled on other grounds by Daviton v. Columbia/HCA Healthcare Corp., 241 F.3d 1131 (9th Cir. 2001).  In addition, a plaintiff must allege that the discrimination was intentional.  See Schmitt v. Kaiser Foundation Health Plan of Washington, 965 F.3d 945, 953 (9th Cir. 2020) ("Title VI implies a private right of action for intentional discrimination.").  To allege intentional discrimination, a plaintiff  "must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs' membership in a protected class."  The Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 702-03 (9th Cir. 2009).

Here, there can be no liability against any of the individual defendants because they are not entities, and plaintiffs have failed to allege that UTLA or the Consortium are entities that receive federal financial assistance subject to Title VI.  (See, generally, Dkt. 119, SAC at ¶¶ 237-242); see Shotz v. City of Plantation, 344 F.3d 1161, 1169-70, n. 11 (11th Cir. 2003) (Title VI "precludes liability against those who do not receive federal funding, including individuals.").

Plaintiffs' Opposition – which consists of three sentences with no citations to any authority, (see Dkt. 129, Opp. at 29-30) – does not respond to this argument. (See, generally, id.). Plaintiffs have, therefore, conceded that their Title VI claim against the non-District defendants is insufficient. See Ramirez v. Ghilotti Bros., 941 F.Supp.2d 1197, 1210 & n. 7 (N.D. Cal. 2013) (collecting cases holding that a party concedes an argument by failing to respond to it).

Further, plaintiffs' Title VI claim fails because they "are not the intended beneficiaries of public schooling."[24]  Posey v. San Francisco Unified School District, 2023 WL 8420895, *2 (N.D. Cal. 2023); Smith, 2014 WL 5846990, at *4 ("The intended beneficiaries of federally funded public school programs are the students, not their parents."). Plaintiffs have failed to allege that they are the "intended beneficiar[ies]" of Title VI.  See Epileptic Found. v. City & Cnty. of Maui, 300 F.Supp.2d 1003, 1011 (D. Haw. 2003) ("To prevail on a Title VI claim . . . a plaintiff must prove (1) that he is an intended beneficiary of the federally-funded program the defendants participated in[.]") (internal quotation marks and alteration omitted). And although parents can assert Title VI claims on behalf of their children, see, e.g., Lopez v. Regents of Univ. of California, 5 F.Supp.3d 1106, 1114 (N.D. Cal. 2013) (noting that parents have standing to assert Title IX claims on behalf of students), the parent-plaintiffs here have not indicated an intention to do so. (See, generally, Dkt. 119, SAC). Accordingly, plaintiffs' Title VI claim must be dismissed.

Finally, because "the [California] Legislature intended Title IX's elements to govern an action under [Cal. Educ. Code] section 220[,]" Donovan v. Poway Unified Sch. Dist., 167 Cal.App.4th 567, 581 (2008), and because the intended beneficiaries of Title IX are identical to those of Title VI, see Cannon v. Univ. of Chicago, 441 U.S. 677, 695-96, 99 S.Ct. 1946, 1957

---

[24] Although Fobbs states that there is no requirement that a plaintiff allege that he or she was an intended beneficiary of a federally funded program, 29 F.3d at 1447, that decision was issued in 1994, years before the Supreme Court's pronouncements in Twombly and Iqbal in 2007 and 2009, respectively.  See, e.g., Smith v. California Bd. of Educ., 2014 WL 5846990, *4 (C.D. Cal. 2014) (applying Twombly and holding that "Plaintiff's Title VI claim is premised on the implausible, in fact, impossible, theory that parents of public school children are intended beneficiaries of public schooling.").

(1979), plaintiffs' claims under Cal. Educ. Code § 220, (see Dkt. 119, SAC at ¶¶ 246-58), must also be dismissed.[25]

As to the remaining portions of the California Education Code referenced in plaintiffs' SAC, Cal. Educ. Code §§ 51500,[26] 51501,[27] 51225.3(a)(1)(G)(ii),[28] (see Dkt. 119, SAC at ¶¶ 246-58), plaintiffs "agree that the statutes do not bind private parties" and reiterate their position that "the Defendants are acting as de facto public parties." (Dkt. 129, Opp. at 32) (emphasis omitted).  For the reasons discussed above, see supra § II.A.1., plaintiffs' argument that the non-District defendants are anything other than private parties is unavailing.

C.    First Amendment Considerations.

Finally, beyond the particular, claim-specific failures outlined above, it must also be noted that significant First Amendment concerns underlie plaintiffs' claims and requested relief.  See, e.g., Monteiro, 158 F.3d at 1026 (noting "the threat to First Amendment freedoms posed by efforts to prevent school boards from assigning the reading of [curricular material] on the ground that individuals or groups may find the contents injurious or offensive").  In effect, plaintiffs seek to litigate the propriety and legality of a potential curriculum with which they disagree.  Their claims

---

[25]  Additionally, because Cal. Educ. Code § 220 only applies to "educational institutions," see Cal. Educ. Code § 210.3, the non-District defendants cannot be held liable under this section.

[26]  This section provides that "[a] teacher shall not give instruction and a school district shall not sponsor any activity that promotes a discriminatory bias on the basis of race or ethnicity, gender, religion, disability, nationality, or sexual orientation, or because of a characteristic listed in Section 220."

[27]  This section provides that material "disapproved by the governing board of the school district" may not be used.

[28]  Although Cal. Educ. Code § 262.4 provides a private right of action to enforce Cal. Educ. Code § 220, it is unclear whether a private right of action exists to enforce Cal. Educ. Code § 51225.3(a)(1)(G)(ii), which requires school districts that develop ethnic studies courses to first present the course at a public meeting. See City of Lancaster v. Netflix, Inc. 99 Cal.App.5th 1093, 1105-06 (2024) (noting that to create a private right of action under California law, the statute should contain "clear, understandable, unmistakable terms" that "strongly and directly indicate that the Legislature intended to create a private cause of action").

thus conflict with the First Amendment in several respects, and are largely barred on that basis as well.

First, plaintiffs' claims directly implicate the First Amendment rights of the non-District defendants. Plaintiffs take issue with the non-District defendants' forms of discussion, expression, and petitioning in relation to the challenged curriculum. (See, e.g., Dkt. 119, SAC at ¶¶ 9-10, 45, 54-60, 109, 129, 172 & 225(c)) (objecting to various UTLA and Consortium activities, including funding, supporting, promoting, and hosting of workshops and events that discuss Palestine and Israel). Notwithstanding plaintiffs' insistence and disclaimers that they challenge only publicly-funded government activities, (see id. at ¶¶ 75 & 222-225), plaintiffs seek to have this court impose restrictions on the non-District defendants' protected speech. (See, e.g., id., Prayer for Relief at ¶ 6) (requesting an injunction "prohibiting all Defendants from using the elements of the LESMC at issue in this case . . . in any training sessions funded by public funds, or for which salary points are awarded by LAUSD"). In particular, plaintiffs seek to have the court suppress any speech by the non-District defendants in teacher-training sessions that might involve the use of "elements" of the challenged curriculum. (See id.).

But the non-District defendants have a right to express their views about the curriculum under the First Amendment and to petition for curricular changes under the Noerr-Pennington doctrine, which provides that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." Sosa v. DIRECTV, Inc., 437 F.3d 923, 929 (9th Cir. 2006). The doctrine also applies to state actors. See Empress LLC v. City & Cnty. of S.F., 419 F.3d 1052, 1056-57 (9th Cir. 2005). The non-District defendants thus have a protected right to express their views on, and petition for, an ethnic studies curriculum. See id. at 1057. Moreover, even if teaching the challenged curriculum were unlawful, and the non-District defendants encouraged the material to be taught, the non-District defendants' activities would be protected, as plaintiffs have not alleged incitement to imminent lawlessness

action.[29]  See Brandenburg, 395 U.S. at 447, 89 S.Ct. at 1829 ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

In their Opposition, plaintiffs try to walk back their claims and insist they are only after the alleged control that the non-District defendants exercise over the curriculum. (See, e.g., Dkt. 129, Opp. at 13) ("The claim is that . . . UTLA and the Consortium effectively are the government, because these Defendants are effectively the ones deciding what materials are being used to teach Ethnic Studies in LAUSD.").  But characterizing the non-District defendants' petitioning activities as effectively exercising state control does not change the fact that they are engaging in protected activity.

Second, plaintiffs maintain that the only speech they seek to suppress is that of teachers in LAUSD classrooms, (see, e.g., Dkt. 129, Opp. at 12) ("What is not at issue here is any expression other than classroom expression by public school teachers, on the clock and paid for with public money."), and specifically request that the court enjoin LAUSD teachers from teaching from the challenged curriculum.  (See Dkt. 119, SAC at Prayer for Relief).  But this request raises serious concerns about the First Amendment and principles of academic freedom.

Although high school teachers do not have freedom of speech to the full extent of the First Amendment, there is no doubt that "allowing the judicial system to process complaints that seek

---

[29]  Plaintiffs rely on Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827 (1969) for the proposition that the court may "prevent a speaker from counseling the commission of imminent lawless action [by LAUSD] when such counseling is likely to incite or produce such action."  (See Dkt. 129, Opp. at 33).  But there are no plausible allegations in the SAC to support such an assertion, (see, generally, Dkt. 119, SAC), and, in any event, the assertion conflicts with plaintiffs' contention that they, for example, "do not claim that UTLA is acting wrongfully by petitioning the government to include the challenged materials in the classroom, or to discuss with others what the curriculum should be or whether the law should be changed to allow Defendants to teach what they want." (Dkt. 129, Opp. at 12-13).  Indeed, according to plaintiffs, "[t]here is no claim that it is illegal for UTLA to speak to teachers about Ethnic Studies and there is no request that this Court order UTLA to stop doing so."  (Id. at 13).  Nor is there any claim "that the law is violated by Defendants' conduct of seminars showing teachers how to teach LESMC, and no relief is sought from the Court asking anyone to stop conducting such seminars."  (Id.).

to enjoin or attach civil liability to a school district's assignment of" curricular material could have broader, potentially chilling effects on speech.  See Monteiro, 158 F.3d at 1029.  In other words, while teachers' speech rights in the classroom may be reasonably abridged by their employers, such limitations are fundamentally different than speech restrictions imposed by a court at the behest of a group of private citizens.  See Garcetti v. Ceballos, 547 U.S. 410, 417-19, 126 S.Ct. 1951, 1957-59 (2006) (noting that the government may place limits on the speech of teachers in the scope of their employment); cf., Matthew Finkin & Robert Post, For the Common Good: Principles of American Academic Freedom at 149 (Yale Univ. Press 2009) (stating, with respect to higher education: "Academic freedom is not the freedom to speak or to teach just as one wishes.  It is the freedom to pursue the scholarly profession, inside and outside the classroom, according to the norms and standards of that profession.").  Confronted with a similar lawsuit over curricular material, the Ninth Circuit in Monteiro wrote:

> Were the plaintiff to succeed in this litigation or even to succeed in forcing the defendants to engage in a trial over such [curricular material], the threat of future litigation would inevitably lead many school districts to "buy their peace" by avoiding the use of books or other materials that express messages – or simply use terms – that could be argued to cause harm to a group of students. . . .  In short, permitting lawsuits against school districts on the basis of the content of literary works [or curriculum] to proceed past the complaint stage could have a significant chilling effect on a school district's willingness to assign [material] with themes, characters, snippets of dialogue, or words that might offend the sensibilities of any number of persons or groups.

Id. at 1029-30.

"The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting."  Monteiro, 158 F.3d at 1027 n. 5; see Board of Educ., Island Trees Union Free Sch. Dist. v. Pico, 457 U.S. 853, 867, 102 S.Ct. 2799, 2808 (1982) (plurality opinion) ("[T]he right to receive ideas is a necessary

predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.") (emphasis omitted).  Students have a right to receive information and "lawsuits threatening to attach civil liability on the basis of the assignment of [curricular material] would severely restrict a student's right to receive material that his school board or other educational authority determines to be of legitimate educational value."  Monteiro, 158 F.3d at 1028.

The Supreme Court has also noted "the importance of protecting the 'robust exchange of ideas[.]'"  C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist., 654 F.3d 975, 988 (9th Cir. 2011) (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683 (1967).  By their nature, these exchanges may sometimes involve uncomfortable conversations – but a system of education "which discovers truth out of a multitude of tongues" must allow teachers and their students to explore difficult and conflicting ideas.  Id. (noting the necessity of academic freedom) (internal quotation marks omitted).  "[W]e must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective."  Id.; see also id. (Although "teachers must be sensitive to students' personal beliefs and take care not to abuse their positions of authority," "teachers must also be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities.").

Determining the content of curricula is a complicated, important matter, and it is for this reason that school boards generally retain broad discretion in doing so, see Monteiro, 158 F.3d at 1026-27, and that teachers must have some discretion and academic freedom in implementing and teaching the curriculum.  See C.F. ex rel. Farnan, 654 F.3d at 988 ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding[.]").  It would be of great concern for the educational project and for academic freedom if every offended party could sue every time they did not like a curriculum or the way it was taught.  See Monteiro, 158 F.3d at 1029; Brown v. Woodland Joint Unified School District, 27 F.3d 1373, 1379 (9th Cir. 1994) ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would

be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee[.]'").

In short, the broader First Amendment considerations at play in this case reaffirm the court's conclusion.  See Monteiro, 158 F.3d at 1029 (finding that requested injunctive relief would "restrict the students' First Amendment freedoms and significantly interfere with the District's discretion to determine the composition of its curriculum").  Accordingly, the court dismisses plaintiffs' claims for failure to state a claim under Rule 12(b)(6).

III.    THE ANTI-SLAPP STATUTE.

"The anti-SLAPP statute enables courts, early in litigation, to strike meritless claims in lawsuits when those claims risk chilling 'continued participation in matters of public significance.'" Serova v. Sony Music Ent., 13 Cal.5th 859, 871 (2022) (quoting Cal. Civ. Proc. Code § 425.16(a)). The statute, codified at California Code of Civil Procedure § 425.16 ("§ 425.16 "), provides for a special motion to strike a "strategic lawsuit against public participation":

> A cause of action against a person arising from any act of that person in
> furtherance of the person's right of petition or free speech under the United
> States or California Constitution in connection with a public issue shall be
> subject to a special motion to strike, unless the court determines that the
> plaintiff has established that there is a probability that the plaintiff will prevail
> on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1).

A court considering a motion to strike under the anti-SLAPP statute must perform a two-step analysis:

> First, the court decides whether the defendant has made a threshold showing
> that the challenged cause of action is one arising from protected activity.  The
> moving defendant's burden is to demonstrate that the act or acts of which the
> plaintiff complains were taken in furtherance of the [defendant]'s right of
> petition or free speech under the United States or California Constitution in
> connection with a public issue, as defined in the statute.  If the court finds

such a showing has been made, it then determines whether the plaintiff has
demonstrated a probability of prevailing on the claim. . . .  The defendant has
the burden on the first issue, the threshold issue; the plaintiff has the burden
on the second issue.

Mallard v. Progressive Choice Ins. Co., 188 Cal.App.4th 531, 537 (2010) (alteration in original)
(internal quotation marks and citations omitted); see AT&T Mobility, LLC v. Bowlin, 2022 WL
1046251, *1 (9th Cir. 2022) ("We engage in a two-part inquiry in considering a motion to strike
under the anti-SLAPP statute'").  "[O]nly a claim that satisfies both prongs of the anti-SLAPP
statute . . . is a SLAPP, subject to being stricken under the statute."  Serova, 13 Cal.5th at 872
(internal quotation marks and emphasis omitted).  Where, as here, "an anti-SLAPP motion to strike
challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of
Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated."  Planned
Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress, 890 F.3d 828, 834 (9th Cir.), as
amended, 897 F.3d 1224 (9th Cir. 2018).

The anti-SLAPP statue applies to all "act[s] . . . in furtherance of [a] person's right of petition
or free speech under the United States or California Constitution in connection with a public issue."
Cal. Civ. Proc. § 425.16(b)(1).  The statute defines four categories of protected activity:

(1) any written or oral statement or writing made before a legislative,
executive, or judicial proceeding, or any other official proceeding authorized
by law, (2) any written or oral statement or writing made in connection with
an issue under consideration or review by a legislative, executive, or judicial
body, or any other official proceeding authorized by law, (3) any written or
oral statement or writing made in a place open to the public or a public forum
in connection with an issue of public interest, or (4) any other conduct in
furtherance of the exercise of the constitutional right of petition or the
constitutional right of free speech in connection with a public issue or an
issue of public interest.

1    Id. at §§ 425.16(e)(1) - (e)(4).  The non-District defendants contend that "Plaintiffs' claims [about

2    Defendants' conduct] fall into at least three of these categories."  (Dkt. 122, UTLA MTS at 7).

3        Section 425.16(e)(4) – the catchall provision – covers "any other conduct in furtherance of

4    the exercise of the constitutional right of petition or the constitutional right of free speech in

5    connection with a public issue or an issue of public interest."  Cal. Civ. Proc. § 425.16(e)(4).  In

6    FilmOn.com Inc. v. DoubleVerify Inc., 7 Cal.5th 133 (2019) ("FilmOn"), the California Supreme

7    Court articulated a two-step inquiry "to determine whether the conduct from which the lawsuit

8    arises falls within the catchall."  Geiser v. Kuhns, 13 Cal.5th 1238, 1246 (2022).  The first step is

9    to determine what "public issue or . . . issue of public interest is implicated by the challenged

10   activity."[30]  Id. (internal quotation marks omitted).  The second step is to "look to the 'functional

11   relationship' between the challenged activity and the public issue it implicates, and ask whether

12   the activity contributed to public discussion of that issue."  Id. (citation omitted).

13       In Geiser, issued three years after FilmOn, the California Supreme Court clarified the first

14   step of the analysis discussed in FilmOn.  The Court held that "FilmOn's first step is satisfied so

15   long as the challenged speech or conduct, considered in light of its context, may reasonably be

16   understood to implicate a public issue, even if it also implicates a private dispute.  Only when an

17   expressive activity, viewed in context, cannot reasonably be understood as implicating a public

18   issue does an anti-SLAPP motion fail at FilmOn's first step."  Geiser, 13 Cal.5th at 1253-54.  The

19   Geiser Court concluded that in certain cases, "it may be more efficient to look to the whole context

20   from which the conduct underlying the lawsuit arises, rather than attempting to parse which

21   considerations fall under one of FilmOn's two steps."  Id. at 1256.

22       Geiser's approach of looking at "the whole context from which the conduct underlying the

23   lawsuit arises," 13 Cal.5th at 1256, is appropriate here given that plaintiffs' SAC is full of

24   allegations attacking anti-Zionist views and, at times, irrelevant and contradictory allegations about

25

26       [30]  "The statutory phrases 'public issue' and an 'issue of public interest' seem to refer to the
     same thing: it is difficult to imagine a 'public issue' that is not an 'issue of public interest,' and vice
27   versa.  Our parties do not distinguish between these two phrases, so any difference does not
     matter here.  We simplify by referring interchangeably to 'public issues' and 'issues of public
28   interest.'"  Dubac v. Itkoff, 101 Cal.App.5th 540, 548 (2024) (emphasis omitted).

the non-District defendants' conduct. (See, e.g., Dkt. 119, SAC at ¶¶ 40-63, 70-74, 91-111, 114-131, 172-221 & 225). Plaintiffs' SAC spends dozens of paragraphs describing the non-District defendants' public statements and conduct – which plaintiffs allege are antisemitic, (see, e.g., id.) – and concludes that they are "introducing, attempting to introduce, teaching, and planning to teach in LAUSD classes" the challenged materials. (Id. at ¶ 85). Elsewhere, the SAC alleges that "[a]mong the political positions that Defendants are promoting and attempting to promote in California's public school classes including LAUSD are that Israel's existence and Zionism are morally wrong[.]" (Id. at ¶ 111). In other words, the non-District defendants' public advocacy, statements, and conduct relating to their views on the proposed curriculum is the gravamen of plaintiffs' action. (See id.). And here, "[t]he context makes clear that" the non-District defendants' advocacy is intended to further "public discussion of the public issues [their advocacy has] implicated." Geiser, 13 Cal.5th at 1255. Indeed, the non-District defendants' alleged conduct in this case "is a paradigmatic example" of "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code § 425.16(e)(4); see Geiser, 13 Cal.5th at 1255; see also Knox v. Serv. Emps. Int'l Union, Loc. 1000, 567 U.S. 298, 321-22, 132 S.Ct. 2277, 2295 (2012) ("Public-sector unions have the right under the First Amendment to express their views on political and social issues without government interference.").

For reasons similar to those discussed above, see supra § II., plaintiffs' contention that the non-District defendants are not shielded by the anti-SLAPP statute because they "effectively are the government, because these Defendants are effectively the ones deciding what materials are being used to teach[,]" (Dkt. 129, Opp. at 13), is unavailing. With respect to the Consortium defendants, plaintiffs allege that the Consortium "exercises public power by participating directly in the writing of LESMC teaching materials with paid employees of the LAUSD for use in publicly-funded classrooms," but provide no detail regarding how the Consortium does this beyond listing various public materials that the Consortium offers. (See, generally, id. at ¶ 51). As for the UTLA defendants, plaintiffs allege that they exercise power through their ability to appoint members to the ESC, which is authorized "to 'provide input' on . . . the development or selection of curriculum

1    and teaching materials to be purchased for Ethnic Studies[.]" (Id. at ¶ 35).  Plaintiffs allege that

2    the non-District defendants who serve on the ESC engage in state action, but do not identify any

3    specific conduct by the ESC that is at issue.  (See, generally, id. at ¶¶ 36 & 52).

4         According to plaintiffs, they "seek no relief in any way suppressing any of these statements

5    or limiting Defendants' right to make them[,]" (Dkt. 119, SAC at ¶ 75), and "the activity at issue is,

6    and is only, what is said and done in public school classrooms during class time." (Dkt. 129, Opp.

7    at 16).  But plaintiffs' contentions are belied by the substance of their SAC and the arguments in

8    their Opposition – the SAC focuses on the non-District defendants' actions and speech outside

9    of the classroom, (see, e.g., Dkt. 119, SAC at ¶¶ 40-63, 71-74, 101-111, 114-121, 128-29 & 172-

10   191), and plaintiffs' Opposition argues that the non-District defendants should be enjoined from

11   encouraging teachers to use the challenged materials.  (See Dkt. 129, Opp. at 33).

12        Far from challenging governmental conduct, plaintiffs' complaint seems to be with the fact

13   that the non-District defendants are advocating for curricular offerings with which plaintiffs

14   disagree.  For instance, plaintiffs write that their "claim is that, when it comes to choosing Ethnic

15   Studies materials in LAUSD, the decision by the District to require the course but not say how to

16   teach it has left a vacuum into which the Defendants have inserted themselves[.]" (Dkt. 129, Opp.

17   at 13).  However, the manner in which the non-District defendants "have inserted themselves[,]"

18   (id.), is what the anti-SLAPP statute is designed to protect – namely, "conduct in furtherance of

19   the exercise of the constitutional right of petition or the constitutional right of free speech in

20   connection with a public issue or an issue of public interest."  Cal. Civ. Proc. Code § 425.16(e).

21        Finally, even if the court were persuaded that the SAC contains some allegations that

22   describe government-related conduct by the non-District defendants, this would not change the

23   court's conclusion.  "[A] plaintiff cannot frustrate the purposes of the SLAPP statute through a

24   pleading tactic of combining allegations of protected and nonprotected activity under the label of

25   one 'cause of action[,]'" Fox Searchlight Pictures, Inc. v. Paladino, 89 Cal.App.4th 294, 308 (2001),

26   for "it is the principal thrust or gravamen of the plaintiff's cause of action that determines whether

27   the anti-SLAPP statute applies[.]"  Martinez v. Metabolife Internat., Inc., 113 Cal.App.4th 181, 188

28   (2003) (emphasis omitted).  Nor can plaintiffs rely on a "disclaimer" in their pleading (or

1    Opposition) to avoid application of the anti-SLAPP statute where, as here, protected conduct forms

2    the basis of their claims.  See, e.g., Finato v. Keith A. Fink & Assocs., 68 Cal.App.5th 136, 151

3    (2021) ("The disclaimer in paragraph 91 of the FAC was nothing more than 'artful pleading' . . .

4    and the trial court should have disregarded it.") (citation omitted).

5           Under the circumstances, the court finds that the non-District defendants have satisfied

6    FilmOn's two-step inquiry, as clarified by Geiser, and established that "the conduct from which the

7    lawsuit arises falls within the catchall."  Geiser, 13 Cal.5th at 1246.  That is, the non-District

8    defendants have shown that their speech, other conduct, and advocacy relating to LAUSD's

9    potential ethnic studies curriculum implicate and compel public discussion of public issues.[31]  See

10   id. at 1256 ("In cases like this one, it may be more efficient to look to the whole context from which

11   the conduct underlying the lawsuit arises, rather than attempting to parse which considerations

12   fall under one of FilmOn's two steps.").

13          Having concluded that defendants have made a showing that the challenged causes of

14   action arise from protected activity under the anti-SLAPP statute, the burden shifts to plaintiffs to

15   demonstrate a probability that they will prevail on their claims.  See Cal. Civ. Proc. Code

16   § 425.16(b)(1); Park v. Board of Trustees of California State University, 2 Cal.5th 1057, 1061

17   (2017) ("If the defendant carries its burden, the plaintiff must then demonstrate its claims have at

18   least minimal merit.") (internal quotation marks omitted).  This burden includes overcoming any

19   legal defense raised by defendants.  Curtain Maritime Corp. v. Pacific Dredge & Construction,

20   LLC, 76 Cal.App.5th 651, 668 (2022).  As discussed above, even accepting the allegations as

21   true, and viewing them in the light most favorable to plaintiffs, see Erickson, 551 U.S. at 93-94,

22   127 S.Ct. at 2200, the court is persuaded that plaintiffs have failed to put forth sufficient allegations

23   to state legally valid claims.  That is, plaintiffs have not sufficiently alleged a probability that they

24   _____

25   [31] Since a defendant need only demonstrate that conduct falls within any one of the four
     categories of the anti-SLAPP statute, see City of Cotati v. Cashman, 29 Cal.4th 69, 75-76 (2002)

26   ("[S]ection 425.16 expressly defines the types of claims that are subject to the anti-SLAPP
     procedures . . . i.e., causes of action arising from any act of protected speech or petitioning as

27   these terms are defined in subdivision (e)(1)-(4) of the statute.") (citation omitted), the court will
     not address whether defendants' conduct is covered by the other categories raised by defendants.

28   (See Dkt. 122, UTLA MTS, at 16-18).

1  can prevail on any of their claims, as their claims are either legally insufficient or barred as a

2  matter of law.  See Robinson v. Alameda Cnty., 875 F.Supp.2d 1029, 1050 (N.D. Cal. 2012)

3  ("Although a Rule 12(b)(6) Motion does not moot an anti-SLAPP motion to strike, it demonstrates

4  that the Plaintiff cannot show probability of success on the merits of her claim.").  Accordingly, the

5  court strikes plaintiffs' state law claims against the non-District defendants under § 425.16(c)(1).

6  See Hilton v. Hallmark Cards, 599 F.3d 894, 901 (9th Cir. 2010) ("[T]he anti-SLAPP statute does

7  not apply to federal law causes of action.").

8       "Speech is often provocative and challenging."  Terminiello v. Chicago, 337 U.S. 1, 4, 69

9  S.Ct. 894, 896 (1949).  Here, it is clear that plaintiffs find the non-District defendants' speech and

10 other conduct relating to the development and implementation of an ethnic studies curriculum to

11 be "provocative and challenging."  "But our legal tradition recognizes the importance of speech and

12 other expressive activity even when – perhaps especially when – it is uncomfortable or

13 inconvenient."  Geiser, 13 Cal.5th at 1256.

14 IV.   LEAVE TO AMEND.

15      Rule 15 of the Federal Rules of Civil Procedure provides that the court "should freely give

16 leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2); see Morongo Band of

17 Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) (The policy favoring amendment

18 must "be applied with extreme liberality.").  However, "[i]t is settled that the grant of leave to amend

19 the pleadings pursuant to Rule 15(a) is within the discretion of the trial court."  Zenith Radio Corp.

20 v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971).  "[T]he district court's

21 discretion to deny leave to amend is particularly broad where plaintiff has previously amended the

22 complaint."  Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058

23 (9th Cir. 2011); see Wagh v. Metris Direct, Inc., 363 F.3d 821, 830 (9th Cir. 2003), overruled on

24 other grounds, Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir. 2007) (en banc).

25      Here, having liberally construed the allegations in the SAC, the court is persuaded that

26 plaintiffs' claims cannot be saved through amendment, and sees no basis to give plaintiffs a fifth

27

28

1    opportunity to amend their complaint.[32]  See Chodos v. West Publ'g Co., 292 F.3d 992, 1003 (9th

2    Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in

3    deciding subsequent motions to amend is particularly broad.") (internal quotation marks omitted);

4    see also Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000) ("Courts are not required to grant

5    leave to amend if a complaint lacks merit entirely.").  Plaintiffs provide no indication as to what

6    additional facts they could add to cure the deficiencies in the SAC.  (See, generally, Dkt. 129, Opp.

7    at 14, 28 & 34-35); see, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1072

8    (9th Cir. 2008) ("[T]he parties' dismissal briefing below . . . confirms that [plaintiff's] prior

9    amendments were intended to cure the deficiencies that lead us to affirm dismissal here[.] . . .

10   [Plaintiff] points to no additional facts that it might allege to cure those deficiencies, which persisted

11   in every prior iteration of the [complaint]."); Espy v. J2 Global, Inc., 99 F.4th 527, 542 (9th Cir.

12   2024) (assuming plaintiff identified "new" facts, plaintiff failed to explain how the new facts

13   "rescue[d]" his claims and his "vague promise of 'additional information' [could not] cure the

14   deficiencies in the complaint").  Although plaintiffs suggest that allowing discovery regarding the

15   challenged curriculum will enable them "to establish the violations of plaintiffs' civil rights[,]" (Dkt.

16   129, Opp. at 14), the court is not persuaded that discovery is necessary, as plaintiffs extensively

17   quoted from and described the challenged curriculum.  (See, e.g., Dkt. 119, SAC at ¶¶ 15, 111,

18   116-18, 119, 129, 130, 174, 177, 181, 191 & 225(a)).  Indeed, plaintiffs state that the SAC

19   "contains much of the discriminatory teaching material designed by Defendants and caused by

20   them to be used in Los Angeles public schools."  (Id. at ¶ 225(a)).  Finally, given that plaintiffs'

21   claims are barred as a matter of law, see supra §§ I. & II., the court is not persuaded that

22   discovery is necessary for plaintiffs to establish that they have, for example, standing, let alone

23   that they have sufficiently alleged facts to state a viable claim.  See, e.g., Reddy v. Litton Indus.,

24   Inc., 912 F.2d 291, 296 (9th Cir. 1990) (denying leave to amend where plaintiff lacked standing)

25   Flores v. GMAC Mortg., LLC, 2013 WL 2049388, *4 (N.D. Cal.2013) ("[T]he Court finds that leave

26   to amend here would be futile where plaintiffs will not be able to establish standing based on their

27   ─────────────

28        [32]  As noted earlier, the SAC is, in fact, plaintiffs' third amended complaint.  See supra note 5.

core allegations."); see also Diamond S.J. Enter., Inc. v. City of San Jose, 395 F.Supp.3d 1202, 1222 (N.D. Cal. 2019), aff'd, 100 F.4th 1059 (9th Cir. 2024) ("[I]t would be unduly prejudicial to Defendant to litigate a third motion to dismiss regarding the same deficiencies."). Accordingly, plaintiffs' SAC will be dismissed without leave to amend.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1.  UTLA defendants' Motion to Dismiss and Motion to Strike **(Document Nos. 121 & 122)**, LESMCC defendants' Motion to Dismiss and Motion to Strike **(Document Nos. 124 & 125)**, and nominal defendant LAUSD's Motion to Dismiss **(Document No. 123)** are **granted**.

2.  Plaintiffs' SAC **(Document No. 119)** is **dismissed with prejudice.**

3.  Judgment shall be entered accordingly.

Dated this 30th day of November, 2024.


_____
/s/
Fernando M. Olguin
United States District Judge